**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name  LUJAN,  Leroy P.
    (Last)         (First)      (Initial)

Prisoner Number  E-76840

Institutional Address  Correctional Training Facility, P.O. Box 689,
East Dorm 8-Low, Soledad, CA. 93960-0689

---

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

LEROY PAUL LUJAN
(Enter the full name of plaintiff in this action.)

      vs.

Ben Curry, Warden (A)

_____

_____

_____

(Enter the full name of respondent(s) or jailor in this action)

CV 08 Case No. 0474
(To be provided by the clerk of court)

**PETITION FOR A WRIT
OF HABEAS CORPUS**

---

<u>Read Comments Carefully Before Filling In</u>

<u>When and Where to File</u>

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

1    <u>Who to Name as Respondent</u>

2            You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6            If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10    A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11            1. What sentence are you challenging in this petition?

12            (a)    Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14    <u>Superior Court</u>                    <u>Orange County</u>

15            Court                            Location

16            (b)    Case number, if known ___C-76180_____

17            (c)    Date and terms of sentence __15 Yeras to Life_____

18            (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                   parole or probation, etc.)        Yes <u>XXX</u>    No _____

20                   Where?

21            Name of Institution: <u>Correctional Training Facility</u>

22            Address: __P.O. Box 689, Soledad, CA. 93960-0689__

23            2. For what crime were you given this sentence? (If your petition challenges a sentence for

24    more than one crime, list each crime separately using Penal Code numbers if known. If you are

25    challenging more than one sentence, you should file a different petition for each sentence.)

26    P.C. §187, 2nd Degree, P.C. §182/145(a), P.C. §245(a)1.

27    _____

28    _____

PET. FOR WRIT OF HAB. CORPUS            - 2 -

3. Did you have any of the following?

    Arraignment:                   Yes <u>XXX</u>    No _____

    Preliminary Hearing:        Yes <u>XXX</u>    No _____

    Motion to Suppress:         Yes _____    No _____

4. How did you plead?

    Guilty <u>XXX</u>    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury _____    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?        Yes _____    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment           Yes <u>XXX</u>    No _____

    (b)    Preliminary hearing     Yes <u>XXX</u>    No _____

    (c)    Time of plea           Yes <u>XXX</u>    No _____

    (d)    Trial                 Yes _____    No _____

    (e)    Sentencing           Yes <u>XXX</u>    No _____

    (f)    Appeal               Yes _____    No _____

    (g)    Other post-conviction proceeding    Yes _____    No _____

8. Did you appeal your conviction?        Yes _____    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal           Yes _____    No _____

        Year: _____    Result: _____

        Supreme Court of California    Yes _____    No _____

        Year: _____    Result: _____

        Any other court           Yes _____    No _____

        Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1        petition?                  Yes \_\_\_\_\_     No\_\_\_\_\_

2    (c)    Was there an opinion?         Yes \_\_\_\_\_     No\_\_\_\_\_

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                              Yes \_\_\_\_\_     No\_\_\_\_\_

5        If you did, give the name of the court and the result:

6        _____

7        _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?     Yes <u>XXX</u>    No\_\_\_\_\_

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17              questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: <u>Superior Court of CA., Orange Co.</u>

19         Type of Proceeding: <u>Writ of Habeas Corpus</u>

20         Grounds raised (Be brief but specific):

21         a. <u>Due Process Vioaltion by BPH</u>

22         b. <u>Due Process vioaltion by BPH</u>

23         c._____

24         d._____

25         Result: <u>DENIED</u>        Date of Result: <u>N/A</u>

26    II.    Name of Court: <u>Crt. of Appeal, Fourth App. Dist.</u>

27         Type of Proceeding: <u>Writ of Habeas Corpus</u>

28         Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS     - 4 -

a. Due Process Violation by BPH _____

b. _____

c. _____

d. _____

Result: __DENIED_____ Date of Result: 8/30/07

III.   Name of Court: Cal. State Supreme Court _____

Type of Proceeding: Wrt.Hab.Corpus/Pet.fr.Review _____

Grounds raised (Be brief but specific):

a. Due Process Vioaltion by BPH _____

b. _____

c. _____

d. _____

Result: __DENIED REVIEW_____ Date of Result: 11/14/07

IV.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

                                Yes _____    No _____

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1   need more space.  Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:  See attached Writ of Habeas Corpus

6        _____

7        Supporting Facts:  See attached Writ of Habeas Corpus

8        _____

9        _____

10       _____

11       Claim Two:  See attached Writ of Habeas Corpus

12       _____

13       Supporting Facts:   See attached Writ of Habeas Corpus

14       _____

15       _____

16       _____

17       Claim Three:_____

18       _____

19       Supporting Facts:_____

20       _____

21       _____

22       _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____

26   _____

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:

4   See attached Table of Authorities

5   _____

6   _____

7   Do you have an attorney for this petition?                    Yes_____    No _XXX_

8   If you do, give the name and address of your attorney:

9   _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _1/10/08_                       _Leroy Lujan_

14             Date                            Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

# TABLE OF CONTENTS

Topic                                                          Pages

Index .............................................i,ii

Points and Authorities ........................iii,iv,v,vi

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY INTEREST IN THE EXPECTATION OF PAROLE UNDER PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME OF INCARCERATION.
.............................................1

A. EXISTENCE OF A LIBERTY INTEREST
.............................................1

B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY
.............................................4

<u>GROUND ONE:</u>

THE BOARD'S DECISION TO DENY PAROLE IS OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY "SOME EVIDENCE" CONTAINING AN INDICIA OF RELIABILITY.
.............................................5

<u>GROUND TWO:</u>

THE BOARD'S FINDING OF UNSUITABILITY AND REFUSAL OF THE GRANTING OF PAROLE VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE" IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION.
.............................................8

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT PETITIONER POSES AN "UNREASONABLE RISK" OF THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE. THE DECISION WAS WITHOUT EVIDENCE AND WAS ARBITRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL DUE PROCESS.
.............................................11

B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT PROHIBITS STATE ACTION THAT DEPRIVES A PERSON OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS OF LAW.
.............................................15

<u>GROUND THREE:</u>

THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY RELYING ON THE UNCHANGING FACTS OF THE CRIME IN THE FACE OF CLEAR EVIDENCE OF REHABILITATION,

## TABLE OF CONTENTS (continued)

Topic                                                                Pages

(GROUND THREE cont.)
    AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
    BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
    EGREGIOUSNESS  IS  BARRED  BY  THE  INMATES
    COMPLIANCE WITH THOSE AGREED TERMS. .....................16

    A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF
       THE CRIME VIOLATES DUE PROCESS.
                                  .....................18

    B. CONTINUED RELIANCE UPON FACTS OF THE CRIME
       VIOLATES DUE PROCESS.
                                  .....................22

    C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
       UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
       AND THE LIBERTY INTERESTS OF INMATES. THE ESSENCE
       OF THE PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS
       WHO NO LONGER POSE A PUBLIC DANGER.
                                  .....................25

    D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
       N PAROLE DECISIONS.
                                  .....................27

    E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY
       HEARING.
                                  .....................28

CONCLUSION                        .....................30

PRAYER FOR RELIEF                 .....................31

### POINTS AND AUTHORITIES

Name/Title

In re Bramble
(1947) 31 Cal.2d 43, 51 [6] P.2d 411

People v. Stuart
(1956) 47 Cal.2d 167, 175 [7] 302 P.2d 5, 55 A.L.R.2d 705

People v. Smith
(1955) 44 Cal.2d 77, 79 [2] 279 P.2d 33

In re McVickers
(1946) 29 Cal.2d 264, 278, 176 P.2d 40

People v. Valentine
(1946) 28 Cal.2d 121, 143 [20] 159 P.2d 1

People v. Ralph
(1944) Cal.2d 575, 581 [2] 150 P.2d 401

Biggs v. Terhune
(9th Cir. 2003) 334 F.3d 910, 914, 915,916

In re Ramirez
(2001) 94 Cal.App.4th 549, 564-565, 571

Edward v. Balisok
(1997) 520 U.S 541, 648

In re Caswell
92 Cal.App.4th 1017, 1029

People v. Dubon
90 Cal.App.4th 949, 952, (2001)

Charlton v. Federal Trade Comm.
543 F.2d 903-907, 908 (D.C. Cir. 1976)

McQuillion v. Duncan
306 F.3d 901-910, (9th Cir. 2002)

In re Smith
109 Cal.App.4th 489 (2003)

Kentucky Dept of Corrections v. Thompson
490 U.S. 454, 459-460 (1989)

Board of Pardons v. Allen
(1987) 482 U.S. 369, 376-78

Greenholtz v. Inmates of Neb. Penal & Corr. Complex
(1979) 442 U.S. 1, 11-12

## POINTS AND AUTHORITIES (continued)

Name/Title

U.S. v. Guagliardo
275 F.3d 868-872, (9th Cir. 2002)

Graynet v. City of Rockford
408 U.S. 104, 108-109 (1972)

Irons v. Warden
358 F.Supp.2d 936 (E.D. Cal. 2005)

In re Scott
34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595

Shaputis
37 Cal.Rptr.3d at 335

In re Rosenkrantz
29 Cal.4th at 654-661

In re Smith
114 Cal.App.4th 343, 370,372

Caswell v. Calderon
363 F.3d 832, 389 (9th Cir. 2004)

Scott
119 Cal.4th at 899

Scott
133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920

Superintendent v. Hill
472 U.S 445, 455-457 (1985)

In re Minnis
(1972) 7 Cal.3d 639, 643, n.2

People v. Morse
(1964) 60 Cal.2d 631, 643, n.8

Masoner
2004 WL1090177 *1-2

Bair
2005 WL2219220 *12 n.3

Williams v. State of New York
(1949) 337 U.S. 241, 247

Sass v. Calif. Board of Prison Terms
376 F.Supp.2d (E.D. Cal. 2005)

<b>POINTS AND AUTHORITIES (continued)</b>

<u>Title/Name</u>

In re Lee
49 Cal.Rptr.3d 931

In re Elkins
50 Cal.Rptr.3d 503

Rosenkrantz v. Marshall
774 F.Supp.2d, 1063 (C.D. Cal. 2006)

Blankenship v. Kane,
2006 WL5215627 *3 (N.D. Cal. 2006)

Murille v. Perez
2005 L2592420 *3n.1. (C.D. Cal. 2005)

Siafullah v. Carey
2005 WL1555389 *8 (E.D. Cal. 2005)

Superintendent Steve Lomas Hill
472 U.S. at 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985)

Rojas v. Neilson
428 F.3d 1229, 1232, (9th Cir. 2005)

Sanchez v. Kane,
444 F.Supp.2d 1049 (C.D.Cal. 2006)

Delgado v. Lewis
233 F.3d 976, 982 (9th Cir. 2000)

Pham v. Terhune
400 F.3d 740, 742 (9th Cir. 2005)

Hines v. Thompson
336 F.3d 848, 853 (9th Cir. 2003)

Pirtle v. Morgan
313 F.3d 1160 , 1167 (9th Cir. 2002)

Powell v. Gomez
33 F.3d 39, 40

Earp v. Oronski
(9th Cir. 2003) 372 U.S. 293 (1963)

Keeney v. Tamaya-Reyes
504 U.S. 1, 5 1992

Taylor v. Maddox
(9th Cir. 2004) 336 F.3d 992, 1001.

-v-

1

<u>POINTS AND AUTHORITIES (continued)</u>

2

Title/Name

3

In re Lawrence
(May 22, 2007) Cal.Rptr.3d WL1475283

4

In re Elkins
(2006) 144 Cal.App.4th 475, 487

5

6

In re Lee
(2006) 143 Cal.App.4th 1400, 1408

7

In re Barker
May 29, 2007, DJDAR 7548

8

9

Martin v. Marshall
431 F.Supp.2d at p.1047

10

CCR, Title 15, Division 2
     §2000(b)(49)
     §2000(b)(62)(90)
     §2402
     §2402(a)(b)

11

12

13

Penal Codes
     §3041
     §3041(a)
     §3041(b)

14

15

16

Evidence Code
     §115

17

California Constitution, Article V
     §8(b)

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY INTEREST IN THE EXPECTATION OF PAROLE UNDER PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME OF INCARCERATION.**

The due process clause of the 5th and 14th Amendment prohibits a state action that deprives a person of life, liberty or property without due process.

However, a person alleging such a violation must establish that (a), he had protection; (b) that he was deprived of such a protection; and, (c) that the procedure which led to the deprivation was constitutionally deficient. Kentucky Dept. of Corrections v. Thomas, 490 U.S 459-460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

### A. EXISTENCE OF A LIBERTY INTEREST.

The Supreme Court held in 1979, and reiterated in 1987 that, "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and then, thereby, gives rise to a constitutionally protected 'Liberty Interest'". McQuillion v. Duncan, supra, 306 F.3d at 901, (citing Greenholtz v. Nebraska Penal Institute, 442 U.S. I, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and Board of Pardons v. Allen, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

Recently, our Ninth Circuit has "held" that California's parole scheme created such a liberty interest because Penal Code §3041 uses mandatory language and is similar to the Nebraska and Montana statues addressed in Greenholtz, supra, and

1  Allen, supra. (See McQuillion, supra, 306 F.3d at 901-901).

2  Not only did the Ninth Circuit hold that "Section 3041 of

3  the Penal Code creates in every inmate a cognizable liberty

4  interest in parole which is protected by the procedural

5  safeguards of the due process clause," but further held that

6  "the interest arises upon the incarceration of the inmate."

7  Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).

8  Two United States Supreme Court decisions, Greenholtz v.

9  Inmates of Nebraska Penal and Correctional Complex, (1979) 442

10  U.S. 1, 12, decided in 1979 and Board of Pardons v. Allen,

11  (1987) 482 U.S. 369, 381, decided in 1987, held the Federal Due

12  Process Clause creates a constitutional liberty interest for

13  convicted persons in certain jurisdictions. The existence of

14  this right depends on whether the state employs "mandatory

15  language" indicating parole will be granted if certain findings

16  are made, Board of Pardons v. Allen, supra, 482 U.S. at pages

17  377-381. In 2002 the Ninth Circuit examined the California

18  parole scheme in MQuillion v. Duncan, (9th Cir. 2002) 306 F.3d

19  895 and found it "uses mandatory language and is largely

20  parallel to the schemes found in Greenholtz and Allen,"

21  McQuillion v. Duncan, supra, 306 F.3d at page 901. Accordingly,

22  the McQullion court found a "liberty interest" was created under

23  the federal constitution for state prisoners in California,

24  McQullion v. Duncan, supra, 306 F.3d at page 901.

25  While it is true post McQuillion, the California Supreme

26  Court had occasion to visit and decide in In re Dannenberg that

27  "life" prisoners did not have a liberty interest in the

28  expectation that the Board of Parole Hearings would engage in

-2-

1  "uniform term" analysis under Penal Code §3041(a) _if_ it
2  demonstrated that public safety warranted denial of parole under
3  §3041(b). That court _did not_ hold, however, that there is _no_
4  protected liberty interest in parole whatsoever. Indeed,
5  California courts have continued to analyze such claims. See _In
6  re Shaputis_, 135 Cal. App. 4th, 217, 224, 231-232, Cal.Rptr.3d
7  324 (citing _Dannenberg_); _In re Scott_, 133 Cal.App.4th 573, 34
8  Cal.Rptr.3d 905 (2005); _In re Lee_, 49 Cal.Rptr.3d 931; _In re
9  Elkins_, 50 Cal.Rptr.3d 503; _In re Lawrence_, (May 22, 2007),
10 Cal.Rptr.3d WL1475283. Post _Dannenberg_, even federal courts have
11 uniformly, save one District court decision (Eastern District of
12 California), which seemingly reversed itself in its very next
13 case, [see _Sass v. California Board of Prison Terms_, 376
14 F.Supp.2d, 975, 982 (E.D. Cal. 2005), which was recently
15 overrulled by the Ninth Circuit in _Sass v. Board of Prison Terms_
16 376 F.Supp.2d, 975, 982, (9th Cir. 2006), and is currently under
17 appeal. (See and compare _Sass_, _supra_, to _Bair v. Folsom State
18 Prison_, 2005 WL2219110 fn.3 (E.D. Cal. 2005), Report and
19 Recommendations adopted by 2005 WL3081634 fn.1 (E.D. Cal.
20 2005).], have followed the reasoning in _McQuillion_, _supra_,
21 establishing a liberty interest. Because the Ninth Circuit
22 analyzed the liberty interest which arose from California's
23 Penal Code §3041(a), _Dannenberg_ does not undermine the Ninth
24 Circuit decision in _McQuillion_. Therefore, _McQuillion v. Duncan_
25 holds that the mandatory language of Penal Code §3041(b)
26 creating a liberty interest in parole remains controlling
27 precedent. [See _Rosenkrantz v. Marshall_, 774 F.Supp.2d 1063
28 (C.D. Cal. 2006); _Blankenship v. Kane_, 2006 WL5215627 *3 (N.D.

1  Cal. 2006); <u>Murille v. Perez</u>, 2005 W.2592420 *3 N.1 (C.D. Cal.

2  2005); <u>Saifullah v. Carey</u>, 2005 WL1555389 *8 (E.D. Cal. 2005)].

3     Thus, petitioner has clearly established not only that he

4  has a constitutionally protected liberty interest but that he

5  was denied this liberty by the denial of parole by the Board of

6  Parole Hearings on February 17, 2007.

7     **B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY.**

8     It is established principles of due process that a prisoner

9  must provided <u>notice</u> of the hearings; and <u>opportunity</u> to be

10  heard; and, <u>statement of reasons</u>, for denial of parole.

11     Petitioner agrees that he was provided each of these

12  protections. However, the United States Supreme Court has

13  expanded these protections to include:

14     "In a variety of contexts, the court has
       recognized decisions resulting in a loss of an

15     important liberty interest violates due process
       if the decision is not supported by some

16     evidence." <u>Superintendent v. Hill</u>, 472 U.S. at
       455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356

17     (1985): <u>Rosenkrantz v. Marshall</u>, 444 F.Supp.2d
       1063 (C.D. Cal. 2006) fn. 13; <u>Rojas v. Neilson</u>,

18     428 F.3d 1229, 1232 (9th Cir. 2005)[Per curiam]

19  The court further held:

20     "Although '[T]he some evidence standard is
       minimally stringent', <u>Powell v. Gomez</u>, 33 F.3d

21     39, 40, the evidence underlying the
       [Governor's] decision must have some indicia of

22     reliability." <u>Hill</u>, <u>supra</u>, 472 U.S. at 455-56,
       105 S.Ct. at 2774; See also <u>Sanchez v. Kane</u>,

23     444 F.Supp.2d 1049 (C.D. Cal. 2006).

24     As an additional matter the <u>Hill</u> court concluded that the

25  decision to deny parole must not be "otherwise arbitrary." <u>Hill</u>,

26  <u>supra</u>, at 547.

27     Clearly then, the <u>Hill</u> analysis determined that due process

28  requires much more than notice, opportunity to be heard and

1  statement of reason. It also requires (A). evidence which

2  supports the conclusion; (B). the evidence to be reliably

3  related to the issue of present dangerousness (CCR Title 15,

4  §2402(a)); In re Scott, supra, 1373 Cal.App.4th 593, 34

5  Cal.Rptr.3d 905; In re Elkins, 50 Cal.Rptr.3d 503; In re Lee, 49

6  Cal.Rptr.3d 931; (C). the evidence must be truthful and (D). the

7  decision must not be arbitrary or capricious. Sanchez v. Kane,

8  444 F.Supp.2d 1049 (C.D. Cal. 2006).

9  **GROUND ONE:**

10          **THE BOARD'S DECISION TO DENY PAROLE IS**
11          **OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY**
            **"SOME EVIDENCE" CONTAINING AN INDICIA OF**
12          **RELIABILITY.**

13      In combining the California and federal standards of

14  review, as they have been articulated thus far by the California

15  Supreme Court and the Ninth Circuit, respectively, the

16  commitment crime can lack the power to supply "some evidence"

17  supporting a denial of parole because of the interplay between

18  two factors - the nature of that crime and the passage of time

19  since its commission. That is, the fact there is "some evidence"

20  the crime was committed and committed a certain way at a certain

21  time does not mean that crime necessarily represents "some

22  evidence", that petitioner's release on parole will pose an

23  unreasonable risk of danger to the public safety at the present

24  time. Whether it possesses the necessary predictive value

25  depends both on the nature of the crime and how long ago it

26  happened. Petitioner's commitment offense, now over 18 years in

27  the past does not provide "some evidence" his present release

28  would represent an "unreasonable risk" of danger to the

1 community.

2 It is worth noting that the issue before this court is
3 whether petitioner is suitable for parole, not when he should be
4 released under the California parole system. The Board's initial
5 task with respect to any inmate serving an indeterminate
6 sentence is to determine whether the prisoner is suitable for
7 parole. That is whether the prisoner "pose[s] an unreasonable
8 risk of danger to society if released from prison. CCR, Title 15
9 §2402." Only after the Board deems an inmate suitable is a
10 release date set. CCR, Title 15, §2282; See also Dannenberg, 34
11 Cal.4th 1061, 1071 (2005). ("[A] determination of individual
12 suitability must proceed the setting of a ... parole release
13 date.") The actual parole release date may well be (in some
14 cases) a number of years into the future, under the Board
15 regulations, the release date is established using a matrix that
16 takes into account the inmate's offense of imprisonment and the
17 circumstances in which it was committed. CCR, Title 15, §2282.

18 Supreme Court law clearly established a parole decision,
19 like a prison disciplinary decision, deprives a prisoner of due
20 process if it is not uspported by "some evidence" or is
21 "otherwise arbitrary." Hill, supra, at 457; McQuillion v. Duncan
22 306 F.3d 895, 904 (9th Cir. 2002).

23 However, that evidence "must have some indicia of
24 reliability," Scott I, supra, 119 Cal.App.4th at p.899) and
25 "suitability determinations must have some rational basis in
26 fact. (In re Elkins, 144 Cal.App.4th at p.489).

27 As our Supreme Court has summarized it, "the judicial
28 branch is authorized to review the factual basis of a decision

-6-

1   of the board denying parole in order to ensure that the decision
2   comports with the requirements of due process of law, but ... in
3   conducting such review, the court may inquire only whether "some
4   evidence" in the record before the board supports the decision
5   to deny parole, based upon factors specified by statute and
6   regulation. If the decision's consideration of the specified
7   factors is not supported by "some evidence" in the record and
8   thus is devoid of a factual basis, the court should grant the
9   prisoner's petition for writ of habeas corpus and should order
10  the board to vacate its decision denying parole and thereafter
11  to proceed in accordance with due process of law. (Rosenkrantz,
12  supra, 29 Cal.4th at p.658, underline added). Finally, as has
13  been recently stated, because the overarching consideration is
14  public safety, the test in reviewing the board's decision
15  denying parole "is not whether some evidence supports the
16  reasons [the board] cites for denying parole, but whether some
17  evidence indicates a parolee's release unreasonably endangers
18  public safety.[Citations]. Some evidence of the existence of a
19  particular factor does not necessarily equate to some evidence
20  the parolee's release unreasonably endangers public safety." (In
21  re Lee, 143 Cal.App.4th at p.1408)(In re Barker, May 29, 2007),
22  DJDAR 7548)(In re Lawrence, (May 22, 2007) Cal.Rptr.3d
23  WL1475283)(In re Rosenkrantz, (2002) 29 Cal.4th 616, 665)(In re
24  Dannenberg, (2005) 34 Cal.4th 1061, 1100).

25      Merely to pick pieces from evidence to create one's version
26  sufficient to justify an action is not "some evidence"
27  reasonably related to the circumstances sufficient to deny
28  parole. Superintendent v. Hill, requires more. The Hill

-7-

1   requirement mandates that the evidence relied upon possess not
2   only an "indicia of reliability" but that is is "reasonably
3   related to the circumstances so as to constitute some evidence
4   that the crime was 'particularly egregious'". (i.e. "reasonably"
5   sufficient to support the decision made). See Hill, 472 U.S.
6   445, 455-56, (1985). Accordingly, to recite in rote,
7   circumstances of the crime sufficient under different
8   circumstances (for instance as one would apply to first degree
9   murder) and proclaim that sufficient under these circumstances,
10  does not constitute "some evidence" justifying denial of parole
11  or establish a current danger to the public. The decision of the
12  board is unreasonable in light of the volumes of evidence
13  showing suitability. Furthermore, since the evidence clearly
14  does not support the board's conclusion, the"conclusion" does
15  not possess any "indicia of reliability" and is patently
16  arbitrary and capricious, denying petitioner his liberty
17  interest in parole. It is clear that the board's finding amounts
18  to an "unreasonable" determination of the facts in light of the
19  evidence available to the board at the hearing. Only by
20  examination may the court determine whether the board's decision
21  was in fact "unreasonable" or "objectively unreasonable."
22  Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000); Pham v.
23  Terhune 400 F.3d 740, 742 (9th Cir. 2005); Hines v. Thompson,
24  336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d
25  1160, 1167 (9th Cir. 2002).

26  GROUND TWO:

27          THE BOARD FINDING OF UNSUITABILITY AND REFUSAL
        OF THE GRANTING OF PAROLE VIOLATED THE
28      PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED

1  HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
2  WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
   WITHOUT ANY RELIABLE EVIDENCE OR "SOME
3  EVIDENCE," IN VIOLATION OF THE 5TH AND 14TH
   AMENDMENT OF THE UNITED STATES CONSTITUTION.

4  Section 3041 of the California Penal Code creates

5  substantial presumption that a parole release date shall be set

6  at the initial parole hearing, and in a manner that is uniform

7  to other similar offenses. Subdivision (a) and (b), of §3041

8  mandates that a parole release date "shall" be set "unless" the

9  board finds that the gravity of the commitment offense or

10 offenses, or the timing and gravity of past convicted offenses

11 are such that a consideration of the public safety warrant not

12 setting a release date at that hearing. "Furthermore, if there

13 be any reasonable doubt as to identity of offense we are bound

14 to resolve that doubt in favor of petitioner." (In re Bramble,

15 1947, 31 Cal.2d 43, 51, [6], 187 P.2d 411). Moreover, the rule

16 is established that when language which is reasonably

17 susceptible of two constructions is used in a penal law,

18 ordinarily that construction which is more favorable to the

19 offender will be adopted. The defendant is entitled to the

20 benefit of every reasonable doubt, whether it arises out of a

21 question of fact, or as to the true interpretation of words or

22 the construction of language used in a statute. (People v.

23 Stuart, (1956), 47 Cal.2d 167, 175, [7], 302 P.2d 5, 55 A.L.R.2d

24 705; People v. Smith, (1955) 44 Cal.2d 77, 79 [2], 279 P.2d 33;

25 In re Bramble, (1947) supra, 31 Cal.2d 43, 51 [6,7], 187 P.2d

26 441; In re McVickers, (1946) 29 Cal.2d 264, 278, 176 P.2d 40;

27 People v. Valentine, (1946 28 Cal.2d 121, 143 [20], 159 P.2d 1;

28 People v. Ralph, (1944), 24 Cal.2d 575, 581 [2], 150 P.2d 401).

-9-

1  There is no other criteria in the statute for denying parole to
2  a prisoner. It appears from the language that "consideration of
3  the public safety" is nonetheless limited to the gravity of the
4  offense and/or the timing and gravity of any past "convicted"
5  offense or offenses. The statute does not encompass or authorize
6  some of the criteria set forth by the California Code of
7  Regulations, Title 15, §2402. It does appear that the statute
8  has been enlarged to include additional criteria not expressly
9  authorized by the statute.

10  Nothwithstanding, the argument set forth in the petition is
11  not merely an argument about a state law violation. The
12  presumption vested by the statue is substantial, while the
13  statutory criteria the board must meet in order to deny parole
14  is limited to criminal conduct at the time of the offense. For
15  the board to interpret the statute in such a manner as to deny
16  parole solely on the commitment offense after the board had
17  denied petitioner on the exact same point five times, deprives
18  petitioner of a substantial liberty interest protected by
19  federal due process. (See Biggs at 334 F.3d 917). The effect of
20  such an interpretation, established by practice, is to subject
21  all prisoners to pro forma decisions, where the board goes
22  through the motion of due processs review, citing post hoc
23  rationalizations to justify the parole denial, that is now
24  always the result. This is little different that a decision to
25  deny parole made without any evidence to support it. Thus, by
26  misinterpretation, whether inadvertently or intentionally, the
27  result is not merely a violation because it is an action the
28  board is simply not authorized to take by the enabling statute

-10-

that impinges on federally protected liberty interests. Petitioner relies on this claim which is now brought before the state court.

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT PETITIONER POSES AN "UNREASONABLE RISK" OF THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE. THE DECISION WAS WITHOUT EVIDENCE AND WAS ARBITRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL DUE PROCESS.

The regulatory law requires the board to set a release date unless it finds that the prisoner poses an "unreasonable risk" to public safety if released at that time. (15 CCR, §2402). This is consistent with the enabling state which requires the setting of a release date.

If the preponderate record before the board demonstrates that petitioner does not post the "unreasonable risk" (which the record shows that he does not, from petitioner's last five parole hearings), a release date must be set.

If the board denies petitioner parole without making this requisite finding based on relevant and credible facts in the record, then this is not merely a state law violation, but a deprivation of the substantial liberty interest he has in obtaining a release date. Failure of the board to act in accord with the regulations, in such situations, constitutes a substantive due process violation because it constitutes an abuse of discretion that unfairly and inaccurately deprives the prisoner of his right to that federally protected liberty interest. The board needs more than "some evidence" to arrive at their decision, even though once the decision is made, the reviewing court needs only to find "some evidence" to support

-11-

1  the decision or findings that were made. As petitioner will
2  point out, the "some evidence" standard is not a "burden of
3  proof" - although the board and the governor seems to think it
4  is. Petitioner will demonstrate by clear and convincing facts
5  that the board's burden of proof is the "preponderance of
6  evidence" standard, but they totally ignore this in arriving at
7  their post hoc rationalization to deny parole in nearly every
8  case. There must be a weighing and balancing process according
9  to a burden of proof.

10     Thus, petitioner alleges that the board's decision in his
11  case exceeded the bounds of "review" and was made without the
12  procedural safeguards required by the Constitution, and without
13  applying the proper proof necessary to overcome the presumptive
14  right to release delineated in Penal Code §3041.

15     Statutory law in California applies the "rock bottom"
16  burden of proof in judicatory proceedings at the "preponderance
17  of evidence" level. (Evidence Code §115). The board lists under
18  "good cause," the preponderance evidence (15 CCR, Division 2,
19  §2001(b)(49), and also lists "relevant" and "material" evidence
20  as the standard for being valid "evidence." (15 CCR, Div. 2,
21  §2000(b)(62)(material evidence), and (90)(relevant evidence).
22  The "good cause" provision is a requirement for decision making
23  that applise to all substantive decisions. These regulatory and
24  statutory provisions initiate the weighing and balancing process
25  of evidence at parole hearings. A responsibility the board must
26  undertake. The board cannot apply the "some evidence" standard
27  because it is not a burden of proof. (In re Ramirez, (2001) 94
28  Cal.App.4th 549 at 564-565; Edwards v. Balisok, (1997) 520 U.S.

-12-

641, at 648). The "some evidence" applies only to questions of evidentiary sufficiency as an "additional requirement of due process, not substituted for other due process requirements." (Ibid.) The "some evidence" standard is applied only by the reviewing court to determine if the board's (governor's) decision is supported by "some evidence," if the court finds the board complied with all other requisite due process requirements. If the board failed to apply a critical element in the weighng and balancing of evidence, such as a burden of proof, then the court cannot deny the petition because there isn't "some evidence" in the record to support the decision. (Scott I, supra, 119 Cal.App.4th at p.899, In re Elkins, supra, 144 Cal.App.4th at 489). As the Appellate Court in In re Caswell 92 Cal.App.4th 1017, 1029, pointed out, there is always some evidence in the record of unsuitability of parole, which if invoked, would subject every consideration of parole to an arbitrary standard or political whim, but for a burden of proof, and the burden of producing evidence, is clearly in California law, e.g. People v. Dubon, 90 Cal.App.4th 949, 952, (2001), and applies to all state agencies.

Here, where the statute presumes that a parole date "shall normally" be set, the board must, in their weighing and balancing of all relevant, material and reliable evidence, present by a preponderance of that evidence, a "rational connection" between the basic facts the board is asserting as sufficient to deny parole, and the ultimate fact statutorily presumed, i.e., that the prisoner is more than likely not "suitable" for setting a parole release date.

1    Petitioner submits that the board and the governor have
2  broad discretion in parole matter, but the requirement of
3  procedural due process embodied in the California Constitution
4  places some limitations upon these discretionary powers.

5    As heretofore shown, the board's burden of proof is the
6  preponderance of relevant and material evidence standard. This
7  is the "rock bottom" standard allowed by California law.
8  (Evidence Code §115; see e.g. <u>Charlton v. Federal Trade Comm.</u>,
9  543 F.2d, 903-907, 908, (D.C. Cir. 1976)(speaking to this
10  standard as being "rock bottom" burden of proof). "Good Cause"
11  is defined in the BPT's regulations as "a finding by the board
12  based upon a preponderance of the (material and relevant)
13  evidence that there is a factual basis and good reason for the
14  decision made." (<u>Ibid</u>. 2000). Here, in petitioner's case, the
15  board, based on the "material and relevant" evidence found
16  petitioner unsuitable for parole on the basis of the commitment
17  offense which petitioner has been denied five times base
18  primarily on the same issues, i.e., unchanging factors. This is
19  a clear due process violation and especially where the relevant
20  and reliable evidence concerning public safety that was
21  presented at petitioner's subsequent parole consideration
22  hearings that show that petitioner does <u>not</u> pose an
23  "<u>unreasonable risk</u> to the public if released at this time.

24    The mandatory language in §3041 of the Penal Code
25  established a rebuttable presumption affecting the board's
26  burden of producing evidence and the burden of proof
27  implementing public policy regarding the parole of "term to
28  life" prisoners.

1    Petitioner asserts that the ultimate facts sought is a
2 determination whether the prisoner is currently in "<u>unreasonable</u>
3 <u>risk</u>" of danger to the public safety if released on parole.
4 (Subd. (b), Penal code §3041; 15 CCR. §2402(a)).

5    The presumption created by mandatory language in both
6 subdivision (a) and (b) of P.C. §3041 is that the petitioner
7 "shall normally" have a parole release date set "unless" the
8 presumption is overcome by the board which carries the burden of
9 proof as to the existence of the presumed fact. <u>McQuillion v.</u>
10 <u>Duncan</u>, 306 F.3d, 901-902, (9th Cir. 2002): <u>Biggs v. Terhune</u>,
11 334 F.3d 910, 916-917 (9th Cir. 2003)(regarding the presumption
12 in Penal Code §3041). If the board cannot produce the evidence
13 according to the burden of proof required, then the presumption
14 stands, and the court is obliged to uphold the presumption, and
15 under <u>In re Smith</u>, 109 Cal.App.4th 489 (2003), must order
16 petitioner released from custody.

17    B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
    PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
18    OF LIFE, LIBERTY, OR PROPERTY, WITHOUT DUE
    PROCESS OF LAW.
19

20    The due process clause of the 14th Amendment prohibits
21 state action that deprives a person of life, liberty, or
22 property, without due process of law, A person alleging a due
23 process violation must first demonstrate that he or she was
24 deprived of liberty or property interest protected by the due
25 process clause, and then show that the procedures that led to
26 the deprivation were constitutionally insufficient. <u>Kentucky</u>
27 <u>Dept. of Corrections v. Thompson</u>, 490 U.S. 454, 459-460 (1989);
28 <u>McQuillion v. Duncan</u>, 306 F.3d, 895, 900 (9th Cir. 2002).

-15-

1    In the parole context, a prisoner alleging a due process

2  claim must demonstrate the existence of a protected liberty

3  interest in parole, and the denial of one or more of the

4  procedural protections that must be afforded when a prisoner has

5  a liberty interest in parole. The Supreme Court held in 1979,

6  and reiterated in 1987, that "a state's statutory scheme, if it

7  uses mandatory language, creates a presumption that parole

8  release will be granted when or unless certain designated

9  findings are made, and thereby gives rise to a constitutional

10  liberty interest." McQuillion, supra, 306 F.3d, 16, 901 (citing

11  Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979)

12  and Board of Pardon v. Allen, 482 U.S. 369, 373 (1987).

13    The Ninth Circuit has held that California's parole scheme

14  creates a cognizable liberty interest in release on parole

15  because Penal Code §3041 uses mandatory language and is similar

16  to the Nebraska and Montana statutes addressed in Greenholtz and

17  Allen, respectively. McQuillion, 306 F.3d 15, 901-902. As the

18  Ninth Circuit has explained, "§3041 of the California Penal Code

19  creates in every inmate a cognizable interest in parole which is

20  protected by the procedural safeguards of the due process

21  clause," and that interest arises "upon the incarceration of the

22  inmate." Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir.

23  2003).

24  **GROUND THREE:**

25        **THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY**
          **RELYING ON THE UNCHANGING FACTS OF THE CRIME IN**

26        **THE FACE OF CLEAR EVIDENCE OF REHABILITATION**
          **AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO**

27        **BE FOUND SUITABLE AT EACH HEARING. A FINDING OF**
          **EGREGIOUSNESS IS BARRED BY THE INMATE'S**

28        **COMPLIANCE WITH THOSE AGREED TERMS.**

1   When the board repeatedly relies on the unchanging facts of
2   the crime to deny parole, in the face of clear evidence that the
3   inmate has been rehabilitated, due process is violated. Biggs v.
4   Terhune, supra, at 915-916, Ramirez, supra, at 571). However,
5   here, the board goes a step further. At the conclusion of each
6   hearing attended by petitioner, the board gave him a series of
7   what to do to be found suitable for parole. If the crime was
8   going to continue to be an impediment to parole, then what
9   difference would it make whether petitioner followed those
10  recommendations, since parole would be denied in any event as
11  the crime will never change? How could the board make those
12  recommendations in good faith if the crime was such that parole
13  was not going to occur no matter how well petitioner programs?
14  Even worse, if he complies with those recommendations and the
15  board gives him a parole date, if the governor is permitted to
16  effectively negate this whole process unilaterally taking that
17  parole date away, then the recommendations and compliances are
18  rendered useless acts.

19  The board has a duty to make all recommendations
20  "sufficiently clear" to inform petitioner what conduct will
21  result in a grant of parole. (U.S. v. Guagliardo, 278 F.3d
22  868-872, (9th Cir. 2002)[citing Graynet v. City of Rockford, 408
23  U.S. 104, 108-109, (1972]). "A prisoner's due process rights are
24  violated if parole conditions are not made 'sufficiently clear'
25  so as to inform him of what conduct will result in his being
26  returned to prison. Likewise, the Board of Prison Terms has a
27  duty to make recommendations for parole eligibility
28  'sufficiently clear' so as to inform the inmate of conduct that

-17-

1 will warrant a finding of suitability." U.S. V. Guagliardo,

2 supra, 278 F.3d 868. Thus, the onus is on the board to clearly

3 and specifically stated what conduct will warrant a finding of

4 suitability. Therefore, it follows that there is only one way to

5 interpret the recommendatins given to petitioner at the

6 Documentation hearing and at each of the Subsequent parole

7 hearings. They constitute the board's "sufficiently clear"

8 instructions as to what petitioner must do to be found suitable.

9 As stated, it is indisputable but that petitioner has complied

10 with every single one of the board's directives to him, and

11 thus, the board must finally find petitioner suitable for

12 release. If the board's directions to the inmate are not

13 acknowledged as sincere offers providing legitimate goals for

14 achieving a status of parole suitability, then they are mere

15 "hoops" designated to support elaborate ruse and a further

16 affront to the due process rights of all prisoners who rely upon

17 them.

18    As noted, petitioner sincerely relied upon the

19 recommendations of the prior board panels, and he partook to

20 fulfill each one. Petitioner's fulfillment may be recognized

21 through his educational and vocational accomplishments and

22 gains, his ongoing self-help work and his crime free behavior

23 throughout his nearly 18 years of incarceration. Petitioner has

24 complied with those directives following each and every hearing,

25 and the board should finally recognize his compliance by

26 granting parole.

27    A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE
        CRIME VIOLATES DUE PROCESS.
28

1    In Biggs v. Terhune, the 9th Circuit held that even if the

2  commitment offense(s) are sufficient to support a denial of

3  parole based upon considerations of due process. Biggs v.

4  Terhune, supra, 334 ₋F.3d at 916. The Ramirez court also

5  acknowledged that there will always be "some evidence" to

6  support a finding that a prisoner committed the underlying

7  offense. Those facts alone, however, do not justify the denial

8  of parole. Thus, while concluding that there was factual support

9  for the findings as to the crime and priors, the Ramirez, court

10 still found the board's decision arbitrary since there had been

11 7 hearings at that point, 9 years had passed beyond the minimum

12 term and it was 17 years after entering prison, and all evidence

13 showed rehabilitation.(Id. at 571). Likewise, as the Biggs court

14 more recently said, despite the fact that there may remain

15 evidence to support a finding of egregiousness of the crime:

16         "A continued reliance in the future on an
           unchanging factor, the circumstances of the
17         offense and conduct prior to imprisonment,
           runs contrary to the rehabilitative goals
18         espoused by the prison system and could result
           in a due process violation." (Biggs, supra, at
19         916-917).

20    In the published case of Irons v. Warden, 358 F.Supp.2d 936

21 (E.D. Cal. 2005), the federal court found that the board

22 violated the prisoner's due process by continuing to rely on the

23 immutable factors. (e.g. the commitment offense and history

24 prior to incarceration) to support the denial of parole. In

25 doing so, the federal judge there ruled that continuing to rely

26 on those factors that can never change, such as the commitment

27 offense, or history prior to imprisonment, where there is no

28 proof of continuing bad conduct to support a finding of current

1  threat to the public, offends due process.

2      In interpreting the rule set forth in <u>Biggs</u>, and the plain
3  language of Penal Code §3041, it is clear that even if the crime
4  may be considered egregious, under federal due process
5  priciples, the denial of parole based on the immutable facts of
6  the crime is only authorized at the first parole consideration
7  hearing. The provisions of Penal Code §3041 only talk of the use
8  of the crime to defer setting of a date at the <u>initial</u> hearing.
9  (Penal Code §3041(a)). After that, to give the statute a
10  constitutional interpretation that is not unreasonably vague,
11  further denials would have to be based on some facts arising
12  subsequent to the crime that show a continued propensity for
13  violence, making the inmate a danger to the public. (<u>Biggs v.</u>
14  <u>Terhune</u>, <u>supra</u>, 334 F.3d at 914-915). To rule otherwise would
15  put petitioner in an impossible situation, where no matter what
16  he shows in terms of positive behavior, reformation,, self-help,
17  work skills, parole plans, or just rehabilitation in general, he
18  would never be able to overcome the unchanging facts of the
19  crime. The only logical application of Constitutionaly Due
20  Process dictates what the court in <u>Irons</u> held, i.e., that any
21  subsequent denial requires the presence of some in-prison
22  behavior showing that the inmate currently presents an
23  unreasonable risk of danger if paroled.

24      Here, the facts of the crime have been used as the real
25  reason for denying parole on 5 separate occasions, yet, those
26  facts have never been tied to current behaviors showing
27  petitioner still presents an unreasonable risk of danger to the
28  public at this time. A rule requiring the presence of in-prison,

-20-

1  adverse behavior to justify further denial based on the crime,
2  simply recognizes what the 9th Circuit in <u>Biggs</u> alluded to when
3  it talked of the rehabilitative goals of the system, and, the
4  need to take into consideration that a person can change. At
5  this point, petitioner has been incarcerated for 18 years,
6  eligible for parole for more than eight of those years. His
7  programming clearly shows his full rehabilitation. In drawing
8  the line as to when further denials become arbitrary, it is
9  obvious that the line has clearly been crossed in this case, and
10 in fact, was crossed as soon as the crime was used in the second
11 parole hearing without the presence of facts showing a continued
12 risk of danger based on how petitioner was programming in
13 prison. To the contrary, the in-prison facts are exclusively
14 positive.

15      As the <u>Ramirez</u> court noted, the paroling authority must do
16 more than merely commend petitioner for the hard work done to
17 rehabilitate himself while in prison. They must actually
18 consider these factors "as...circumstance[s] tending to show his
19 suitability for parole." <u>Ramirez</u>, <u>supra</u>, 94 Cal.App.4th at
20 571-572 [emphasis original]. Of course, all the board did with
21 petitioner's extensive accomplishments was to brush them aside
22 with several terse lines, and issue superficial compliments. The
23 <u>Biggs</u> rule is clear that if an inmate continue[s] to demonstrate
24 exemplary behavior and evidence of rehabilitation, denying him a
25 parole date simply because of the nature of his offense and
26 prior conduct would raise serious questions involving his
27 liberty interest in parole. <u>Biggs v. Terhune</u>, <u>supra</u>, 334 F.3d at
28 916. Here, the evidence of rehabilitation is beyond dispute.

-21-

1    In comparing the present case with <u>Biggs</u>, it is undeniably
2    clear that the board lacks any justification whatsoever to
3    continue to deny petitioner a parole date. In <u>Biggs</u>, the inmate
4    was convicted of the premeditated and deliberate First Degree
5    Murder of a witness in a major theft case against the
6    defendants, and yet, the court was quick to caution the board
7    that it could not continue to solely rely on the commitment
8    offense to deny the inmate parole, even though it was only his
9    initial hearing at that point. Yet, petitioner has been denied
10   parole on five separate occasions, each time effectively relying
11   virtually exclusively upon the unchanging facts of his
12   commitment offense. The continued reliance upon the commitment
13   offense is simply arbitrary, particularly in the fact of the
14   board's acknowledgements of petitioner's model behavior in
15   prison and extensive accomplishments, all of which are conceded
16   by the statement of decision. Therefore, as the court states in
17   <u>Biggs</u>, denying him a parole date simply because of the nature of
18   the offense, not only raises serious questions involving his
19   liberty interest in parole, but blatantly violates due process.
20   (See <u>Biggs v. Terhune</u>, <u>supra</u>, 334 F.3d at 915-916; <u>Irons</u>,
21   <u>supra</u>).

22       B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
            DUE PROCESS.

23       First, continued reliance upon these unchanging factors
24   makes a sham of California's parole system and amounts to an
25   arbitrary denial of petitioner's "liberty interest in release on
26   parole," and his "presumption that a parole release date will be
27   granted." (See <u>McQuillion v. Duncan</u>, 306 F.3d 895, 902 (9th Cir.
28   2002), <u>Biggs</u>, 334 F.3d at 9144-915, <u>Rosenkranz</u>, 29 Cal.4th at

654, 661). Petitioner has been denied parole on five different occasions. continued reliance upon these unchanging factors amounts to converting petitioner's offense to a term of life without the possibility of parole. (See Irons, 358 F.Supp.2d at 947 ["continuous reliance on the unchanging circumstances transforms an offense into a de facto life imprisonment without the possibility of parole"]; Scott, 34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595; Shaputis, 37 Cal.Rptr.3d at 335). Second, the circumstances of the crime and petitioner's conduct prior to imprisonment do not amount to some evidence supporting the conclusion that petitioner "currently" (underline added) poses an unreasonable risk of danger if released at this time."] In re Shaputis, (2006) 37 Cal.Rptr.3d 324, 334-335). In the parole context, the requirments of due process can only be met if "some evidence" supports the decision and the evidence underlying the decision is supported by "some indicia of reliability." Biggs, 334 F.3d at 914; Caswell v. Calderon, 353 F.3d 832, 839 (9th Cir. 2004); Scott, 119 Cal.4th at 899; Superintendent v. Hill, 472 U.S. 445, 455-457 (1985); McQuillion v. Duncan , 306 F.3d 895, 903 (9th Cir. 2002).

Petitioner presents a stronger case than Biggs for several reasons. First petitioner's commitment offense was less serious than the petitioner in Biggs. The Biggs petitioner was involved in a violent, manipulative and premeditated murder, the petitioner here has a much lesser serious offense than petitioner Biggs. Second, the Biggs petitioner had not yet served the full terms of his sentence, while petitioner here has exceeded his sentence by approximately three years. Finally,

-23-

1  petitioner here has demonstrated exemplary behavior and evidence
2  of rehabilitation; as required by Biggs court, for a significant
3  period of time. Therefore, the sole reliance on petitioner's
4  commitment offense in denying him parole impinges on
5  petitioner's constitutional liberty interest in parole. (Martin
6  v. Marshall, supra, 431 F.Supp.2d at p.1047). (In re Lawrence,
7  (May 22, 2007), Cal.Rptr.3d WL1475283 (Cal.App.2d Dist.).

8       While it may have been reasonable to rely on petitioner's
9  offense and conduct prior to imprisonment as an indicator of
10  dangerousness for some period of time, continued reliance on
11  such unchanging circumstances after 18 years of incarceration
12  and five parole suitability hearings, violates due process
13  because these factors now lack predictive value with regards to
14  petitioner's present and future dangerousness. After 18 years
15  of rehabilitation in which petitioner's eligible parole date for
16  release was passed on September 23, 1999, (Exhibit "E", Initial
17  M.E.P.D.), the ability to predict petitioner's future
18  dangerousness based simply on the circumstances of the crime is
19  nil. (See Irons, 358 F.Supp.2d at 947 n.2 ["four prior times in
20  finding [Irons] unsuitable for parole" and "after 15 years" of
21  imprisonment, ability to assess dangerousness "is near zero."];
22  Scott, 133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920 ["the
23  predictive value of the commitment offense may be very
24  questionable after a long period of time."].

25       Petitioner's record is replete with evidence of
26  petitioner's rehabilitation, which was expressed by the board,
27  including Psychological Reports, Correctional Counselor's
28  Reports, extensive self-improvement through vocational,

-24-

1 educational, self-help therapy and disciplinary free

2 incarceration for the past ten years. (See Exhibit "D").

3 　　While the board may initially have been entitled to rely

4 upon the commitment offense and petitioner's conduct prior to

5 imprisonment to find petitioner unsuitable for parole, under

6 these circumstances, petitioner submits that the continued

7 reliance and sole reliance of the convicted offense do not now

8 constitute "some evidence" with "some indicia of reliability" of

9 petitioner's current dangerousness. (See Hill, 472 U.S. at 445;

10 Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner,

11 2004 WL1090188 *1-2; Bair, 2005 WL2219220, *12 n.3; Scott, 133

12 Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 919-920; Rosenkrantz,

13 2002 29 Cal.4th 616, 665; Dannenberg, (2005) 34 Cal.4th 1061,

14 1100; In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re

15 Lawrence, (2007) Cal.Rptr.3d WL1475283; In re Barker, (2007)

16 DJDAR 7548).

17 　　C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
　　　　UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
18 　　　　AND THE LIBERTY INTERESTS OF INMATES. THE
　　　　ESSENCE OF THE PAROLE SYSTEM IS THE RE-ENTRY OF
19 　　　　PRISONERS WHO NO LONGER POSE A PUBLIC THREAT.

20 　　Parole, the release of the imprisoned before they have

21 served the maximum time set by their sentence, has long been

22 part of the California penal system. The Indeterminate

23 Sentencing Law, requiring the trial judge to set a minimum but

24 not a maximum sentence was enacted in 1971. In re Minnis, (1972)

25 7 Cal.3d 639, 643, n.2 ("the court in imposing the sentence

26 shall not fix the term or duration of the period of

27 imprisonment")(citation and internal quotations omitteds). The

28 goal of indeterminate sentences and the California parole system

is not only to punish but also to provide for reformation and rehabilitation:

> "The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender ... retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence."

People v. Morse, (1964) 60 Cal.2d 631, 643, n.8 (quoting Williams v. State of New York, (1949) 337 U.S. 241, 247). In a lengthy discussion of this topic, the California Supreme Court states as follows:

> [T]he purpose of the indeterminate sentence law, like other modern laws in relation to the administration of the criminal law, is to mitigate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the the crime. The endeavor to put before the prisoner great incentive to well-doing, in order that his will to do well would be strengthened and confirmed by the habit of well-doing.
>
> [...]
>
> [T]he interests of society require that under prison discipline every effort should be made to produce a reformation of the prisoner ... The Legislative policy [was to provide a system whereby] a hope was to be held out to prisoners that through good conduct in prison and a disposition shown toward reformation, they might be permitted a conditional liberty upon restraint under which they might be restored again to society...
>
> [...]
>
> Although good conduct while incarcerated and potential for reform are not the only relevant factors, the court has acknowledged their significance. Furthermore, authority has declared that these factors are among those of "paramount importance."

In re Minnis, Cal.3d at 644-645. The Rosenkrantz court, citing

1  Minnis, reaffirmed the principles. "[E]ven before factors

2  relevant to parole decisions had been set forth expressly by

3  state statute and by regulations, we concluded that [a]ny

4  official or board with discretion, is under obligation to

5  consider all relevant factors [citations], and the [official or

6  board] cannot, consistently with its obligation, ignore post

7  conviction factors unless directed to do so by Legislature." In

8  re Rosenkrantz, (2002) 29 Cal.4th 515, 656 (quoting Minnis, 7

9  Cal.3d at 645).

10      D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
           IN PAROLE DECISIONS.

11      "[P]arole applicants in California have an expectation that

12  they will granted parole unless the board finds, in the exercise

13  of its discretion, that they are unsuitable for parole in light

14  of the circumstances specified by statute and by regulation."

15  Rosenkrantz, 29 Cal.4th at 659-61 (holding that the California

16  Constitution, Article V, §8(b) and the California Penal Code

17  §3041, "give rise to a protected liberty interest in that "a

18  prisoner granted parole by the board has an expectation that the

19  governor's decision to affirm, modify, or reverse, the board's

20  determination will be based upon the same factors the board is

21  required to consider," and that "liberty interest underlying a

22  governor's parole review decision is protected by due process of

23  law.").

24      Federal courts have also unequivocally held that

25  California's parole system gives rise to a liberty interest

26  constitutionally protected by due process. (See Board of Pardons

27  v. Allen, (1987) 482 U.S. 369, 376-78; Greenholtz v. Inmates of

28  Neb. Penal & Correctional Complex, (1979) 442 U.S. 1, 11-12,

-27-

1    (holding a state's statutory parole scheme that uses mandatory
2    language may create a presumption that parole release will be
3    granted upon certain circumstances or findings, thus giving rise
4    to a constitutionally protected liberty interest); McQuillion v.
5    Duncan, (9th Cir. 2002) 306 F.3d 896, 902-903, n.1, 903 (holding
6    that because California's parole scheme uses mandatory language
7    and is largely parallel to the schemes found in Allen and
8    Greenholtz, that give rise to a protected liberty interest in
9    release on parole, "California's parole scheme gives rise to a
10   cognizable liberty interest in release on parole"). Biggs v.
11   Terhune, (9th Cir. 2003) 334 F.3d 910, 915-916.

12        E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY HEARING.

13        On habeas corpus, a petitioner is entitled to an
14   evidentiary hearing where the petitioner has established a
15   "colorable" claim for relief and where the petitioner has never
16   been accorded a state or federal hearing on his claim. Earp v.
17   Oronski, (9th Cir. 2003) 372 U.S 293 (1963) and Keeney v.
18   Tamaya-Reyes, 504 U.S. 1, 5 (1992). In stating a "colorable"
19   claim, a petitioner is merely required to allege specific facts
20   which, if true, would entitle him to relief. (Ibid.). Granted,
21   under AEDPA, a federal court is not required to order a hearing
22   where petitioner failed to develope the facts in state court. In
23   such cases, the federal court accords a presumption of
24   correctness to the facts found by the state court and need not
25   hold a evidentiary hearing, unless those facts are rebutted by
26   clear and convincing evidence. On the other hand, no deference
27   is due where state had made an unreasonable determination of the
28   facts and where a state court makes evidentiary finding without

-28-

1 | holding a hearing and giving petitioner an opportunity to
2 | present evidence. Such findings clearly result in an
3 | "unreasonable determination" of the facts. Taylor v. Maddox,
4 | (9th Cir. 2004) 336 F.3d 992, 1001.

5 | In summation, an evidentiary hearing is required under the
6 | AEDPA and the Appellate court will remand for a hearing if the
7 | District Court rules without granting one, "where petitioner
8 | establishes a colorable claim for relief and has never been
9 | accorded a state or federal hearing on his claim." Earp, supra,
10 | at 1167.

11 | Here, petitioner requests an evidentiary hearing at every
12 | level of the state's habeas proceedings and each of the court's
13 | to which he appealed who rule without granting him an evidentiary
14 | hearing. As a result, (1) petitioner is entitled to an
15 | evidentiary hearing in this court before the court can make any
16 | credibility determination of the facts alleged in the petition
17 | and supporting exhibits; (2) any contrived facts found by the
18 | state court while denying a request for an evidentiary hearing
19 | necessarily resulting from an "unreasonable determination" of
20 | the facts and hence are <u>not</u> entitled to any presumption of
21 | correctness. (Earp, supra, at 1167; Taylor, supra, at
22 | 1101)["when state court's legal error infects the fact finding
23 | process, thus resulting in factual determinations will be
24 | unreasonable and no presumption of correctness can attach to
25 | it"].

26 |
27 |
28 |

## CONCLUSION

All criminal convictions represent the basest form of human behavior. Our laws however, provide mechanisms by which even some murderers are entitled to be paroled. The judiciary has an obligation to faithfully execute those laws. The record establishes that petitioner does not pose an unreasonable risk to public safety. Any contrary conclusion lacks any evidentiary support. As the record is void of any evidence to substantiate a claim of "present danger" and allows only for a contrary conclusion, it (justice) can only be served by an order from this court directing an evidentiary hearing; and because there is nothing which, either singly or in conjunction with other evidence that could support any decision other than parole suitable, the board's decision should be vacated; the petition issued; the petitioner remanded back to the board with directions to find petitioner suitable; set a parole release date within 30 days; and/or petitioner ordered released. Only in this way can the liberty interest petitioner continues to be denied be restored.

///

///

1

## PRAYER FOR RELIEF

2    Petitioner is without remedy save for Habeas Corpus.

3  Accordingly, petitioner requests that the court:

4          1. Issue a Writ of Habeas Corpus granting petitioner's

5             Due Process violation claims;

6          2. Issue an Order to Show Cause;

7          3. Declare the rights of petitioner;

8          4. Appoint counsel to represent petitioner;

9          5. Issue an Order directing an Evidentiary Hearing;

10         6. Issue an Order releasing petitioner based on

11            supporting evidence;

12         7. Grant any and all relief found necessary or

13            appropriate.

14

15  Dated this /0  day of JANUARY, 2008.

16                        Respectfully submitted,

17

18                        _Leroy Lujan_

19                        Leroy Paul Lujan

20                        Petitioner in Pro Per

21  ///

22  ///

23

24

25

26

27

28

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life          )
Term Parole Consideration          )          CDC Number E-76840
Hearing of:                        )
                                   )
LEROY LUJAN                        )
_____    )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 15, 2007

2:30 P.M.

PANEL PRESENT:

Ms. Janice Eng, Presiding Commissioner
Ms. Margery Melvin, Deputy Commissioner

OTHERS PRESENT:

Mr. Leroy Lujan, Inmate
Ms. Guiterra E. Rutledge, Attorney for Inmate
Mr. Brian Gurwitz, Deputy District Attorney
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**JANAE WARNOCK**

**NORTHERN CALIFORNIA COURT REPORTERS**

ii

## INDEX

|                                            | Page |
|--------------------------------------------|------|
| Proceedings ............................... | 1    |
| Case Factors .............................. | 10   |
| Pre-Commitment Factors .................... | 28   |
| Post-Commitment Factors ................... | 42   |
| Parole Plans .............................. | 57   |
| Closing Statements ........................ | 95   |
| Recess..................................... | 109  |
| Decision................................... | 110  |
| Adjournment ............................... | 119  |
| Transcriber Certification ................. | 120  |

--oOo--

1

1      <u>P R O C E E D I N G S</u>

2            **DEPUTY COMMISSIONER MELVIN:**   We are on

3      record.

4            **PRESIDING COMMISSIONER ENG:**   Okay, thank

5      you.   This is a Subsequent Parole Consideration

6      Hearing for Leroy Lujan, L-U-J-A-N.   Did I

7      pronounce that correctly?

8            **INMATE LUJAN:**   Yes, ma'am.

9            **PRESIDING COMMISSIONER ENG:**   Okay.   CDC

10     Number E-76840.   Today's date is February 15th,

11     2007, and the time is 2:30 in the afternoon.   We

12     are located at CTF Soledad.   The inmate was

13     received on November 21st, 1990, from Orange County

14     and the life term began on the same date,

15     11/21/1990.   Minimum eligible parole date is

16     September 23rd, 1999.   The controlling offense for

17     which the inmate has been committed is Murder Two.

18     Case Number C76180, Count One Penal Code 187.   The

19     inmate received a total terms of fifteen years to

20     life.   This hearing is being tape recorded, so for

21     the purpose of voice identification, each of us

22     will be required to state our first and last

23     names, spelling our last names.   When it comes

24     your turn, sir, after you spell out your last

25     name, please provide us with your CDC Number.

26     Okay.   So, I'll begin and we'll move around the

27     room to my left.   My name is Janice Eng, E-N-G,

2

1    Commissioner.

2          **DEPUTY COMMISSIONER MELVIN:**  My name is

3    Margery Melvin, M-E-L-V-I-N, Deputy Commissioner.

4          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  My name

5    is Brian Gurwitz, G-U-R-W-I-T-Z, Senior Deputy

6    District Attorney from Orange County.

7          **ATTORNEY RUTLEDGE:**  Guiterra E. Rutledge,

8    R-U-T-L-E-D-G-E, attorney for Mr. Lujan.

9          **INMATE LUJAN:**  Inmate Leroy Lujan,

10   L-U-J-A-N, E-76840.

11         **PRESIDING COMMISSIONER ENG:**  Okay, thank

12   you.  We also have two correctional officers

13   present for security reasons, and they will not be

14   participating in the hearing.  Before we go any

15   further, Mr. Lujan, I'm going to ask that you read

16   aloud the ADA statement that's on the desk in

17   front of you.  And you can begin at any time.

18         **INMATE LUJAN:**  "ADA Americans With

19              Disability Act.  The Americans with

20              Disability Act (ADA) is a law to help

21              people with disabilities.

22              Disabilities are problems that make it

23              harder for some people to see, hear,

24              read, talk, walk, learn, think, work

25              or take care of themselves than it is

26              for others.  Nobody can be kept out of

27              public places or activities because of

3

1          a disability.  If you have a

2          disability, you have the right to ask

3          for help to get ready for your PBT

4          Hearing, get to a hearing, talk, read

5          forms and papers, and understand the

6          hearing process.  BPT will look at

7          what you ask for to make sure that you

8          have a disability that is covered by

9          ADA, and that you have asked for the

10         right kind of help.  If you do not get

11         help or if you don't think you get the

12         kind of help you need, ask for a BPT

13         1074 grievance form.  You can also get

14         help to fill it out."

15          **PRESIDING COMMISSIONER ENG:**  Okay.  Do you

16  understand what those words would mean?

17          **INMATE LUJAN:**  Yes, ma'am.

18          **PRESIDING COMMISSIONER ENG:**  Okay.  The

19  record does reflect that you also signed a PBT

20  Form 1073 back on September 26th of 2006.  That

21  particular form is a reasonable accommodation

22  notice and request in accordance with the

23  provisions of the Americans with Disabilities Act.

24  And basically on this form, you checked off a box

25  that stated that you do not have any disabilities

26  as defined in the PBT ADA.  So is that information

27  -- is that correct?

4

1           **INMATE LUJAN:**  Yes, ma'am.

2           **PRESIDING COMMISSIONER ENG:**  Okay.  So, this

3    information is still current and correct?

4           **INMATE LUJAN:**  Yes.

5           **PRESIDING COMMISSIONER ENG:**  Okay.  I still

6    have to go through some standard questions with

7    you.

8           **INMATE LUJAN:**  Yes.

9           **PRESIDING COMMISSIONER ENG:**  More about ADA.

10   So, do you have any problems walking up or down

11   stairs or for distances of a 100 yards or more?

12          **INMATE LUJAN:**  No.

13          **PRESIDING COMMISSIONER ENG:**  Okay.  I see

14   that you are wearing glasses.  Are those going to

15   be adequate enough if you have to read any

16   documents?

17          **INMATE LUJAN:**  They are just for reading.

18          **PRESIDING COMMISSIONER ENG:**  They are just

19   for reading?  And you're fine with distances also?

20          **INMATE LUJAN:**  Yeah.

21          **PRESIDING COMMISSIONER ENG:**  Okay, okay.

22   So, if you have any problems with it, you'll let

23   us know?

24          **INMATE LUJAN:**  Yes, ma'am.

25          **PRESIDING COMMISSIONER ENG:**  Okay.  And do

26   you have any problems with hearing?

27          **INMATE LUJAN:**  No.

5

1           **PRESIDING COMMISSIONER ENG:**  Okay.  So, have

2    you ever been included in the Triple CMS or the

3    EOP Programs?

4           **INMATE LUJAN:**  No.

5           **PRESIDING COMMISSIONER ENG:**  Do you know

6    what those are?

7           **INMATE LUJAN:**  Kind of, yeah.

8           **PRESIDING COMMISSIONER ENG:**  Okay.  Do you

9    understand that that's in the mental health area?

10          **INMATE LUJAN:**  Yeah, mental health, yeah.

11          **PRESIDING COMMISSIONER ENG:**  Okay, okay.

12   So, as far as you know then, you have not been in

13   the --

14          **INMATE LUJAN:**  Oh, I haven't.

15          **PRESIDING COMMISSIONER ENG:**  Okay.  So, have

16   you ever taken any psychotropic medication, either

17   in prison or on the streets?

18          **INMATE LUJAN:**  No.

19          **PRESIDING COMMISSIONER ENG:**  Okay.  And, how

20   far did you get in school, sir?

21          **INMATE LUJAN:**  Tenth grade.

22          **PRESIDING COMMISSIONER ENG:**  Tenth grade?

23   Okay.  So, to the best of your recollection while

24   you were growing up in school, were you ever

25   involved in Special Education classes?

26          **INMATE LUJAN:**  I think I was in math.

27          **PRESIDING COMMISSIONER ENG:**  In math?

6

1              **INMATE LUJAN:**  Yeah.

2              **PRESIDING COMMISSIONER ENG:**  Okay, okay.

3    During all the time, or just for a period of time?

4              **INMATE LUJAN:**  Just a period of time.

5              **PRESIDING COMMISSIONER ENG:**  Okay.  So, do

6    you suffer from any disability that would prevent

7    you from participating in the hearing today?

8              **INMATE LUJAN:**  No.

9              **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel,

10   are there any other ADA issues that you feel need

11   further discussion?

12             **ATTORNEY RUTLEDGE:**  No.

13             **PRESIDING COMMISSIONER ENG:**  Okay.  This

14   hearing is being conducted pursuant to the Penal

15   Code and the rules and regulations of the Board of

16   Parole Hearings governing parole consideration

17   hearings for life inmates.  The purpose of today's

18   hearing is to once again consider your suitability

19   for parole.  So in doing so, we will consider the

20   number and the nature of the crimes for which you

21   were committed, your prior criminal and social

22   history, your behavior and programming since your

23   commitment, and your plans if paroled.

24             **INMATE LUJAN:**  Okay.

25             **PRESIDING COMMISSIONER ENG:**  We've had the

26   opportunity to review your Central File, and

27   you'll also be given the opportunity to clarify or

7

1   to correct the record. So, we will consider your

2   progress since your commitment, your counselor's

3   reports, and your mental health evaluation.

4   However, we will focus on your progress and any

5   new reports since your last hearing. So, if you

6   have any changes in your parole plans, you should

7   bring that to our attention when we start talking

8   about the parole plans, okay? We will reach a

9   decision today and inform you whether or not we

10   find you suitable for parole and the reasons for

11   our decision. So, if you are found suitable for

12   parole, the length of your confinement will be

13   explained to you at that time, okay? Before we

14   recess for deliberation, the District Attorney's

15   representative, who is present, your attorney, and

16   you yourself, will have an opportunity to make a

17   final statement regarding your parole suitability.

18   So, if you choose to make a statement to the

19   Panel, just keep in mind to focus on why you feel

20   you are suitable for parole. We will then recess,

21   clear the room, and deliberate. And once we

22   complete deliberations, we will resume the hearing

23   and announce our decision. Okay. The California

24   Code of Regulations states that regardless of time

25   served, a life inmate shall be found unsuitable

26   for and denied parole if in the judgment of the

27   Panel, the inmate would pose an unreasonable risk

8

1    of danger to society if released from prison.  You

2    have certain rights.  Those rights include the

3    right to a timely notice of this hearing, the

4    right to review your Central File, and the right

5    to present relevant documents.  Counselor, so far

6    have your client's rights been met?

7              **ATTORNEY RUTLEDGE:**  Yes.

8              **PRESIDING COMMISSIONER ENG:**  Okay.  You have

9    the additional right to be heard by an impartial

10   panel.  You have been introduced to this Panel.

11   Do you have any objections?

12             **INMATE LUJAN:**  No.

13             **PRESIDING COMMISSIONER ENG:**  Okay.

14   Counselor, do you have any objections?

15             **ATTORNEY RUTLEDGE:**  No.

16             **PRESIDING COMMISSIONER ENG:**  To the Panel?

17   Okay, thank you.  You will receive a copy of our

18   written, tentative decision.  That decision will

19   become final in 120 days.  So, a copy of the final

20   decision and a copy of the transcript will be sent

21   to you.  But you may need to note that on May 1,

22   2004, the regulations regarding the right to

23   appeal a decision made at this hearing will be

24   (inaudible).  And basically, you have to go to

25   court to know.  So, if you have any questions

26   about that policy, you can discuss it with your

27   legal counsel or you can see if you can find the

9

1    policy and review it in your prison law library.

2    Okay.  Sir, you are not required to admit to or

3    discuss your offense; however, this Panel does

4    accept as true the findings of the Court.  Do you

5    understand what that means?

6              **INMATE LUJAN:**  Yes.

7              **PRESIDING COMMISSIONER ENG:**  Okay.

8    Commissioner, is there any confidential material

9    in the file?  And if so, will we be using it

10   today?

11             **DEPUTY COMMISSIONER MELVIN:**  There is

12   confidential material in the file; however, it

13   will not be used today.

14             **PRESIDING COMMISSIONER ENG:**  Okay, thank

15   you.  Did I pass a Hearing Checklist around

16   already?  Is that floating around?

17             **DEPUTY DISTRICT ATTORNEY GURWITZ:**

18   (Inaudible).

19             **PRESIDING COMMISSIONER ENG:**  Okay.  I'm

20   passing the Hearing Checklist around.  Your

21   attorney has already initialed it, and now the

22   District Attorney has initialed it.  And it's

23   labeled Exhibit 1.  And we do this to make sure

24   we're all operating on the same set of documents

25   for your hearing today.

26             **INMATE LUJAN:**  All right.

27             **PRESIDING COMMISSIONER ENG:**  Okay.

10

1    Counselor, are there any additional documents to

2    be presented to the Panel this afternoon?

3            **ATTORNEY RUTLEDGE:**  No.

4            **PRESIDING COMMISSIONER ENG:**  Okay.  Any

5    preliminary objections?

6            **ATTORNEY RUTLEDGE:**  No.

7            **PRESIDING COMMISSIONER ENG:**  And will your

8    client be speaking with the Panel?

9            **INMATE LUJAN:**  Yes.

10           **PRESIDING COMMISSIONER ENG:**  On all matters?

11           **INMATE LUJAN:**  Yeah.

12           **PRESIDING COMMISSIONER ENG:**  Okay.  So, I'll

13   have to swear you in.  Please raise your right

14   hand.  Do you solemnly swear or affirm that the

15   testimony you give at this hearing will be the

16   truth, the whole truth, and nothing but the truth?

17           **INMATE LUJAN:**  Yeah.

18           **PRESIDING COMMISSIONER ENG:**  Okay, thank

19   you.  First off, what I'm going to do is read into

20   the record the statement of facts about the night

21   of the crime, okay.  So, I'm going to take that

22   from the Provision Officer's report.  It's in

23   the -- on page three.  On pages three to four, it

24   starts around on line eleven.  Okay.

25           "Records of the Newport Beach Police

26           Department reveal that on September

27           30th, 1989, at approximately 10:15

11

1 p.m., police responded to a West

2 Balboa Boulevard address to

3 investigate a report that gunshots had

4 been fired.  Their subsequent

5 investigation revealed that the

6 defendant was one of several young men

7 involved in a shooting death of

8 21-year-old John David Fahey,

9 F-A-H-E-Y.  After talking with various

10 witnesses and the suspects, police

11 determined that earlier in the day on

12 September 30, 1989, 21-year-old

13 Heather Rose, a resident at 1324 West

14 Balboa, Apartment A, became involved

15 in a physical altercation with

16 19-year-old Jennifer McMartin,

17 M-C-M-A-R-T-I-N, who was one of

18 several roommates of Mr. Fahey

19 residing at 1324 West Balboa,

20 Apartment C.  The physical altercation

21 occurred because Ms. Rose was jealous

22 of another young woman she felt was

23 becoming involved with 20-year-old

24 Brent Claxton, C-L-A-X-T-O-N, a young

25 man she had been dating.  Ms. Rose

26 reportedly received injuries which

27 necessitated medical treatment.  Later

12

1    in the day, Ms. Rose told her

2    roommate, 21-year-old Leslie Peng,

3    P-E-N-G, that quote, 'some guys are

4    coming over to protect them,' unquote.

5    In the early evening, approximately 20

6    persons arrived, mainly male Hispanic,

7    quote, 'gang types,' unquote.  One man

8    had a handgun, and others carried

9    baseball bats and other items that

10   could be used as weapons.  When the

11   occupants of Heather Rose's apartment

12   heard someone coming down the stairs,

13   the men grabbed the various weapons,

14   and Mr. Fahey was confronted by

15   several of the suspects after he came

16   down the stairs.  A physical

17   altercation ensued involving the

18   victim and several suspects.

19   Subsequently, Mr. Fahey attempted to

20   flee.  However, he was pursued by

21   approximately five suspects, including

22   the defendant.  Mr. Lujan was observed

23   to strike Mr. Fahey with a baseball

24   bat causing the victim to fall to the

25   ground.  The physical assault

26   continued until Stanley Anaya,

27   A-N-A-Y-A, allegedly approached and

13

1           shot the victim in the chest with a

2           .25 caliber handgun.  The victim was

3           transported to a nearby hospital,

4           where he was pronounced dead at 10:45

5           p.m. as a result of a gunshot wound."

6     Sir, is that an accurate description of what

7     occurred that night back in 1989?

8           INMATE LUJAN:  Yeah.

9           PRESIDING COMMISSIONER ENG:  Were you

10    friends with Heather Rose?

11          INMATE LUJAN:  No.

12          PRESIDING COMMISSIONER ENG:  Were you

13    friends with Ms. Peng?

14          INMATE LUJAN:  No.

15          PRESIDING COMMISSIONER ENG:  Did you know

16    anyone in either apartment -- that Apartment A or

17    Apartment C?

18          INMATE LUJAN:  No.

19          PRESIDING COMMISSIONER ENG:  Okay.  So, how

20    did you end up there?

21          INMATE LUJAN:  Later on in the day, some of

22    my friends were going down there to the -- they

23    said it was a party.  And they asked if I wanted

24    to go, because at the time -- at that time and

25    moment, I was selling drugs.  And I was

26    (inaudible).  So, probably, I guess, for drugs to

27    go party with.

14

1      **PRESIDING COMMISSIONER ENG:**  So, did you

2    know also the other -- I guess they were mostly

3    males?

4           **INMATE LUJAN:**  Yes.

5      **PRESIDING COMMISSIONER ENG:**  Okay.  Before

6    going over there?

7           **INMATE LUJAN:**  Yeah.

8      **PRESIDING COMMISSIONER ENG:**  Okay.  And

9    typically, when you were around this group of

10   friends of yours, did they normally go to a party

11   armed?

12          **INMATE LUJAN:**  Yes.

13         **PRESIDING COMMISSIONER ENG:**  With guns and

14   bats?

15          **INMATE LUJAN:**  Normally, not bats.  But,

16   normally guns, yes.

17         **PRESIDING COMMISSIONER ENG:**  So, did you

18   wonder why they were grabbing bats?  Or did you

19   notice?

20          **INMATE LUJAN:**  I didn't notice.

21         **PRESIDING COMMISSIONER ENG:**  Did you --

22          **INMATE LUJAN:**  No.

23         **PRESIDING COMMISSIONER ENG:**  You had no

24   idea?

25          **INMATE LUJAN:**  No, not the bats, no.

26         **PRESIDING COMMISSIONER ENG:**  So, were all of

27   you at another place, and then all decided at a

15

1    certain time, to go over?

2         INMATE LUJAN:  No.  Like I said, when I

3    heard about it was when they were all leaving.

4    And they had mentioned to me that they were going

5    to go to a party.  This was about 8:00 -- 8:30 at

6    night.  And they just asked if I wanted to go, and

7    I said, yeah.  They actually left me because I had

8    to go do something, and then I ended up calling

9    one of the other guys to see where it was going to

10   be at.

11        PRESIDING COMMISSIONER ENG:  So, you

12   actually showed up later and on your own?

13        INMATE LUJAN:  Me and one other person.

14        PRESIDING COMMISSIONER ENG:  So, had you

15   heard any discussion about Ms. Rose having any

16   type of a problem?

17        INMATE LUJAN:  No.

18        PRESIDING COMMISSIONER ENG:  Or as far as

19   you knew, it was simply a party?

20        INMATE LUJAN:  Yeah, that's all I knew.  It

21   was a party.  Because the only time -- we didn't

22   even get a chance to talk to nobody.  I didn't,

23   because when I left my house, all I did was make

24   one phone call.  I said, where are you guys at?

25   They said, over here.  We're going to be right --

26   we're going to be leaving from here.  And that's

27   when I went to Irvine.

16

1          **PRESIDING COMMISSIONER ENG:**  Okay.

2          **INMATE LUJAN:**  So, there was no -- really no

3    conversation.

4          **PRESIDING COMMISSIONER ENG:**  So, I just want

5    to understand.  So, you're intent was really to go

6    to this party, and possibly have an opportunity to

7    sell some drugs to some folks?

8          **INMATE LUJAN:**  Yeah.

9          **PRESIDING COMMISSIONER ENG:**  Is that what it

10   was?  Is that clear?

11         **INMATE LUJAN:**  Yeah.

12         **PRESIDING COMMISSIONER ENG:**  Okay.  So, how

13   did you end up with a baseball bat in your hands

14   outside?

15         **INMATE LUJAN:**  Okay.  Inside the house when

16   we first arrived, I went into the house.  I

17   grabbed a beer.  By that time, people were already

18   out in the front fighting.  So, I think girls were

19   screaming in the house saying, they're fighting

20   outside.  So, when I went out to go out the front,

21   I didn't want to go out the front door, because I

22   didn't know what I was going to go out to.  So,

23   what I did was I went to the back to find the back

24   door to go out the back.  When I was going out the

25   back, in between the corner of the wall, there was

26   a baseball bat.  And I just picked it up and

27   walked out -- and ran out the back door.

17

1        **PRESIDING COMMISSIONER ENG:**  So, what was

2    going to -- why would you pick up the baseball

3    bat?

4        **INMATE LUJAN:**  Not knowing what was going

5    on?  I didn't know what was going on, and so -- to

6    protect myself.

7        **PRESIDING COMMISSIONER ENG:**  But you are

8    going out the back door, to try to avoid what was

9    going on?

10       **INMATE LUJAN:**  Yeah, but I got to go to the

11   front to get in my truck to leave.  My truck is in

12   the front?

13       **PRESIDING COMMISSIONER ENG:**  Okay.  So,

14   somehow you ended up coming face to face with the

15   victim?  Or did I read that incorrectly?

16       **INMATE LUJAN:**  No, yeah.  That's true.  When

17   I came around the house and started to jog down

18   the side of the house, and that's when I meet him,

19   right there.

20       **PRESIDING COMMISSIONER ENG:**  And did you

21   recognize him?  Did you know him?

22       **INMATE LUJAN:**  No, I didn't.

23       **PRESIDING COMMISSIONER ENG:**  So, what did

24   you end up doing?

25       **INMATE LUJAN:**  At that time it took, like, a

26   couple of seconds for us to realize who -- we

27   didn't know each other or what.  And then he

18

1  attempted to swing at me.  I jumped back.  He

2  missed, and then took off, like, took off running.

3  And then I pursued him.

4       PRESIDING COMMISSIONER ENG:  I want to ask

5  you something.  Think back to that night.  What

6  triggered in your mind that you would take off

7  running after him when you had no idea who he was?

8       INMATE LUJAN:  Okay, the -- like I said

9  before and in other hearings, it was happening

10  kind of fast.  But at the time, what I was

11  thinking was -- when he took off to run was to hit

12  him, I guess.  I didn't think.  I was just -- I

13  just reacted.

14       PRESIDING COMMISSIONER ENG:  When you think

15  back now, do you think that he was afraid of you?

16  Because all of a sudden, he came up, and you were

17  standing there with a bat?

18       INMATE LUJAN:  Well, now that I think about

19  it now, yes.  I know he was afraid.  Because of

20  all that happened before.  Our confrontation,

21  like, right there, I didn't know about what

22  happened before because I didn't come out the

23  front.  I went out the back.  So, now that I look

24  back and read these transcripts and understand

25  more, he was afraid.

26       PRESIDING COMMISSIONER ENG:  Otherwise, as

27  far as you knew, he could have been just somebody

19

1   that was walking by the house, or walking by

2   there?

3         INMATE LUJAN:  Yeah, as far as I knew, yeah.

4   Because I didn't know him.

5         PRESIDING COMMISSIONER ENG:  But you still

6   made a choice to go after him?

7         INMATE LUJAN:  Yeah, it was the wrong

8   choice.  I just keep -- I just can't explain what

9   was going through my mind at the time it happened.

10        PRESIDING COMMISSIONER ENG:  Were you angry?

11        INMATE LUJAN:  Angry, yes.

12        PRESIDING COMMISSIONER ENG:  Do you know at

13  what or why you may have felt angry?

14        INMATE LUJAN:  Maybe (inaudible).

15        PRESIDING COMMISSIONER ENG:  Uh-huh.  Okay.

16  So, you were able to catch up to him and strike

17  him?

18        INMATE LUJAN:  Yes, ma'am.

19        PRESIDING COMMISSIONER ENG:  Okay.  So, he

20  ended up falling down because of you striking him

21  with a bat?

22        INMATE LUJAN:  Yes.

23        PRESIDING COMMISSIONER ENG:  Is that

24  correct?

25        INMATE LUJAN:  Yes.

26        PRESIDING COMMISSIONER ENG:  And at that

27  time, is that when these other folks that you knew

20

1    were coming around?  Or was there a crowd around

2    you, or was it just you and Mr. Fahey?

3          INMATE LUJAN:  As far as I know, it was just

4    me and him.  Then when he turned to run and I

5    pursued him, I hit him and he fell on the ground.

6    And that's when other people came around.  I

7    didn't see anybody until that time.

8          PRESIDING COMMISSIONER ENG:  Okay.  Did you

9    see who fired the weapon?

10          INMATE LUJAN:  Yes.

11          PRESIDING COMMISSIONER ENG:  About how many

12    people were surrounding the victim at the time?

13          INMATE LUJAN:  Maybe about three.  I don't

14    know for sure.

15          PRESIDING COMMISSIONER ENG:  But it was

16    obvious who had the gun drawn, or no?

17          INMATE LUJAN:  Well it -- well, after I

18    heard the gun shot, because my back was kind of

19    turned this way when he was lying on the ground,

20    and he came from my right shoulder.

21          PRESIDING COMMISSIONER ENG:  Okay.  What

22    happened after you heard the shot?

23          INMATE LUJAN:  I left.  I ran and got in my

24    truck and left.

25          PRESIDING COMMISSIONER ENG:  Do you know

26    what happened to the other two or three folks that

27    were standing around?

21

1        **INMATE LUJAN:**  Everybody ran.  Everybody

2    took off running.

3        **PRESIDING COMMISSIONER ENG:**  Did you notice

4    that anybody checked to see if the victim was dead

5    or alive?

6        **INMATE LUJAN:**  Not that I know of.  I

7    didn't.  I just took off running.

8        **PRESIDING COMMISSIONER ENG:**  Uh-huh.  Okay.

9    What drugs were you dealing back then?

10        **INMATE LUJAN:**  Crack cocaine.

11        **PRESIDING COMMISSIONER ENG:**  Crack, okay.

12    Was that sort of the drug that you were not only

13    selling, but, you know, dealing in, but were you

14    taking crack at the same time?  Or did you do a

15    lot of drugs?

16        **INMATE LUJAN:**  No.  I experimented here and

17    there, but I never started drugs.

18        **PRESIDING COMMISSIONER ENG:**  But you were

19    not a user?

20        **INMATE LUJAN:**  No.

21        **PRESIDING COMMISSIONER ENG:**  Is that

22    correct?

23        **INMATE LUJAN:**  Yes.

24        **PRESIDING COMMISSIONER ENG:**  Okay.  What

25    about drinking?

26        **INMATE LUJAN:**  I drank occasionally.

27        **PRESIDING COMMISSIONER ENG:**  Okay, okay.

22

1   Would you say that pretty much most at the time,

2   you were stable, you were sober?

3        **INMATE LUJAN:** Yes.

4        **PRESIDING COMMISSIONER ENG:** Not under

5   substance abuse in any way?

6        **INMATE LUJAN:** I was stable.

7        **PRESIDING COMMISSIONER ENG:** Or under the

8   influence? Okay. So, that night had you been

9   doing any drugs and drinking? Were you high?

10       **INMATE LUJAN:** No. I had just taken a drink

11  of the beer. I wasn't high.

12       **PRESIDING COMMISSIONER ENG:** Okay. So, what

13  do you think now when you think back of this Mr.

14  Fahey who lost his life at the age of 21? Not

15  much older than you were at the time?

16       **INMATE LUJAN:** I have been thinking about

17  this for years, almost seventeen years now. And I

18  can't come to grips with how and why it went down

19  the way it did. I can sit here and say I wish it

20  didn't. I wish, like I said before in the past,

21  because then, like I said, I could correct what

22  went wrong -- been wrong. I sometimes beat myself

23  up about it because up there -- because of what I

24  did. Because of what I did, actually causing him

25  to lose his life, because I left him to where he

26  was helpless on the ground. I understand that

27  now. Not that in my mind I thought that someone

23

1   was going to shoot him.  I always try to put it

2   behind me, like, to not think about it, because,

3   you know, because I don't know what I could do.  I

4   try and keep doing the best I can and show you

5   guys that I'm not that person that I was before.

6   If I'd have known -- I was a kid.  If I'd have

7   known better, I would have -- definitely not have

8   even been there that night.  I wouldn't have even

9   been selling drugs.

10           **PRESIDING COMMISSIONER ENG:**  But,

11   unfortunately, you were.

12           **INMATE LUJAN:**  Yes.

13           **PRESIDING COMMISSIONER ENG:**  Okay.  And

14   those were the choices that you made.

15           **INMATE LUJAN:**  I realize that.

16           **PRESIDING COMMISSIONER ENG:**  Okay.  And

17   you're correct that one of the major things that

18   this Panel wants to see is for you to show and

19   explain to the Panel how, after 16, 17 years, you

20   state that you have changed, but how.  How do you

21   show a Panel that you've changed?  That, given any

22   other type of situation, if you were to be on the

23   streets today, that -- how have your thought

24   processes and your reactions and what you would

25   do, how has that changed from back when you were

26   19 years old?  Because you were not under the

27   influence of any alcohol or narcotic?

24

1          **INMATE LUJAN:**  Uh-huh.

2          **PRESIDING COMMISSIONER ENG:**  Okay.  So, you

3    were able to think clearly and make choices.

4          **INMATE LUJAN:**  Yes.

5          **PRESIDING COMMISSIONER ENG:**  So, tell this

6    Panel how that's changed, that you would make --

7    you would not make those incorrect choices again.

8          **INMATE LUJAN:**  Well, because all of the

9    years I've been doing time in here, I've been

10   going to different classes, counseling, and stuff.

11   And I've been learning a lot about how to deal

12   with myself.  And when it comes down to

13   confrontation, what would I do?  I always say --

14   on a daily basis in here, you have confrontational

15   things and people over the smallest things.  And

16   I've always dealt with them, like, okay, I'm

17   sorry, and I walk away.  AVP that I've been going

18   to has also brought to my eyes to show that I can

19   walk away.  I don't have to be in certain

20   situations.  I don't have to -- why even put

21   myself in that spot.  And if I do, what am I going

22   to react -- what is my reaction going to be?  And

23   in the classes, I have learned to be able to speak

24   a little better, because I can hardly talk when it

25   comes to certain things.  I know now that what I

26   was doing as a kid, it was all wrong.  I just --

27   you know, I didn't know.  I don't need to be

25

1    influenced by my friends, money, nothing like

2    that. You know, it has to do with me being

3    responsible enough, and taking, you know, taking

4    considerations of other people. And I try to do

5    that now. I try to look at people for what, you

6    know, that person is. I try to help people if I

7    can by talking to them about what I went through.

8    And I know if by doing the program that I have

9    been doing that it is actually making me feel to

10   myself that I know that I won't be put in a

11   situation to react -- or not to react to anything

12   anymore.

13        **PRESIDING COMMISSIONER ENG:** I hope you

14   understand -- you know, I hear what you're saying,

15   and in a perfect world, we would never be in

16   another situation where you would feel that way

17   again. But reality is that the past has a

18   tendency to repeat itself. I don't know if you've

19   ever heard that term. But there are so many

20   stresses out there and in every day life, once an

21   inmate is released, that it won't be the exact

22   same situation. But you could very well find

23   yourself in another very, very stressful situation

24   that in a very short amount of time, possibly in a

25   split second, you are going to have to make some

26   decisions.

27        **INMATE LUJAN:** Yes.

26

1          **PRESIDING COMMISSIONER ENG:**  On what you are

2    going to do.  So, this is why we want to see --

3    and through this hearing, to see how you have

4    developed or fine tuned some of the things that

5    you may have learned.

6          **INMATE LUJAN:**  Yeah, because even in here.

7    Going to work every day, dealing with the people

8    where I live at in East Dorm -- there's 370 people

9    that you have to deal with different ways and

10   different ethnic, everything.  And I feel that if

11   I can control things in here for myself, you know.

12   I get in arguments with people at work, because

13   now that I'm in the position I'm in, I'm a lead

14   man over there, I have to explain to people do

15   this, do it this way.  I have to learn to deal

16   with each individual certain ways and have to

17   treat everybody differently because I know

18   everybody's not going to react to me telling them

19   what to do or how to do this.  I've been in

20   arguments before, and employer could have got

21   heated.  But I chose to myself, hey, you know,

22   just walk away.  Let it go, turn around and walk

23   away.  And then later on, come back and talk to

24   him again, and try to talk to him in a better way

25   because it's -- and that's the only way I've

26   resolved in being in the position I'm in right now

27   at work so I can -- and I have chronos stating

27

1    from my supervisors, too, a laudatory chrono

2    stating that I have been a good lead man in that

3    spot.  And given that all the people I work -- I

4    work with ten guys under me, and we don't ever see

5    eye to eye.

6            PRESIDING COMMISSIONER ENG:  Uh-huh.

7            INMATE LUJAN:  Guys don't want to do things

8    that, you know, the way that it should be done.

9    They want to do it their way.  And I try to talk

10   to them.  And I've learned after a while, talking

11   to somebody even if their mad, you have to come

12   down to being a better result of getting things

13   done the right way.  And that's what I've been

14   trying to do.  Like I said, every day I work, it's

15   just like -- I know out there on the street is

16   stressful, too, I imagine.  My brother tells me,

17   my sisters tell me.  It's not easy there.  And I

18   know that, but being in here isn't easy either

19   dealing with nothing but convicts and people that

20   don't have rational thinking.  I try to be as

21   rational in everything.  I'm not the smartest

22   person in the world.  I'm not even close to being

23   anything like that, but I try to think and take

24   into consideration how this person thinks or how

25   he's going to react.  So I know how I should

26   react.  And that's what I do every day at work.

27           PRESIDING COMMISSIONER ENG:  Okay, good.

28

1    Let's take a look at your previous record, okay.

2    And yours is laid out a little differently than

3    all the ones that I've seen.  And I'm going back

4    on -- I'm using what I'm reading in the probation

5    officer's report, and again this comes out of the

6    CI&I.  And it reveals that you were arrested back

7    in February 15, 1989, Los Angeles County Sheriff's

8    Office, for Sale of a Controlled Substance,

9    Burglary, and Receiving Known Stolen Property.  Do

10   you remember that?

11          **INMATE LUJAN:**  Yes, ma'am.

12          **PRESIDING COMMISSIONER ENG:**  Okay.  So,

13   again, because you had already stated that you

14   were selling drugs, okay.  But what was the rest

15   of this about?

16          **INMATE LUJAN:**  Oh, the Receiving Stolen

17   Property and Burglary because it was the job I was

18   working at at the time, some of the guys were

19   stealing stuff from them and bringing it to me.

20   And I would give them drugs for it, and they

21   raided my house.  They found all of the stuff in

22   the house, and some drugs that I had sold to some

23   cops going undercover.

24          **PRESIDING COMMISSIONER ENG:**  Okay, okay.

25   So, what was the disposition of that?  What

26   happened?

27          **INMATE LUJAN:**  I actually was going to Court

29

1    on that when I was arrested for this.

2          PRESIDING COMMISSIONER ENG:  Okay.

3          INMATE LUJAN:  I was already convicted for

4    the -- stolen property and went to -- I was in

5    Pelican Bay.  After that 1381 because it was

6    pending on this deal to come back to get a result,

7    and the judge dismissed it.

8          PRESIDING COMMISSIONER ENG:  Okay.  Because

9    you had already done a plea bargain on this

10   murder.

11         INMATE LUJAN:  Yes, ma'am.

12         PRESIDING COMMISSIONER ENG:  Okay, okay.

13   So, that's what I wanted to try to understand.

14   Did that one have -- was that previous one linked

15   to this -- I was reading this about -- that the

16   sheriff's office had received information from

17   neighbors that narcotics were being sold from your

18   home, and that led to an undercover officer

19   purchasing twenty dollars worth of rock cocaine

20   from you.  Is that what led to this arrest in

21   February, or was this something else that

22   happened?

23         INMATE LUJAN:  That's the crime that I'm

24   committed for right now.

25         PRESIDING COMMISSIONER ENG:  No, this was --

26   an undercover officer purchased twenty dollars

27   worth of rock cocaine from you.  And then they

31

1          INMATE LUJAN:  I had found it in my dad's

2    closet.  It was my dad's.

3          PRESIDING COMMISSIONER ENG:  Oh, that must

4    have been embarrassing for your father.

5          INMATE LUJAN:  Yeah, it was.

6          PRESIDING COMMISSIONER ENG:  Was it loaded?

7          INMATE LUJAN:  No.  But I had bullets with

8    it, but it wasn't loaded.

9          PRESIDING COMMISSIONER ENG:  Had you ever

10   used guns?  Did your father ever teach you how to

11   use a gun?

12         INMATE LUJAN:  Oh, when we were young, we

13   used to go to target practice.

14         PRESIDING COMMISSIONER ENG:  Okay.  So,

15   alright.  So, that's been it then.  So, really

16   just the arrest for the Sell of the Rock Cocaine

17   and the Stolen Property, etc.  Okay.

18         INMATE LUJAN:  And I also had a credit card

19   thing.

20         PRESIDING COMMISSIONER ENG:  You know.

21   You're right.  I'm sorry, I had another sticky.

22   This is why.  It was all messed up in here.  I'm

23   sorry.  Because also, later on, in -- on page 13

24   of the probation officer's report.  You're right.

25   I'm glad that you brought that up.  On August

26   2nd -- you're other one happened in, what did I

27   say?

32

1          **INMATE LUJAN:**  February.

2          **PRESIDING COMMISSIONER ENG:**  February.  In

3   August, you were arrested by Redondo Beach Police

4   Department and were charged with Theft by Use of

5   Access Card.  So, you what -- you had a couple of

6   credit cards that weren't yours.  And it states

7   here that your brother found a wallet in the

8   gutter?

9          **INMATE LUJAN:**  Yeah.

10         **PRESIDING COMMISSIONER ENG:**  Near your home?

11         **INMATE LUJAN:**  Yeah.

12         **PRESIDING COMMISSIONER ENG:**  Okay.  And what

13   was the disposition of that one?

14         **INMATE LUJAN:**  I had to pay a fine.

15         **PRESIDING COMMISSIONER ENG:**  Uh-huh.

16         **INMATE LUJAN:**  Six hundred and

17   ninety-something dollar fine.  And that was it.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  No

19   county jail or anything?

20         **INMATE LUJAN:**  No.

21         **PRESIDING COMMISSIONER ENG:**  Or probation?

22   Okay.  And then Torrance Municipal Court reveals

23   that on September, the next month, the end of

24   the -- September 25th, that you were placed on two

25   years informal probation.  After you were

26   convicted -- what were you convicted of?  What's

27   Violating Section 484(a) of the Penal Code?

30

1    searched your home.  That's when they located a

2    lot of sound equipment.  So, that was -- was that

3    how you were arrested on February 15th, or was that

4    another incident?

5         INMATE LUJAN:  No, that's how I was

6    arrested.

7         PRESIDING COMMISSIONER ENG:  Okay, that's

8    what I wanted to be sure about.  I got a little

9    confused with that.  Okay, okay.  So, the only --

10   was that the only time you had an incident with

11   the law enforcement prior to the life crime?

12        INMATE LUJAN:  No.  I had been arrested for

13   carrying a gun when I was 16 or 17.

14        PRESIDING COMMISSIONER ENG:  When you were a

15   juvenile?

16        INMATE LUJAN:  Yes, ma'am.

17        PRESIDING COMMISSIONER ENG:  Oh.

18        ATTORNEY RUTLEDGE:  You got counseling,

19   though, right?  You didn't -- I don't know that

20   there was --

21        INMATE LUJAN:  Yeah, I received counseling.

22        ATTORNEY RUTLEDGE:  Okay.

23        PRESIDING COMMISSIONER ENG:  So, you were

24   carrying a gun?

25        INMATE LUJAN:  Yeah.

26        PRESIDING COMMISSIONER ENG:  And where did

27   you get the gun from?

1          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Petty

2     theft.

3          **PRESIDING COMMISSIONER ENG:**  Anybody have

4     any idea what that is?

5          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Petty

6     theft.

7          **ATTORNEY RUTLEDGE:**  Four Eighty-four is --

8          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Four

9     Eighty-four is theft.

10          **PRESIDING COMMISSIONER ENG:**

11     Four-Eight-Four?

12          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Yes.

13          **ATTORNEY RUTLEDGE:**  Then the credit card

14     thing.

15          **PRESIDING COMMISSIONER ENG:**  That was it?

16     Okay.  So, you did get -- so, yeah, that sounds

17     like what it would have been for.  Oh, okay.  So,

18     you got two years informal probation?

19          **INMATE LUJAN:**  Yeah.

20          **PRESIDING COMMISSIONER ENG:**  Okay.  And then

21     California Department of Motor Vehicles shows that

22     your license was suspended effective April 16,

23     '88, because of a citation.  It says two

24     violations were noted to have occurred in '87 and

25     '88.  Do you know what happened with that?

26          **INMATE LUJAN:**  Yeah.

27          **PRESIDING COMMISSIONER ENG:**  Why did you --

34

1    why did they suspend your driver's license?

2        **INMATE LUJAN:**  Because I was speeding in the

3    car.

4        **PRESIDING COMMISSIONER ENG:**  Did you have a

5    few speeding tickets?

6        **INMATE LUJAN:**  Yeah.

7        **PRESIDING COMMISSIONER ENG:**  Were they

8    excessive?

9        **INMATE LUJAN:**  Yeah, I just had -- yeah,

10    about, I was like going 65 in a 45.

11        **PRESIDING COMMISSIONER ENG:**  Okay.  So, is

12    that it?

13        **INMATE LUJAN:**  Yeah.

14        **PRESIDING COMMISSIONER ENG:**  And have we

15    covered it all?

16        **INMATE LUJAN:**  Yeah.

17        **PRESIDING COMMISSIONER ENG:**  Okay.  And then

18    we take a look at your social history.  I see that

19    you were born on June 19th, 1970.  And you were

20    about what, 19 years old --

21        **INMATE LUJAN:**  Yes.

22        **PRESIDING COMMISSIONER ENG:**  -- when the

23    life crime happened.  And you're currently 36?

24        **INMATE LUJAN:**  Yes.

25        **PRESIDING COMMISSIONER ENG:**  Okay, okay.

26    And it states here that you had a satisfactory

27    relationship with your family.  You worked with

35

1    your father.  What else -- I'm trying to see what

2    else I can see here.  You had -- you have three

3    sisters and one brother?

4           INMATE LUJAN:  Yes, ma'am.

5           PRESIDING COMMISSIONER ENG:  Where are you

6    in the -- within the five children?

7           INMATE LUJAN:  The second youngest, but the

8    oldest boy.

9           PRESIDING COMMISSIONER ENG:  You're the

10   second oldest, but the -- oh, so the two last ones

11   are two boys.

12          INMATE LUJAN:  Yeah.  Me and my brother.

13         PRESIDING COMMISSIONER ENG:  And then --

14         INMATE LUJAN:  And my three sisters.

15         PRESIDING COMMISSIONER ENG:  All three

16   sisters, okay.  Okay.  So, is the family close?

17         INMATE LUJAN:  Yeah.

18         PRESIDING COMMISSIONER ENG:  It says here

19   your family relationships were poor in the past,

20   but they're better now.

21         INMATE LUJAN:  Yes.  I said -- what I mean

22   by yes is, because everybody was close, but I

23   chose to do things that didn't fit into that.  And

24   I kind of veered off, and when I was selling

25   drugs, they didn't want me to do that.  They

26   didn't like me to do that.  They kept trying to

27   tell me to stop.  But at that time, I was just --

36

1    I wanted to do what I wanted to do, you know.  The

2    money was just too easy, so I just took it.  I

3    didn't listen to nobody.

4         PRESIDING COMMISSIONER ENG:  So, you were

5    rather rebellious?

6         INMATE LUJAN:  Yes.

7         PRESIDING COMMISSIONER ENG:  At what age did

8    that really start?

9         INMATE LUJAN:  Fifteen, sixteen, because I

10   didn't even want to go to school anymore.

11        PRESIDING COMMISSIONER ENG:  Uh-huh.

12        INMATE LUJAN:  And the last -- it was tenth

13   grade when I was -- tenth grade was the last grade

14   I went to school, actually finished.  I just

15   didn't want to go anymore.

16        PRESIDING COMMISSIONER ENG:  Have any of

17   your older sisters, have they ever had any

18   problems with school or with the law?

19        INMATE LUJAN:  I don't know about the law,

20   but my older sister, which is Virginia, she kind

21   of ran away from home when I was young.

22        PRESIDING COMMISSIONER ENG:  Were your

23   parents very strict?  When you look at your family

24   and growing up, was everybody pretty much happy

25   and was it a close family?

26        INMATE LUJAN:  Yeah.

27        PRESIDING COMMISSIONER ENG:  And would you

37

1  say that it was your choice to go off in a

2  different direction?

3         INMATE LUJAN:  Yeah.

4         PRESIDING COMMISSIONER ENG:  But your family

5  wasn't happy, and they were aware of this?  Is

6  that correct?

7         INMATE LUJAN:  Yeah.  And they tried

8  everything they could to get me to not do the

9  things I was doing.

10         PRESIDING COMMISSIONER ENG:  Okay.  So, are

11  you -- I thought I read somewhere that your father

12  passed away.  Did he?

13         INMATE LUJAN:  Yeah.

14         PRESIDING COMMISSIONER ENG:  A little while

15  ago?

16         INMATE LUJAN:  Yeah.

17         PRESIDING COMMISSIONER ENG:  Okay.  But your

18  mother is still alive?

19         INMATE LUJAN:  Yes.

20         PRESIDING COMMISSIONER ENG:  Okay.  And are

21  all of your siblings still alive?

22         INMATE LUJAN:  Yeah.

23         PRESIDING COMMISSIONER ENG:  Okay.  And so

24  where is your mother right now?

25         INMATE LUJAN:  She's living in Downey,

26  California.

27         PRESIDING COMMISSIONER ENG:  Okay.  And how

38

1    about your siblings.  Are they close?

2         INMATE LUJAN:  Yeah.  My sister -- one of my

3    sisters lives in Long Beach, and one lives in

4    Buena Park.  My brother lives with my mom.

5         PRESIDING COMMISSIONER ENG:  Your youngest

6    brother?

7         INMATE LUJAN:  Yeah.

8         PRESIDING COMMISSIONER ENG:  Okay.  He lives

9    with your mom, okay.  He lives with your mother.

10   Okay.  And are you in touch with all of them?

11        INMATE LUJAN:  Yes.

12        PRESIDING COMMISSIONER ENG:  So, did you

13   ever get married?

14        INMATE LUJAN:  Yes, I did.

15        PRESIDING COMMISSIONER ENG:  Okay.  I know I

16   saw something somewhere.  Tell me about that.

17        INMATE LUJAN:  I got married in 1990, I

18   think.  When I was --

19        PRESIDING COMMISSIONER ENG:  You're right.

20        INMATE LUJAN:  When I was in Pelican Bay,

21   she made the choice to and wanted to get married,

22   and I had to try to explain to her that, you know,

23   I don't know when I'm going to get out.  That, you

24   know, she has to really think about it.  And she

25   says she wanted to take care of me, to be there

26   with me, be by my side.  And so we got married,

27   and we were -- we'd been together for the whole

39

1    time until last year.  She doesn't have any kids,

2    and she's already 37 years old now.  So, she asked

3    if she could get on with her life, and I had to

4    say, yeah.

5          PRESIDING COMMISSIONER ENG:  This is -- how

6    do you pronounce her name?  Amparo?

7          INMATE LUJAN:  Amparo.

8          PRESIDING COMMISSIONER ENG:  Amparo, okay.

9    So, since 1990.  And that's -- so you are letting

10   her go?

11         INMATE LUJAN:  Yes.

12         PRESIDING COMMISSIONER ENG:  Okay.  Has

13   it --

14         INMATE LUJAN:  I already did let her go.

15         PRESIDING COMMISSIONER ENG:  You did?

16         INMATE LUJAN:  Last year.  She came up to

17   see me and asked me if she could get on with her

18   life, and I told her yeah.  I can't say no.  You

19   are my best friend, you're my -- you were there

20   for me this whole time.

21         PRESIDING COMMISSIONER ENG:  Uh-huh.

22         INMATE LUJAN:  And I can't -- excuse me, I

23   can't make you do what I did.  This is what I did.

24   I have to take this responsibility, and I need to

25   let you get on.  Now she means everything to me,

26   but I know it's best for me to just let her do

27   what she has to do.

40

1        **PRESIDING COMMISSIONER ENG:**  So, when did

2  this split happen?

3        **INMATE LUJAN:**  Last year in November.  She

4  came up for our anniversary.

5        **PRESIDING COMMISSIONER ENG:**  Uh-huh.

6        **INMATE LUJAN:**  We still talk.  I mean, we

7  still -- like I say, she's my best friend.

8        **PRESIDING COMMISSIONER ENG:**  Okay.

9        **INMATE LUJAN:**  And she's still there for me.

10  She says -- she wrote a support letter and

11  everything.  It's just -- and it's hard for her,

12  and I feel for her.  But like I said, I

13  understand.

14        **PRESIDING COMMISSIONER ENG:**  Okay.

15        **INMATE LUJAN:**  I'm not going to be selfish

16  and just think of myself.

17        **PRESIDING COMMISSIONER ENG:**  So, do you have

18  a child?

19        **INMATE LUJAN:**  Yes, I have --

20        **PRESIDING COMMISSIONER ENG:**  Or children?

21        **INMATE LUJAN:**  Well, from what I hear.  I

22  don't know.  Because none of them ever came and

23  told me.  They just -- people just say.  Like they

24  told my brother and my sisters, they didn't tell

25  me.  But I think it was because I was out there,

26  and they just didn't want to let me know.

27        **PRESIDING COMMISSIONER ENG:**  Well, prior to

41

1    you becoming incarcerated, did you have any known

2    children?

3         INMATE LUJAN:  The one boy, Javier.  He -- I

4    actually got to hold him one time.

5         PRESIDING COMMISSIONER ENG:  Okay.

6         INMATE LUJAN:  And that was on a Wednesday

7    or Thursday before this case.

8         PRESIDING COMMISSIONER ENG:  Okay.  And

9    since that time, are you aware of where he is or

10   what's going on with him?

11        INMATE LUJAN:  No, I tried to find him,

12   tried to find his mother, but she kind of left.

13   The last letter I got from her was when I was in

14   Jamestown in '94, I think it was.  And she had

15   told me that when he is old enough to ask who his

16   father is, she'll tell him.  She'll let him know.

17        PRESIDING COMMISSIONER ENG:  So, as far as

18   you know, you just have one son -- what was his

19   name?

20        INMATE LUJAN:  Javier.

21        PRESIDING COMMISSIONER ENG:  Javier, okay.

22        INMATE LUJAN:  Yeah, as far as I know.

23        PRESIDING COMMISSIONER ENG:  Okay, okay.

24   Have I missed anything that you would like me to

25   add into the record about your family and your

26   upbringing?  Is there anything that you can think

27   that I missed?

42

1          INMATE LUJAN:  Well, when I said we're

2    better now as a family, because now I think about

3    them more than anything.  They were like, were so

4    close.  They come and see me all the -- as much as

5    they can.  It's just kind of far for them coming

6    up.  But at times, I do get to go out there and

7    see my nieces and nephews.  I mean, I'm -- I feel

8    that there's nothing more important than family.

9          PRESIDING COMMISSIONER ENG:  Let me ask you

10   something.  Would you say that through a lot of

11   the years, they were always there?

12          INMATE LUJAN:  Always, from day one.

13          PRESIDING COMMISSIONER ENG:  Okay.  But you

14   weren't?

15          INMATE LUJAN:  Yes.

16          PRESIDING COMMISSIONER ENG:  Okay.  Right

17   now I'm going to have -- Commissioner Melvin is

18   going to review your post-conviction factors, and

19   bring us up to date.

20          DEPUTY COMMISSIONER MELVIN:  Okay, Mr. -- is

21   it Lujan?

22          INMATE LUJAN:  Yes, ma'am.

23          DEPUTY COMMISSIONER MELVIN:  Mr. Lujan, as

24   stated, I am going to cover what you've done since

25   your last appearance before the Board.  I prepared

26   for this portion of the Hearing by reviewing your

27   C-Files, submissions from your attorney, the file

43

1    prepared for me in this matter including the

2    report from CC1 S. Mitchell dated 12/6/06.  And

3    the psychological report from Dr. Laura Petrocek

4    dated 12/16/05.  Your custody level at this time

5    is medium A.  Your classification score is 19.

6    Regarding your disciplinary matters, you have a

7    total of two 115s, the last one being 2/11/97 for

8    Attempting to Smuggle Photos.  And then you have

9    three 128s, the last one being March 30, 1995 for

10   Gambling.  Your current work assignment is Prison

11   Industrial Authority Furniture Maker, and you have

12   vocations in the area of -- areas of Silk

13   Screening, which you earned in 1995; Vocational

14   Welding, which you earned in 1999; and then

15   Machine Operation I, which you earned in '03,

16   September of '03.

17        **INMATE LUJAN:**  Right.

18        **DEPUTY COMMISSIONER MELVIN:**  And regarding

19   the PBH report prepared by CC1 Mitchell, the

20   person indicates that you do have support letters

21   stating that your family will provide a place of

22   residence and financial support.  And, in summary,

23   Mitchell recommended that you remain disciplinary

24   free, you earn positive chronos, which you did,

25   and participate in self help programs, which you

26   did, and which I'll go into later.  According to

27   Dr. Zeekas (phonetic) -- I'm sorry, not Zeekas,

44

1    Dr. Petrocek.   The doctor indicates that Mr.

2    Lujan's report currently does not differ or

3    deviate significantly from that which has

4    previously been reported.   As related in previous

5    reports, he is still vague about his motive in the

6    crime, "it happened so fast."   Regarding relevance

7    of mental condition to life crime, the inmate

8    stated, I felt I was macho.   He states, "I'm a

9    better person than I was before."   Mr. Lujan was

10   remorseful about the death of the victim.

11   Regarding your assessment for dangerousness, the

12   doctor indicates that within a controlled setting,

13   you possess some risk as of '93 and '96 based on

14   reading your C-File.   If released into the

15   community, your violence potential is estimated to

16   be below average when compared to the average

17   citizen in the community.   Significant risk

18   factors and precursors to violence are his past

19   substance abuse, and a relapse would increase his

20   risk for violence and undo his gains he has made.

21   If paroled, the doctor suggests that you be

22   mandated to attend both AA and NA meetings, and

23   have frequent periodic drug testing for alcoholic

24   and illegal substances.   The doctor goes on to say

25   that you are still vague about why you committed

26   the crime.   He believes that you need to do some

27   more sole searching about your motives before

45

1    considering -- before being considered for a

2    parole release date.  And I do have some questions

3    about that, and I'm going to ask a little bit

4    later.  Do you have any comments on the reports,

5    Ms. Rutledge or Mr. Lujan?

6          **INMATE LUJAN:**  No.

7          **ATTORNEY RUTLEDGE:**  I have writing on mine.

8    Is there writing on your report?

9          **DEPUTY COMMISSIONER MELVIN:**  There is

10    writing on my report.  However, I don't know if

11    it's -- who wrote these things.

12          **ATTORNEY RUTLEDGE:**  Could it have been the

13    last Board because it wouldn't have been in the

14    C-File then?

15          **DEPUTY COMMISSIONER MELVIN:**  I have --

16    honestly, I really, really don't know.  I can tell

17    you this.  In reading the report, I'm looking at

18    what's typed, and I'm not introducing any

19    additional writings and considering them in my

20    assessment of this report.  So, you know, that's

21    all I have to say in response to the writings that

22    are on the report.  Do you want to add anything to

23    that?

24          **PRESIDING COMMISSIONER ENG:**  No, I agree,

25    because often times some of the copies that I get

26    are also -- I pretty much know I do all the

27    reading myself.  Because, Mr. Lujan, this is for

46

1  your benefit -- that no matter what, and I know

2  what you referred to what you said to previous

3  panels.  And generally, every day is a new day.

4  We've got new people.  We've, you know, we read

5  the same information, but we may look at it a

6  little differently.  So, that's why we engage you

7  in conversation.  So, you know --

8          INMATE LUJAN:  Yeah, because that's why when

9  I first came in, I wasn't going to speak about the

10  crime.  But I figured you guys didn't see it on my

11  last hearing, so I said I'll probably try it this

12  time.  Like I said, I have -- and in the

13  highlight, I'll tell you exactly what I did and

14  what I'm responsible for.

15          PRESIDING COMMISSIONER ENG:  And I think

16  that's wise, because I think a lot of people may

17  assume that the Panel always read all the previous

18  transcripts.  And to be honest with you, we don't.

19  Okay.  And not just because of time, but in order

20  to be fair and open and unbiased.  And it's our

21  reading of what we see here, and then the

22  discussions.  Okay.  And so --

23          DEPUTY COMMISSIONER MELVIN:  There's a

24  couple more things that I need to go over, and

25  those are the laudatory chronos you've earned

26  since January 26.  There is a chrono here from J.

27  Kramer, and it's dated 10/22/06.  And it's for

47

1    your participation in a two-hour Alternatives to

2    Violence Project.  And he notes specifically what

3    you've learned in participating in the project,

4    and he indicates that you are -- you were an

5    active -- interactive participant radiating

6    positive energy and exuberance.  The program will

7    change your life daily as different or difficult

8    situations arise.  AVP's goals are to educate and

9    publicize the transformations that can happen as a

10   result of the workshops in which all participants

11   are actively involved.  The next chrono is dated

12   10/04/06, and that's from J. Kramer as well.  And

13   that's for your participation in Wednesday AA

14   Central Group for the third quarter.  The next

15   laudatory chrono was dated 9/19/06, and that's

16   from R. Pope.  And that's for your participation

17   in Alternatives to Violence Project, and he goes

18   on to say what the project involves.  And he

19   indicates that you should be commended for your

20   successful participation and completion of the AVP

21   workshop and his individual contribution to

22   promoting a peaceful, nonviolent programming

23   environment at CTF.  The next laudatory chrono is

24   dated 7/14/06, and that's for your participation

25   in Wednesday AA Central A Group for the second

26   quarter.  And basically, by following the twelve

27   steps of recovery in his life, he can show his

48

1    willingness to improve himself if applied.  Mr.

2    Lujan is to be commended for his role in the

3    success of the group.  And then, finally, there is

4    a chrono dated 4/5/06 from J. Kramer.  And he

5    indicates that -- or commends you for your

6    participation in Wednesday AA Central Group, and

7    this is for the first quarter.  And it's basically

8    saying the same thing as the previous laudatory

9    chrono.  And I've got some questions for you

10    regarding what you've learned in these programs

11    and classes.  Which of the twelve steps is the

12    most important to you and why?

13        **INMATE LUJAN:**  I'd say step four.

14        **DEPUTY COMMISSIONER MELVIN:**  Okay.  And what

15    is the step, and why is it the most important one

16    to you?

17        **INMATE LUJAN:**  Individual searching.  Moral

18    inventory of myself.  I think that's -- you know,

19    I had to dig deep inside of me and really see who

20    I am in order for me to change.  And I think I've

21    done that today.  I've taken that first step.

22        **DEPUTY COMMISSIONER MELVIN:**  And I wanted to

23    make sure that I covered everything that I'm

24    supposed to cover in my portion.  If there is

25    anything that I've left out by way of certificates

26    or laudatory chronos, please let me know.

27        **INMATE LUJAN:**  I got a couple more --

49

1          **DEPUTY COMMISSIONER MELVIN:**  Okay.

2          **INMATE LUJAN:**  -- for AVP.  Do you want

3    them?

4          **DEPUTY COMMISSIONER MELVIN:**  Yes, please.

5          **PRESIDING COMMISSIONER ENG:**  Sir, while

6    Commissioner Melvin is looking at this, I wanted

7    to ask you this.  I did notice that you had

8    declined to review your Central File at the last

9    two times.  Is that true?

10          **INMATE LUJAN:**  No, I reviewed.

11          **PRESIDING COMMISSIONER ENG:**  You did.

12          **INMATE LUJAN:**  Yes.  I was in there for

13    almost three hours.

14          **PRESIDING COMMISSIONER ENG:**  Was that just

15    in the last, like month or so?

16          **INMATE LUJAN:**  This was -- my last one was

17    in January.  January or February.  I don't know.

18    It was December when I reviewed my file this last

19    time.  But I was supposed to come in January for

20    this.

21          **PRESIDING COMMISSIONER ENG:**  Oh, all right.

22    Because according to the Board report, I noticed

23    because I was going to ask.  I was concerned

24    because I saw -- I found two where in February of

25    '05, you declined.  And then again you declined to

26    review it in October of '06.  So, I was a little

27    concerned about that.

50

1          **INMATE LUJAN:**  No, I don't decline.  I look.

2          **PRESIDING COMMISSIONER ENG:**  Oh, okay.

3          **INMATE LUJAN:**  I review.

4          **PRESIDING COMMISSIONER ENG:**  Good, okay.

5    Sorry, Commissioner.

6          **DEPUTY COMMISSIONER MELVIN:**  That's quite

7    all right, Ms. Eng.  Okay, I have -- excuse me,

8    three additional laudatory chronos.  And the first

9    one I'm going to read is dated 10/22/06, and it's

10   from J. Kramer.  And it's for Mr. Lujan's

11   participation in a two-hour Alternatives to

12   Violence Project Follow-up Class held Monday,

13   October 16th of last year.  And he notes that you

14   were an interactive participant radiating positive

15   energy and exuberance.  And he believes that the

16   program will change your life daily as different

17   or difficult situations arise.  And then the next

18   chrono is dated 12/21/06, and again, it's for your

19   participation in a two-hour Alternatives to

20   Violence Project.  And this particular component

21   involved the theme of trust.  It was centered

22   around, I guess, developing trust, and the

23   foundations of trust.  And then the final

24   laudatory chrono is dated 9/19/06, and it's from

25   R. Pope, the Associate Warden.  And it's for your

26   voluntary participation in the Alternatives for

27   Violence Project.  And he goes on to say what the

51

1    project entails -- I'm sorry, what the workshop

2    entails, and he commends you for your successful

3    participation and completion of the AVP workshop

4    and your individual contribution to promoting a

5    peaceful, nonviolent programming environment at

6    CTF.  And I'm going to, I guess, turn these back

7    over to you and they will be placed in your -- you

8    need to make a copy of them, and then the

9    originals will be placed in your C-File.

10            **INMATE LUJAN:**  Okay.

11            **DEPUTY COMMISSIONER MELVIN:**  Wait.  Is that

12    right?

13            **ATTORNEY RUTLEDGE:**  They should have put the

14    original in and then given him the --

15            **PRESIDING COMMISSIONER ENG:**  Yeah, he should

16    have had a copy.

17            **DEPUTY COMMISSIONER MELVIN:**  Oh, okay.  So,

18    the originals are likely in the C-File.

19            **PRESIDING COMMISSIONER ENG:**  But if I

20    were -- we are going to give these back to you,

21    and then you can follow up with whomever to make

22    sure --

23            **INMATE LUJAN:**  They are in there.

24            **PRESIDING COMMISSIONER ENG:**  Because we

25    don't want you losing them.

26            **ATTORNEY RUTLEDGE:**  There's some more I've

27    given to the other Commissioner right in front of

52

1    you in the file.

2            **DEPUTY COMMISSIONER MELVIN:**  Oh, okay.

3    Thank you.  Thank you, Ms. Rutledge.  And this

4    laudatory chrono -- these are more recent.  It's

5    dated 2/12/07, and this is for -- and this one I

6    should probably read,

7            "During their previous eight hours --

8            eight years as a North Facility and

9            East Dorm Housing Officer, I have had

10           the opportunity to routinely observe

11           Mr. Lujan's institutional adjustment

12           while performing my duties.  He has

13           always been respectful and

14           communicates well with staff and

15           peers.  As a Welder at North Facility,

16           he has done outstanding work on our

17           staff office.  He really takes pride

18           in his work.  He is also an astounding

19           artist.  Throughout the years, his

20           crafts and drawings have been

21           displayed in our institutional hobby

22           store.  Mr. Lujan is a man who has

23           made significant changes in his life

24           to become a better person.  These

25           changes are notable in his work,

26           communication, and art.  He has

27           matured tremendously by taking

53

1           advantage of available institutional

2           problems (AA, NA, AVP, Anger

3           Management, and Mediation) which have

4           allowed him to develop empathy, tact,

5           personal responsibility, and remorse.

6           He appears to have earned a chance to

7           parole."

8   For this, Mr. Lujan is to be commended.  And this

9   is from T. Munoz, the Dorm Officer in First Watch

10  at CTF.  The next one is dated 2/15/07, and it's

11  from Correctional Officer P. Sterling.  And he is

12  part of the East Dorm Industries Patrol.  And it

13  says that,

14          "Mr. Lujan was initially housed here at

15          CTF -- I'm sorry, Central Facility East Dorm

16          in 2000, and has remained housed here since

17          that time.  As East Dorm Industry Patrol

18          Officer, I have had the opportunity to

19          observe Mr. Lujan and his relationship --

20          relations with the prison community

21          throughout his daily activities.  His work

22          habits are professional and above average to

23          exceptional.  He appears to have the

24          confidence and respect of his immediate

25          supervisors, as his CDC 101 work report will

26          reflect.  As a member of Narcotics Anonymous

27          group, he has been responsible for

54

1    coordinating several fundraising events.

2    During this period, I have observed Mr.

3    Lujan exercise exemplary communication

4    skills, tactfulness, and interpersonal

5    skills.  He exercises them well with staff

6    and inmates alike.  This chrono is written

7    as a character reference of the person Mr.

8    Lujan is today."

9    And again, that's from Correctional Officer

10   Sterling.  And this one is from the Watch Officer,

11   A. Salazar.  And he's East Dorm Second Watch

12   Officer, and it's dated 2/9/07.  It says that,

13   "Mr. Lujan has been housed at the East

14   Dorm Facility for seven years now.

15   East Dorm is a privileged facility

16   that requires inmates to remain

17   disciplinary free, follow housing

18   regulations as they pertain to

19   security safety concerns, program

20   productively in a working environment.

21   As the facilities' second watch dorm

22   officer, I have had the opportunity to

23   observe Mr. Lujan throughout his daily

24   activities during the past seven

25   years.  He is always respectful to his

26   peers and staff alike.  By remaining

27   disciplinary free in a sensitive

55

1　　　　　environment such as the East Dorm

2　　　　　Facility, he demonstrates a mature

3　　　　　level of responsibility, tactfulness,

4　　　　　and concern for himself, staff and

5　　　　　inmates who live with him.  He's

6　　　　　earned the respect of many who know

7　　　　　him.  He has definitely earned mine."

8　The next one is from Scott Collins whose PI is

9　Superintendent, and it's dated 2/9/07.  And he says

10　that;

11　　　　　"you were assigned to the PIA

12　　　　　Furniture Production Factory.  And as

13　　　　　a Furniture Sander, you are

14　　　　　responsible for constant flow of

15　　　　　production into the paint room.

16　　　　　You've done a job well -- you've done

17　　　　　your job well.  And he -- you've been

18　　　　　promoted as a 10-105 to this spray

19　　　　　booth position where he -- where you

20　　　　　have excelled tremendously.  In

21　　　　　December of '06 you received a

22　　　　　certificate of -- certification of

23　　　　　proficiency.  You are currently the

24　　　　　lead man in a -- in the spray booth

25　　　　　and continues to do a good job.  In

26　　　　　addition, he's done well to take

27　　　　　advantage of all the available

56

1    training PIA offers through our inmate

2    employability program.  They include

3    Finding Employment Program, Anger

4    Management, Reengaging in Society and

5    Community Reentry."

6 And then the following -- the last and final chrono

7 is from Tom Graves who is PIA Superintendent, and

8 it's dated 2/9/07.  And he says,

9    "that for the past eight years, he's

10    had the opportunity to work with

11    numerous inmates.  It has not been my

12    practice to write laudatory chronos for

13    inmates.  But in the case of inmate

14    Lujan, I take exception.  Over the last

15    two years, I have been his direct

16    supervisor.  I have witnessed his

17    ability to work well with -- to work

18    well under stressful situations.  As

19    the lead man in the paint spray booth

20    area, he has led other inmates in

21    meeting various deadlines with the PIA

22    Furniture Factory.  He stepped into

23    this lead man position after previously

24    men were not able to meet the job

25    requirements.  His ability to work well

26    with different supervisors and inmates

27    has shown this writer such important

57

1           skills as effective communication,

2           adaptability, and a willingness to work

3           in what is often a stressful,

4           high-paced job.  These attributes will

5           certainly be valued over -- once Mr.

6           Lujan is released.  This chrono is

7           written as a character reference for

8           the reader."

9  And thank you very much.  There are no additional

10 chronos to my knowledge, so I will turn over the

11 matter -- the hearing to the Chair.

12          **PRESIDING COMMISSIONER ENG:**  Mr. Lujan,

13 let's talk about your parole plans.  Do you have

14 any current letters?

15          **INMATE LUJAN:**  Yes.

16          **ATTORNEY RUTLEDGE:**  I think I gave them to

17 you.  Do you have a stack?  I gave them to Mr. --

18 when I gave the chronos, I gave the stack of

19 letters to Deputy Commissioner Mejia.  It was

20 about ten or twelve letters.

21          **PRESIDING COMMISSIONER ENG:**  I was

22 wondering, because I didn't have anything.  That's

23 why I asked if there were any additional

24 documents, I thought -- wait a minute.  Are they

25 under here?

26          **ATTORNEY RUTLEDGE:**  That looks like them.

27          **PRESIDING COMMISSIONER ENG:**  They were

58

1   underneath this.  Okay.  Sorry.  I had no idea

2   that these were here.

3          **ATTORNEY RUTLEDGE:**  He also has -- I think

4   he has it down, but he has -- I think it's in

5   writing, but as far as his resume and his

6   (inaudible).  I just noticed he had it in there

7   and hadn't given it to you.  I'm sorry about that.

8          **PRESIDING COMMISSIONER ENG:**  Okay.  So, at

9   least let me start.  Okay, okay.  I was wondering

10  because I had read -- and I thought, gee, I only

11  have one letter.  They didn't give me anything

12  else.  And then I was reading the previous

13  decision saying that you had really solid plans.

14  And I said, something is wrong here.  Okay.  We've

15  got a current letter of February 2nd, 2007, signed

16  by Michelle Lujan.  And who's Michelle?

17         **INMATE LUJAN:**  She's my sister.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  This is

19  one of your three older sisters.  Okay.  And she

20  lives in Buena Park, California.  And she does

21  state that I have offered Leroy a place to parole.

22  She owns a three bedroom, one bath house in Buena

23  Park.  And that Leroy would have his own bedroom.

24  He will be allowed to stay the first three months

25  rent free in order to help him adjust.  They are

26  only thirty miles away from the old neighborhood

27  that you grew up in, and she has no contact with

59

1    any individuals from your past.  Her house is on a

2    quiet street in a good neighborhood.  She states

3    that you have many job selections.  Let's see.

4    Okay.  So, this sister is providing you -- is this

5    your first choice for residence?

6          INMATE LUJAN:  Yes, ma'am.

7          PRESIDING COMMISSIONER ENG:  Okay, okay.

8          INMATE LUJAN:  That's my first choice.

9          PRESIDING COMMISSIONER ENG:  Okay.  And I --

10   and according to this Board report, you have a

11   backup with your ex-wife, Amparo, right?

12         INMATE LUJAN:  Yes, ma'am.

13         PRESIDING COMMISSIONER ENG:  And I'm

14   assuming there's a letter in here.  I'd rather --

15   here it is.  I got it.  And this letter is dated

16   January 8, 2007.  And she states that the two of

17   you have been together for nineteen years, and

18   still remain -- and she still remains committed to

19   him and his current situation.  She states that

20   you can come and reside with her at her residence

21   located in Compton, California.  That's a single

22   family residence consisting of four bedrooms and

23   two bathrooms and a double car garage.  Her home

24   is conveniently located across the street from

25   Compton Community College where Leroy will be able

26   to carry on his desires to expand his education.

27   She states that you have solid employment offers,

60

1    and we'll get to those.  I'm assuming there's

2    letters.  Here's one with a family tire business.

3    And there's also a position at Crown Carton

4    Company.  Are those close to Compton?  The two job

5    offers?

6         INMATE LUJAN:  Pretty close, yeah.

7         PRESIDING COMMISSIONER ENG:  Okay, okay.

8    So, she lives in a large home by herself?

9         INMATE LUJAN:  No, she lives with her mother

10   and step-father.

11        PRESIDING COMMISSIONER ENG:  Okay.  So,

12   yeah.  This letter is signed by Mrs. Amparo,

13   A-M-P-A-R-O, Lujan.  And it states he's a U.S.

14   Navy Reservist.  Okay.  So, okay.  So, those are

15   the two residences, right?

16        INMATE LUJAN:  Uh-huh.

17        PRESIDING COMMISSIONER ENG:  Okay.  Are

18   there any other backup residence letters?

19        INMATE LUJAN:  My mother.

20        PRESIDING COMMISSIONER ENG:  Okay.  I just

21   don't want to make sure that I don't miss

22   anything, and that I pull them all together at the

23   right time.  What is your mother's name?

24        INMATE LUJAN:  Elizabeth.

25        PRESIDING COMMISSIONER ENG:  Elizabeth?

26   Here we go.  Okay.  October 20th, 2006.  It's a

27   typed letter, it's not signed, but it's,

61

1    sincerely, Elizabeth Lujan.  She states that she

2    is Leroy's mother, and this is her letter of

3    support for your parole.  And I'm trying to see.

4    She says she is 70 years old, and she's asking to

5    please see the remorse in him.  I need him to come

6    home to me and help him start his new life as a

7    changed man.  She states, our family is very

8    close.  We have job offers waiting for him.  We

9    have a car and money to get new clothes.  He has a

10   place to stay, either with me or for sure with his

11   sister.  So, let's see.  Where did you say your

12   mother lives?  In Downey?

13        INMATE LUJAN:  Yes, ma'am.

14        PRESIDING COMMISSIONER ENG:  And does she

15   own her own home?

16        INMATE LUJAN:  Yes.

17        PRESIDING COMMISSIONER ENG:  And is that the

18   home that you grew up in?

19        INMATE LUJAN:  No.

20        PRESIDING COMMISSIONER ENG:  It's another

21   home, okay.  How large is it?

22        INMATE LUJAN:  She's got, I think three

23   bedrooms and two baths.

24        PRESIDING COMMISSIONER ENG:  So did --

25        INMATE LUJAN:  She just actually moved there

26   within the last few years.

27        PRESIDING COMMISSIONER ENG:  Okay, okay.

62

1        **INMATE LUJAN:**  After my father passed away.

2        **PRESIDING COMMISSIONER ENG:**  Okay.  So, it's

3   just your mother and your youngest brother?

4        **INMATE LUJAN:**  Yes.

5        **PRESIDING COMMISSIONER ENG:**  Javier and your

6   mother so there's room for you also.

7        **INMATE LUJAN:**  Yes.

8        **PRESIDING COMMISSIONER ENG:**  Okay.  So,

9   that's a support letter from your mother.  In

10  terms of employment -- okay.  We have a letter

11  from Crown Carton Company signed by Carlos Romo,

12  R-O-M-O.  He is your brother-in-law.  He says he's

13  known you since 1988.  And he says he manages a

14  little established carton company, and he has a

15  position ready for Leroy upon his immediate

16  release.  Okay.  Do you have any idea what that

17  position is?

18       **INMATE LUJAN:**  No, I don't.

19       **PRESIDING COMMISSIONER ENG:**  What does his

20  company do?

21       **INMATE LUJAN:**  As far as I know, they make

22  boxes or carbons.  I don't know how or exactly

23  what.

24       **PRESIDING COMMISSIONER ENG:**  Okay.

25       **ATTORNEY RUTLEDGE:**  This is something that

26  Amparo just faxed to me this week.

27       **PRESIDING COMMISSIONER ENG:**  Oh, about the

63

1    Crown Carton Company.  So, you haven't -- okay.

2         **ATTORNEY RUTLEDGE:**  She said that she had

3    found a -- she had another job offer, and she

4    faxed it over so you probably haven't seen this.

5         **INMATE LUJAN:**  Oh, I haven't.

6         **PRESIDING COMMISSIONER ENG:**  Who is Carlos

7    married to?

8         **INMATE LUJAN:**  I can't think.  I can't

9    remember.

10         **PRESIDING COMMISSIONER ENG:**  How is he your

11    brother-in-law?

12         **INMATE LUJAN:**  That's her brother.  My

13    wife's brother.

14         **PRESIDING COMMISSIONER ENG:**  Oh, okay.

15    Okay, okay.

16         **INMATE LUJAN:**  I can't remember his wife's

17    name.

18         **PRESIDING COMMISSIONER ENG:**  Okay, so all

19    right.  So, that's why you really have no idea

20    what this job involves?

21         **INMATE LUJAN:**  No.

22         **PRESIDING COMMISSIONER ENG:**  Okay.  We have

23    a letter from State Electric Corporation located

24    in Redondo Beach, California.  A long letter

25    signed by Gary and Pamela -- how do you pronounce

26    that last name?

27         **INMATE LUJAN:**  It's Iraci.

64

1          **PRESIDING COMMISSIONER ENG:**  This is a test.

2          **INMATE LUJAN:**  Yeah.  Iraci, something.

3          **PRESIDING COMMISSIONER ENG:**  Iraci, I'm not

4     sure.

5          **INMATE LUJAN:**  Iraci, yeah.

6          **PRESIDING COMMISSIONER ENG:**  I-R-A-C-I, and

7     they are the owners of State Electric Corporation.

8     This letter is dated February 12th, 2007.  And

9     which one is your cousin?

10          **INMATE LUJAN:**  The girl Iraci.

11          **PRESIDING COMMISSIONER ENG:**  Okay.  I guess

12     that wouldn't be Gary, that's Pamela.

13          **INMATE LUJAN:**  Yeah.

14          **PRESIDING COMMISSIONER ENG:**  Okay, your

15     cousin.  Okay.  Did you grow up with her?

16          **INMATE LUJAN:**  She used to baby sit me when

17     I was young.

18          **PRESIDING COMMISSIONER ENG:**  Okay, so she's

19     older.  Okay.  I'm trying to see.  She gives a lot

20     of background about family, etc.  Maybe you can

21     help me out and focus me on where you want me to

22     go with this.  Is this a general support letter,

23     or is this an offer of employment?

24          **INMATE LUJAN:**  It should be --

25          **PRESIDING COMMISSIONER ENG:**  Oh, here we go.

26          "My husband owns a multi-million

27          dollar electrical company, and we are

65

1            so competent of Leroy, Jr.'s, talents

2            and rehabilitation and conversion that

3            my husband has secured a job for him

4            as a laborer for his company.  He will

5            have to go to school in the evenings

6            to get certified as an electrician,

7            but in the interim, he will be hired

8            as a laborer.  My husband has built

9            his business up for the last twenty

10          years, and he would not risk his

11          reputation or his livelihood if he

12          were not completely convinced of

13          Leroy's character.  Our family is

14          committed to embrace our cousin, who

15          is such a talented man who has grown

16          to be like his beloved father who we

17          lost a few years ago."

18  Okay, so it's really a lovely letter.  It's a long

19  letter, but it's a very lovely letter.  It really

20  goes way back and brings us up to date, and states

21  something about family and about, you know, your

22  mother needing help in getting up there.  And how

23  it would be nice to have you back and part of the

24  family again.  So, this is a very nice offer of

25  employment.  We have a letter from the Marine

26  Clerks Association Local 63.  It states your

27  current number of the waiting list as 500.  Okay.

66

1    This is dated February 8, 2007.  So, what is this

2    about?

3            INMATE LUJAN:  That's -- well, they put me

4    on a list for the, like a union spot in the

5    company.  So, as soon as I'm released, when my

6    name comes up, whatever job is opened, if I want

7    to take it, I can do that.

8            ATTORNEY RUTLEDGE:  Effective with your

9    (inaudible), is that right?

10            INMATE LUJAN:  Yeah.

11            PRESIDING COMMISSIONER ENG:  This is doing

12    what, though?  Explain this.

13            INMATE LUJAN:  Whatever is opened, really.

14    It's like a shipping place where they drive

15    forklifts, move freight from spot to spot.

16            PRESIDING COMMISSIONER ENG:  So, does this

17    say that you're a union member, or you are on wait

18    list to become a union member to do -- it looks

19    like to be a clerk?  Is that what that is?

20            INMATE LUJAN:  That's what -- yes, that's

21    what it's called, clerk.  But it's actually --

22    I'll be doing the laboring part.

23            ATTORNEY RUTLEDGE:  A longshoreman?

24            INMATE LUJAN:  Yeah, almost like a

25    longshoreman.

26            PRESIDING COMMISSIONER ENG:  Oh, okay.

27            INMATE LUJAN:  But I'll be on the waiting

67

1   list.  On the list.  I'm not union.

2        PRESIDING COMMISSIONER ENG:  No, you're not

3   a union member yet.  You're on a wait list to

4   become a union member?  That's what this is?

5        INMATE LUJAN:  Yes, ma'am.

6        PRESIDING COMMISSIONER ENG:  So, okay, okay.

7   So, you've signed up, you've done what you have to

8   do, and now they've issued you a number that says

9   that you are -- you're number is 500.

10        INMATE LUJAN:  I have 500 people that go

11   before me.

12        PRESIDING COMMISSIONER ENG:  Yeah, there are

13   499 people before you.

14        INMATE LUJAN:  Yes, yes.

15        PRESIDING COMMISSIONER ENG:  That could be

16   good, it could be bad.  It could be good if

17   there's a list of 10,000.

18        INMATE LUJAN:  Yeah.

19        PRESIDING COMMISSIONER ENG:  Okay.  But the

20   fact is that you did -- you know, you did do

21   something.  We have a letter dated December 20th of

22   2006, signed by -- is it Dyon or Diane?  It's

23   D-Y-O-N.  Dyon?

24        INMATE LUJAN:  Dyon.

25        PRESIDING COMMISSIONER ENG:  Dyon.

26   Hermosillo?

27        INMATE LUJAN:  Hermosillo.

68

1          PRESIDING COMMISSIONER ENG:  Sorry.   I

2     really apologize upfront for my horrible

3     pronunciation.   Okay.   Hermosillo.

4          INMATE LUJAN:  Yes, ma'am.

5          PRESIDING COMMISSIONER ENG:

6     H-E-R-M-O-S-I-L-L-O, who lives in Long Beach,

7     California.   This is your nephew.   This is a

8     nephew of yours, okay.

9          ATTORNEY RUTLEDGE:  It's a general support

10    letter.

11         PRESIDING COMMISSIONER ENG:  Okay, it's a

12    general support.   He is a real responsible nice

13    guy.   How old is your nephew?

14         INMATE LUJAN:  He's ten.

15         PRESIDING COMMISSIONER ENG:  He's ten?

16         INMATE LUJAN:  Yes, ma'am.

17         PRESIDING COMMISSIONER ENG:  And he knows

18    how to use a computer.

19         INMATE LUJAN:  He does.

20         PRESIDING COMMISSIONER ENG:  Okay.   So, this

21    is one of your older sister's sons?

22         INMATE LUJAN:  Yes.

23         PRESIDING COMMISSIONER ENG:  I'm assuming,

24    okay.   That's very sweet.   January 1st, 2007.

25    Sandra Hermosillo in Long Beach.   I want to make

26    sure that's the same address.   That certainly is.

27    Okay.   So, this must be -- oh, this is your

69

1    sister?

2          INMATE LUJAN:  Yes, ma'am.

3          PRESIDING COMMISSIONER ENG:  Okay, Sandra.

4    Okay.  Because she says, my brother is scheduled

5    to meet with you sometime this month or next.

6    Okay.  She's got two very determined children who

7    are eagerly waiting patiently for their uncle

8    Leroy to come home.  Her husband is a hard worker,

9    okay.  So, is this a general support letter, or is

10   this another place that you might be able to live

11   in?

12         INMATE LUJAN:  That's a general support

13   letter.

14         PRESIDING COMMISSIONER ENG:  Okay, wait a

15   minute.  It says on his release -- he has many job

16   offers including one that is guaranteed by my

17   husband's place of employment.  Did I miss that

18   one?

19         INMATE LUJAN:  You should have that one.

20         PRESIDING COMMISSIONER ENG:  Okay, I haven't

21   hit it yet?

22         INMATE LUJAN:  I don't think so.

23         PRESIDING COMMISSIONER ENG:  Because --

24   okay.  She's stating that her husband's place of

25   employment, which is very important in order for

26   him to adapt to the initial challenges that might

27   come his way.  Okay.  All right.  How do you

70

1   pronounce A-L-Y-N-A?

2       INMATE LUJAN:  Alyna.

3       PRESIDING COMMISSIONER ENG:  Alyna

4   Hermosillo.  This must be your niece?

5       INMATE LUJAN:  Yes, ma'am.

6       PRESIDING COMMISSIONER ENG:  Okay, okay.

7   Very sweet.  December 15th, 2006.  And your niece

8   also says -- again, this is from Long Beach.  And

9   states that she hasn't been able to see you very

10  often.  But she's letting you know and letting us

11  know that she got all A's and one B on her report

12  card, and that she has perfect attendance at

13  school, too.  So, how old is this young lady?

14      INMATE LUJAN:  Eleven.

15      PRESIDING COMMISSIONER ENG:  I have to read

16  this.  This I have -- I must say I have not seen

17  this.  P.S. I have about $44.00 saved up to give

18  him if he wants to buy a nice shirt or cologne or

19  something.  I had to read that into the record.  I

20  think that's precious.

21      ATTORNEY RUTLEDGE:  I --

22      PRESIDING COMMISSIONER ENG:  We've all --

23  okay.  We have another letter that you have.

24      ATTORNEY RUTLEDGE:  That's from the

25  brother-in-law from the (inaudible) you just

26  referred to.  I meant to put that in an attachment

27  for you.

71

1          **PRESIDING COMMISSIONER ENG:**  Okay.

2          **ATTORNEY RUTLEDGE:**  It's a tire shop job

3    offer.

4          **PRESIDING COMMISSIONER ENG:**  Oh, okay.  So,

5    following up on the other family letter, we do

6    have a letter from A-N-G-E-L.  We know how I would

7    pronounce that.  How are you supposed to pronounce

8    that?

9          **INMATE LUJAN:**  Angel.

10          **PRESIDING COMMISSIONER ENG:**  Oh, it is.

11    Okay.  I thought it was going to be something

12    different.  You did that on purpose.  Angel

13    Hermosillo, and this is at Ozar Brothers Tires in

14    Santa Monica.  And obviously, this is your

15    brother-in-law, and this is his letter of support

16    for you.  And he says,

17          "It is very important for us to know

18          that he will definitely hire Leroy to

19          work for him once he's been released

20          from Soledad Correctional Facility.

21          He strongly believes that the day I

22          hire him, he will adjust quickly to

23          our working environment and be very

24          capable of earning a living as an

25          honest hardworking man."

26    Okay.  What is your first choice for jobs?

27          **INMATE LUJAN:**  I was thinking about that,

72

1    and I would say an electrician job would be better

2    because I would be able to go to school at the

3    same time.  I don't know how to do electricity

4    stuff, but you get paid better that way.

5          PRESIDING COMMISSIONER ENG:  So, you are

6    thinking more long term that that would be a

7    better choice for you?

8          INMATE LUJAN:  Yes.

9          PRESIDING COMMISSIONER ENG:  Have you ever

10   done anything that will -- that would be similar

11   to electrician's type work so you would have an

12   idea whether or not you liked it?

13         INMATE LUJAN:  When I was young, I used to

14   always take things apart and put them back

15   together.  So, I'm sure I'll enjoy it.  I -- not

16   only that, because I was a welder, too.  So as a

17   welder, I know how to be that.

18         PRESIDING COMMISSIONER ENG:  Uh-huh.

19         INMATE LUJAN:  I'm going to have to learn

20   how to do it.

21         PRESIDING COMMISSIONER ENG:  Good.  I didn't

22   want to miss this because we do have a letter --

23   well there is a letter in the packet.  It is dated

24   a year old, over a year ago, though.  It's January

25   9th, 2006, from Tran guan?

26         ATTORNEY RUTLEDGE:  Oh, that's from the

27   co-defendant's parents, the Nigawas (phonetic)?

73

1          **PRESIDING COMMISSIONER ENG:**  Nigawa?

2          **INMATE LUJAN:**  Nigawa.

3          **PRESIDING COMMISSIONER ENG:**  Inoko

4   (phonetic) Nigawa.  And it's a general support

5   letter?

6          **INMATE LUJAN:**  Yes.

7          **ATTORNEY RUTLEDGE:**  And it's a job offer.

8          **INMATE LUJAN:**  And a job offer.

9          **PRESIDING COMMISSIONER ENG:**  Well, it did

10   say that -- you know, I was reading that and it

11   said that the family is equally determined to

12   assist in any way we can including employment when

13   he is released.  But what type of company is this?

14   And they are in Harbor City, California.  Do you

15   know what type of company?

16          **INMATE LUJAN:**  I have no idea.

17          **PRESIDING COMMISSIONER ENG:**  But you have

18   other offers of employment that you prefer and are

19   current, etc.?  Is that correct?

20          **INMATE LUJAN:**  Yeah.

21          **PRESIDING COMMISSIONER ENG:**  Okay, okay.

22   And then, for the record, Mr. Lujan has provided

23   us with a resume also.  Okay.  Okay, you did

24   receive your GED in (inaudible).

25          **INMATE LUJAN:**  Yeah.

26          **PRESIDING COMMISSIONER ENG:**  Okay.  So, have

27   you been taking other courses while in the

74

1     institution?  Any additional courses?

2          INMATE LUJAN:  As in, in the school?  No.

3          PRESIDING COMMISSIONER ENG:  Okay, okay.

4     Have I missed anything, or have I pretty much read

5     them all into the record?

6          INMATE LUJAN:  Pretty much, yes.

7          PRESIDING COMMISSIONER ENG:  You know, the

8     previous panel is correct.  You have diverse

9     strong support from your family.  Okay.  But I do

10    want to follow up and ask you one thing.  You

11    always had that family there before.  You came

12    from somewhat of a stable family, okay.  And you

13    obviously have a lot of capability, but you chose

14    to be dealing drugs?

15         INMATE LUJAN:  Yes.

16         PRESIDING COMMISSIONER ENG:  Okay.  And, you

17    stated that and pretty much everybody knows, that

18    when you're dealing drugs, it's fast, sort of easy

19    money.  Correct?

20         INMATE LUJAN:  Uh-huh.

21         PRESIDING COMMISSIONER ENG:  Okay.  So,

22    that's what you're used to.  So, upon getting back

23    out into the streets, the type of money that you

24    will make initially may not compare to what you

25    know you used to make or could make from your

26    other lifestyle.

27         INMATE LUJAN:  Okay.  After being in here --

75

1   that was, like, what 17 years ago.  I was young.

2   I wanted to have everything right then and there.

3   Over the years I've been incarcerated, I've worked

4   hard at the jobs that I've had in here which only

5   pay twenty cents, thirty cents.  And I work hard.

6   I understand now what is more important.  Not fast

7   money, not money that is just going to come easy.

8   I work hard for what I do now, and I see the

9   lifestyle that it led me into.  It wasn't a nice

10   lifestyle.  It was the worst.  But now, I take --

11   where I can see now, I have a little bit more

12   character for myself.  And I think about how hard

13   my dad worked when he was -- when we were growing

14   up because he was working sometimes two, three

15   days at a time to support us, because my mom

16   didn't work.  To be in here and sit in here all

17   these years, I have this advantage look.  If my

18   dad could do it, you know, I don't need that fast

19   money.  I'd rather be broke and have nothing

20   instead of doing that.  It's just not something

21   that I would ever want to get back into.

22        PRESIDING COMMISSIONER ENG:  I don't have

23   any other questions.  Commissioner, do you have

24   any other questions that you would like to pose to

25   Mr. Lujan?

26        DEPUTY COMMISSIONER MELVIN:  No, I don't.

27        PRESIDING COMMISSIONER ENG:  Okay.  So, now

76

```
 1    I'm going to ask Mr. Gurwitz from the District

 2    Attorney's Office if he has any questions to pose

 3    to you through the Panel.  So, if you recall, that

 4    you will respond back to the Panel.

 5         INMATE LUJAN:  Yes, ma'am.

 6         PRESIDING COMMISSIONER ENG:  Okay.

 7         DEPUTY DISTRICT ATTORNEY GURWITZ:  Thank

 8    you, Commissioner.  I do have a number of

 9    questions on this case.  About a handful, or so.

10    Does the inmate believe that this victim was

11    murdered because of the color of their skin?

12         PRESIDING COMMISSIONER ENG:  Sir?

13         INMATE LUJAN:  At the time, I really didn't

14    know what to think.  Even at the past hearings, I

15    didn't know what to think either.  But now I feel

16    that it wasn't the color of his skin, nothing like

17    that.  It was just irresponsibility of myself that

18    took it to beyond, listening to -- I mean, not

19    listening, but just being around and influenced by

20    friends and money.  It was just -- it had nothing

21    to do with color of skin.

22         DEPUTY DISTRICT ATTORNEY GURWITZ:  I guess I

23    don't understand.  My question would be why -- I'm

24    basing that on his prior statements.  Why has he

25    maintained in the past that the victim may have

26    been killed because of color of his skin?  That's

27    his own statement in several reports.
```

77

1          **INMATE LUJAN:**  Yes.

2          **PRESIDING COMMISSIONER ENG:**  Okay, so you do

3     recall making that statement?

4          **INMATE LUJAN:**  Yeah.

5          **PRESIDING COMMISSIONER ENG:**  Okay.

6          **INMATE LUJAN:**  It's because I wasn't taking

7     responsibility for myself, and I was trying to

8     push it off on other things, anything other than

9     myself taking responsibility.

10         **PRESIDING COMMISSIONER ENG:**  So, today you

11    are stating that you do not believe that the death

12    of this victim had anything to do with --

13         **INMATE LUJAN:**  No.

14         **PRESIDING COMMISSIONER ENG:**  -- the color of

15    his skin?

16         **INMATE LUJAN:**  No.

17         **PRESIDING COMMISSIONER ENG:**  Did the group

18    of folks that you were with -- I thought I read

19    something about referring to a bunch of Skinheads?

20         **INMATE LUJAN:**  Yeah, that's what they said

21    in the reports.

22         **PRESIDING COMMISSIONER ENG:**  Was there any

23    truth to that?  That there had been discussions

24    with you and your friends about going over there

25    to find some Skinheads?

26         **INMATE LUJAN:**  No.  This is afterwards that

27    all this was brought up about Skinheads and stuff

78

 1    like that.  So, that's why I took on with.

 2              PRESIDING COMMISSIONER ENG:  I'm sorry.

 3    After what?

 4              INMATE LUJAN:  After all the trials and

 5    everything.

 6              PRESIDING COMMISSIONER ENG:  Okay.

 7              DEPUTY DISTRICT ATTORNEY GURWITZ:  Did the

 8    victim have a shaved head?  That's one thing I've

 9    been trying to look for on the report.

10              ATTORNEY RUTLEDGE:  Objection to the

11    relevance to the victim's hair.

12              DEPUTY DISTRICT ATTORNEY GURWITZ:  There's

13    been contention that this was a race based killing

14    of one gang member, Hispanic and Black members of

15    the gang against a Skinhead.  And it's just a very

16    simple question as to whether he had a shaved

17    head.

18              ATTORNEY RUTLEDGE:  What --

19              PRESIDING COMMISSIONER ENG:  However, let

20    me -- Mr. Gurwitz.  However, I'm trying to

21    understand the relevance because he wasn't

22    convicted of a race-based crime.  Is that correct?

23              DEPUTY DISTRICT ATTORNEY GURWITZ:  Well,

24    that's correct.  He was not convicted.  I mean,

25    there was no -- I don't even know if there was a

26    race-based murder enhancement at the time, but all

27    of the evidence shows that from the People's

79

1    perspective, is that this is a race-based,

2    gang-related killing.  The defendant has made

3    statements before, and he even accepted it as

4    truthful for this statement when he, you know, in

5    the current Board report.  The victim may have

6    been killed, because of, among other things, the

7    color of his skin.  One of the notes that I had in

8    the file from the prior deputy is, did he have a

9    shaved head?  Somebody should find out.  I don't

10   know why the inmate would be afraid, or his

11   attorney would be afraid, of answering that

12   question.

13        **ATTORNEY RUTLEDGE:**  Objection.  We didn't

14   say we were afraid.

15        **PRESIDING COMMISSIONER ENG:**  Okay.

16        **DEPUTY DISTRICT ATTORNEY GURWITZ:**  That's

17   the only reason to object.

18        **PRESIDING COMMISSIONER ENG:**  Okay.  Wait a

19   minute now.  I'm just trying to understand where

20   your questions are going to, because, again, we

21   are not here to retry the case.  As far as this

22   Panel is concerned, I'm not sure of the relevance

23   of that because -- and I don't want to lead to any

24   bias one way or the other.  Because I didn't read

25   anything here that gives us an indication that it

26   had been any type of race-based crime.

27        **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Can I

80

1    read --

2              **PRESIDING COMMISSIONER ENG:**  Except that I

3    read something about the Skinheads.  Okay.

4              **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Can I

5    read his own statement, where he claimed it was?

6    Because he does make that --

7              **PRESIDING COMMISSIONER ENG:**  Please refer to

8    that in our packets.

9              **DEPUTY DISTRICT ATTORNEY GURWITZ:**  It's

10             **PRESIDING COMMISSIONER ENG:**  Is that in --

11             **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Among

12   other things in the Board report of January 2004,

13   which he adopted for this report, section -- or

14   page two of the report.  The first section, the

15   last sentence, it says,

16             "Where I hit him was in no way fatal

17             but because of someone's stupidity, a

18             person, a human being, John Fahey lost

19             his life, and for what, the color of

20             his skin, or the people he hung around

21             with.  They are just plain nothing."

22   When he says he wasn't accepting responsibility, I

23   mean, accepting responsibility or not has nothing

24   to do with making a statement that this person was

25   killed because of the color of his skin.  I mean

26   that's a very different thing.  You could accept

27   responsibility or not, and it could still be

81

1    because of the color of his skin or not.  So, I'm
2    trying to probe into the causation behind this
3    killing.  There's been reports before by -- and
4    complaints by the psychologist that the motives
5    here are vague.  His failure to come to grips with
6    this requires more sole searching, it's been said.
7    I'm just wondering if -- I don't see where any
8    prejudice comes to this inmate by asking him one
9    question about the circumstances of this murder.
10          PRESIDING COMMISSIONER ENG:  Okay.  I
11   understand where you are coming from now, because
12   I --
13          ATTORNEY RUTLEDGE:  Can I respond to that?
14          PRESIDING COMMISSIONER ENG:  Well, wait a
15   minute, before I lose my thought.  I do recall
16   when I read this, it left a question mark in my
17   head.  Okay.  Well, what were you meaning by the
18   color of his skin.  And -- but before you answer,
19   it wasn't just that.  It is also because what
20   we're trying to do is really understand also to
21   see whether or not you truly do understand exactly
22   what Mr. Gurwitz said, the cause of factors that
23   led you to participate in this.  Because it had
24   been stated in previous -- I mean, it's all here
25   in black and white for us.
26          INMATE LUJAN:  Uh-huh.
27          PRESIDING COMMISSIONER ENG:  So, those

82

1    questions do remain, okay.  However, if you -- you

2    heard what the question was, all right.  And I

3    think you have a better understanding of what

4    we're trying to get a better understanding of.

5    So, what do you feel were part of the reasons that

6    led to this man's death?  Is that -- would that

7    help you?

8         DEPUTY DISTRICT ATTORNEY GURWITZ:  Well, I

9    think that question's been asked, and I think he's

10   skirting it.  I just want to know if the victim

11   had a shaved head or not?

12        PRESIDING COMMISSIONER ENG:  Well, now, if

13   he --

14        DEPUTY DISTRICT ATTORNEY GURWITZ:  Yeah, I

15   mean, he knows him.  I mean, I'm sure he

16   remembers.

17        ATTORNEY RUTLEDGE:  But --

18        PRESIDING COMMISSIONER ENG:  Do you feel

19   that the victim's appearance had anything to do

20   with him being a target?

21        INMATE LUJAN:  No.

22        PRESIDING COMMISSIONER ENG:  At that time,

23   did that go through your head?

24        INMATE LUJAN:  No.

25        PRESIDING COMMISSIONER ENG:  Okay.

26        DEPUTY DISTRICT ATTORNEY GURWITZ:  Now

27   another question I have.  Is he now or has he ever

83

1    been a member of a criminal street gang?

2              **PRESIDING COMMISSIONER ENG:** Okay, sir?

3              **INMATE LUJAN:** No.

4              **DEPUTY DISTRICT ATTORNEY GURWITZ:** Who's

5    Boogie, B-O-O-G-I-E, for the record?

6              **INMATE LUJAN:** That's me.

7              **PRESIDING COMMISSIONER ENG:** Okay.

8              **INMATE LUJAN:** Now I have no -- can I

9    answer?

10             **PRESIDING COMMISSIONER ENG:** Yes.

11             **INMATE LUJAN:** I have no past history in my

12   file anywhere in my file that says I am a gang

13   member. I hung around gang members to sell drugs

14   to. Now, I associated with them, I admit that.

15   But never was I actually a gang member. Now, I

16   don't know if you guys can see the difference in

17   association and actually being one, but that's it.

18             **PRESIDING COMMISSIONER ENG:** Okay.

19             **DEPUTY DISTRICT ATTORNEY GURWITZ:** So, I

20   assume that was his jacket left at the scene that

21   had Washington Boulevard and Boogie on it.

22             **ATTORNEY RUTLEDGE:** Ask a question.

23             **DEPUTY DISTRICT ATTORNEY GURWITZ:** It was a

24   question. I'll say it with a lull to my

25   (inaudible).

26             **PRESIDING COMMISSIONER ENG:** Was that your

27   jacket that was left at the scene?

84

1          INMATE LUJAN:   No.   I had brought -- last

2    time I came, I had brought some things in the

3    transcript to explain that --

4          DEPUTY COMMISSIONER MELVIN:   Stop.

5    **[Thereupon the tape was turned over.]**

6          DEPUTY COMMISSIONER MELVIN:   We're back on

7    record.

8          INMATE LUJAN:   Okay.

9          PRESIDING COMMISSIONER ENG:   Okay.

10          INMATE LUJAN:   The last time I brought

11    some -- in there's some transcript stating that a

12    prosecution witness stated that -- they asked her

13    that question.   Who left the black jacket there?

14    And she said that she saw a guy that was six foot,

15    two-hundred and eighty pounds take off a black

16    jacket that night.   I didn't have a jacket that

17    night.

18          PRESIDING COMMISSIONER ENG:   What -- but the

19    nickname.   What was that nickname?

20          DEPUTY DISTRICT ATTORNEY GURWITZ:   Boogie,

21    B-O-O-G-I-E.

22          INMATE LUJAN:   Okay.

23          PRESIDING COMMISSIONER ENG:   B-O-O-G-I-E.

24    You just stated that that was your nickname,

25    correct?

26          INMATE LUJAN:   Yes.

27          PRESIDING COMMISSIONER ENG:   Okay.   So, are

85

1    you stating that someone else also had that name?

2         **INMATE LUJAN:**  It comes to where everybody

3    shares names.  I mean, you have Little Man,

4    Shorties.  There was a few guys that had the same

5    name, because when I was out there selling drugs,

6    a lot of the younger guys sort of wanted to be

7    like you.  And they often asked for you to say --

8    if you would look on the jacket, it would probably

9    say Boogie, Jr., or something in that aspect.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  So, you

11   are stating here on the record --

12        **INMATE LUJAN:**  But I am --

13        **PRESIDING COMMISSIONER ENG:**  That jacket was

14   not yours, is that correct?

15        **INMATE LUJAN:**  Not mine.  But my nickname

16   was -- is Boogie.

17        **PRESIDING COMMISSIONER ENG:**  Okay.

18        **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Did the

19   inmate ever see -- well, let me just say where I'm

20   coming from here.  The Board asked the inmate how

21   many people were around at the time of the

22   shooting.  And I think the inmate said, three or

23   four.

24        **INMATE LUJAN:**  Yeah.

25        **DEPUTY DISTRICT ATTORNEY GURWITZ:**  And I'm

26   curious.  Did anybody other than the inmate

27   strike -- did the inmate see anybody, other than

86

1    himself obviously, strike the victim with any kind

2    of -- with anything?

3         PRESIDING COMMISSIONER ENG:  Okay.  So, do

4    you recall -- well you were -- you were holding

5    the baseball bat.

6         INMATE LUJAN:  Yeah.

7         PRESIDING COMMISSIONER ENG:  Okay.  And

8    your -- one of the crime partners obviously had a

9    gun that you did not see until after you heard the

10   shot.  Now, there were a few other individuals

11   there.  Were any of them armed with anything?

12        INMATE LUJAN:  I -- well, when I came out of

13   the back of the house and was running down the

14   side, there was nobody but me and him.

15        PRESIDING COMMISSIONER ENG:  Right.

16        INMATE LUJAN:  And then when he took off

17   running, I chased and hit him.  There was still

18   nobody around until after the gunshot.  After the

19   gunshot, then I turned and looked.  And then I

20   seen people standing around.

21        PRESIDING COMMISSIONER ENG:  And those

22   people standing around, were they armed?

23        INMATE LUJAN:  To be honest, I didn't see.

24   I -- right after that, I took off running.

25        PRESIDING COMMISSIONER ENG:  And so you

26   didn't notice if anybody else had a bat in their

27   hands at that time?

87

1          **INMATE LUJAN:**  Not that I know of.

2          **PRESIDING COMMISSIONER ENG:**  So, it was just

3    you striking the victim, him falling to the

4    ground.   Then the next thing you know, there was a

5    shot?

6          **INMATE LUJAN:**  Yes.

7          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  And

8    everybody ran.   I mean it wasn't just the inmate,

9    right?

10          **INMATE LUJAN:**  Yeah, everybody ran.

11          **PRESIDING COMMISSIONER ENG:**  Okay.

12          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Okay.

13    And actually I have two more questions, not just

14    one.   Now, when the Board was asking him about

15    his -- all of the circumstances of the event, the

16    inmate never mentioned any of the following when

17    he was summarizing the murder.   And my question

18    is, why didn't he mention any of the following:

19    Number one, that the victim had a knife in his

20    hand when he took a swing at the defendant.   Some

21    headlights of a car flashed on it, and he saw it.

22    Number two, when he took a swing at the defendant

23    with the knife, it caught the defendant's shirt

24    and nicked the shirt somehow.   It made a little

25    rip in it.   And then number three, when the

26    defendant was standing over the victim, the victim

27    tried to stab him in the leg.   All of those things

88

1  are obviously critical if they're true or if

2  they're not true.  And he didn't mention them this

3  time, and he has before, so I'm wondering why.

4          PRESIDING COMMISSIONER ENG:  Okay.  The

5  three things that Mr. Gurwitz just mentioned, this

6  Panel is well aware of because we had read about

7  them.  Was there any specific reason why you

8  didn't say anything about those?

9          INMATE LUJAN:  No, I just was saying what

10 you asked.

11         PRESIDING COMMISSIONER ENG:  So --

12         INMATE LUJAN:  You know, I was trying to

13 hide nothing.

14         PRESIDING COMMISSIONER ENG:  So, did those

15 three things occur that night?

16         INMATE LUJAN:  Yes.

17         PRESIDING COMMISSIONER ENG:  So, you are

18 stating that Mr. Fahey, on your first

19 confrontation with him, when you first came out

20 the back and met face to face.  You were holding

21 the bat, and you're stating that he took a swing

22 at you?

23         INMATE LUJAN:  Yeah.

24         PRESIDING COMMISSIONER ENG:  Correct?  All

25 right.  But at that time, because we did discuss

26 that that you did not add that he had any type of

27 a weapon in his hand.  You did say that he swung

89

1   at you, and then tried to run away.  Okay.  So, he

2   did have a weapon?

3          INMATE LUJAN:  Yeah.

4          PRESIDING COMMISSIONER ENG:  In his hand?

5          INMATE LUJAN:  As far as I knew, he had,

6   yeah.

7          PRESIDING COMMISSIONER ENG:  Yeah, even

8   though it was dark, is what Mr. Gurwitz stated

9   correct?  That at that time, lights were shining

10  in your face or something?

11         INMATE LUJAN:  No.  It's correct, because I

12  said that before.

13         PRESIDING COMMISSIONER ENG:  Uh-huh.

14         INMATE LUJAN:  But we were saying that the

15  car lights, because the street was right there.

16  The lights from the car reflected off of what he

17  had in his hand.  At the time, I didn't know what

18  he had in his hand.

19         PRESIDING COMMISSIONER ENG:  Okay.

20         INMATE LUJAN:  I backed up to move --

21  because I didn't have the baseball bat.  I had it

22  halfway in my hands, and I was running.  That's

23  when I moved back.  He swung and took off running,

24  and I chased him.

25         PRESIDING COMMISSIONER ENG:  When Mr. Fahey

26  was down on the ground before he was shot, after

27  you hit him and he fell.  Okay.  Did you see him

90

1    try -- did he sit up or something and try to

2    make -- take another swing at you with a weapon?

3            INMATE LUJAN:  When I hit him, he fell to

4    the ground.  When he -- he sat back up, and that's

5    when I was standing near him, and he did swing at

6    me again.  He tried to hit my leg.  I don't know

7    if he had anything in his hand at the time, but I

8    jumped up and moved out of the way.

9            PRESIDING COMMISSIONER ENG:  He was shot?

10           INMATE LUJAN:  Yeah.

11           PRESIDING COMMISSIONER ENG:  Okay.

12           DEPUTY DISTRICT ATTORNEY GURWITZ:  If he was

13   acting this way, you know, potentially in

14   self-defense, why didn't he report it to the

15   police for the many days between the killing and

16   the time he was captured?

17           INMATE LUJAN:  I was young, scared, and

18   never done nothing like this before.

19           PRESIDING COMMISSIONER ENG:  I have to call

20   (inaudible).  I still don't understand.  If you

21   felt like the victim was actually sort of

22   attacking you -- and I had read this somewhere.

23   Why did you go after him?  Why didn't you run the

24   other way?

25           INMATE LUJAN:  At the time, I couldn't say

26   because they were just -- like I say, it happened

27   kind of fast.  But even though I sit back and

91

1    think about it now, I should have run the other

2    way. I should have taken off the other way. My

3    brain -- after him, it was just instinct, you

4    know. He tried to hurt me, he tried to hit me.

5           PRESIDING COMMISSIONER ENG: So, you are

6    saying your instinct was to attack back?

7           INMATE LUJAN: I don't know. Yeah, more or

8    less.

9           PRESIDING COMMISSIONER ENG: Okay.

10          DEPUTY DISTRICT ATTORNEY GURWITZ: And my

11    last question was, at the time that he swung the

12    baseball bat at the victim, was he -- was the

13    inmate in fear that he was going to be killed

14    himself? In other words, as he sits here now,

15    does he feel like he was acting in self defense

16    back then?

17          INMATE LUJAN: No.

18          PRESIDING COMMISSIONER ENG: Okay.

19          DEPUTY DISTRICT ATTORNEY GURWITZ: Okay. I

20    have nothing further, thank you.

21          PRESIDING COMMISSIONER ENG: Okay.

22    Counselor, any questions to pose to your client?

23          ATTORNEY RUTLEDGE: Yes. Mr. Lujan, I found

24    these in your file. They are programs for a

25    banquet for NA and AA. And I wondered, did you do

26    the artwork for these?

27          INMATE LUJAN: Yes.

92

1          **ATTORNEY RUTLEDGE:**  And you also on the

2    backside -- and I'll leave these for the Board.

3    You also were part of the setup crew, the AA

4    Chairman, and a member.

5          **INMATE LUJAN:**  Yes, ma'am.

6          **ATTORNEY RUTLEDGE:**  That's right, both of

7    the years.  That's '94 to '95 and '95 to '96.  Is

8    that correct?

9          **INMATE LUJAN:**  Yes.

10          **ATTORNEY RUTLEDGE:**  Okay.  And also, there's

11    a letter -- is this letter in your C-File?  This

12    one from Charlie?

13          **INMATE LUJAN:**  It should be.

14          **ATTORNEY RUTLEDGE:**  All right.  It's dated

15    November 2nd, 2006.  It's written by Charlie B.

16    Walker, Superintendent I, of the IEP Program.  And

17    he basically -- this essentially explains that

18    their program is aimed at addressing issues

19    involving the connection between drugs and alcohol

20    and crime.  And he says,

21              "During the previous years, inmate

22              Lujan has participated in a number of

23              these developmental programs offered

24              through IEP, including but not limited

25              to reengaging, (inaudible) reentry,

26              anger management, and how to find

27              employment."

93

1    And he talks about how he -- the program -- he

2    uses videos and important things to address the

3    connection between addiction crime and rejoining

4    society.  And I wanted to note, particularly in

5    sessions three and four, he talks about addiction

6    and the gang.  The lifestyles that were led before

7    incarceration and the deception of addiction helps

8    everyone to understand whether they used, abused

9    or sold drugs.  And in taking this class, did this

10   help you come to terms with your need for twelve

11   steps?  Or, having been a drug dealer, what led

12   you to participate in the twelve step program?

13        INMATE LUJAN:  Not that I used, but my

14   feeling was -- that I actually sat in there in the

15   beginning and seen what I used to do to people.

16   What I caused people to have addiction to, and

17   what I could do to help the people instead of

18   trying to make them be --

19        ATTORNEY RUTLEDGE:  Have you been in this

20   program three -- you did a minimum of three years?

21        INMATE LUJAN:  Yes.

22        ATTORNEY RUTLEDGE:  And he says, "his

23   participation is indicative of his desire to do

24   well upon his reentry into a free society.  He is

25   commended for his efforts."  Signed by C. E.

26   Walker, Superintendent I, Inmate Employability

27   Program Coordinator, PIA Soledad.  The last thing

94

1    I wanted to ask you was -- I also found a

2    photograph in here.  It appears to be your -- from

3    your sister, Michelle.  I think there's a -- there

4    should be a letter in the C-File with a photograph

5    that Michelle sent last year.  Oh, careful, you're

6    dropping some of that.  And it's got on the left

7    is Grace Nesbitt, and his mother, father, brother,

8    his sister Hermosillo is here, and this is

9    Michelle, the one that's offering him employment.

10   She put all their names at the bottom.  And Grace

11   wrote a letter, your older sister, Grace Nesbitt,

12   saying that she would sponsor you in AA.  Is she

13   still in AA?

14        INMATE LUJAN:  Yes.

15        ATTORNEY RUTLEDGE:  Does that offer still

16   stand from 2006, that she's going to sponsor you?

17        INMATE LUJAN:  Yes.

18        ATTORNEY RUTLEDGE:  All right.  And also, is

19   this a picture of Michelle's home?

20        INMATE LUJAN:  Yes, ma'am.

21        ATTORNEY RUTLEDGE:  Okay.  Michelle also

22   sent a photo of her home, but (inaudible) hadn't

23   faxed the letters this year because of the mail,

24   so I didn't receive any photographs.  How many

25   years has Grace been sober?  Has she been in AA

26   for a while?

27        INMATE LUJAN:  Yes.  Over ten years.

95

1          **ATTORNEY RUTLEDGE:**  All right.  No further

2     questions.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  Ms.

4     Melvin, have you got any other questions you would

5     like to ask?

6          **DEPUTY COMMISSIONER MELVIN:**  No.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  Let's

8     move on to closing and final statements.  Mr.

9     Gurwitz.

10          **DEPUTY DISTRICT ATTORNEY GURWITZ:**  Okay.

11     This is an extremely brutal crime, an extremely

12     brutal murder that occurred, and the District

13     Attorney opposes parole.  The brutality I think is

14     best described by Commissioner Fisher, back in

15     2004, page -- what is that, page 60 of the

16     transcript, where she explains that how the

17     defendant was beaten so badly that the imprint

18     from the baseball bat striking in his chest was

19     clearly visible and his ribs were broken.

20     Internal injuries from the trauma caused

21     substantial bleeding into his chest cavity.  It

22     couldn't have been an easy way to die.  He must

23     have been absolutely terrified, and for all

24     practical purposes, we can assume that he didn't

25     have any idea why he was the victim of this

26     attack.  Very brutal crime.  In the psychologists'

27     reports that have been done and -- well, the

96

1    psychologists' reports, one of them says that the

2    defendant -- at least one, and it's kind of the

3    theme that's been going throughout.  The defendant

4    is vague regarding the motive for this crime.  And

5    it was either that psychologist or a prior Board

6    member that used the term sole searching for what

7    the defendant has to do more of.  The People

8    certainly appreciate the fact that the

9    psychologist and others have recognized, rather

10   implicitly, that the defendant is not telling the

11   full truth about this, not coming to grips with

12   what happened.  But I don't think that it's as

13   complex or as, you know, there's so much need for

14   psycho-babble as vague is the motive or, you know,

15   he needs more sole searching.  There's three

16   things that are pretty simple in this case.

17   Number one, it was a gang-related murder that

18   arose from a preplanned attack.  Number two, the

19   defendant lied about it repeatedly, and then tried

20   when he was caught to fabricate a self-defense

21   claim.  And number three, now that he's here, he's

22   trying to put himself in a position where he

23   doesn't have to answer to that nonsense

24   self-defense claim.  And that was pretty evident

25   when he didn't even try and bring up the same

26   facts.  So, it's troubling that he's not even

27   admitting now that he was lying back then.  As to

97

1    what occurred back then, and the reasons for it --

2    to show that it was a gang-related killing, the

3    probation report, for example, on page eight, says

4    that,

5              "The defendant explained that the

6              reason that he was at Ms. Rose's

7              apartment was to attend a party, but he

8              did hear that Ms. Rose had been

9              physically assaulted by skinheads, and

10             that she called Richard Nigawa,

11             N-I-G-A-W-A, and told him about it.  He

12             understands that Mr. Nigawa transported

13             bats to Heather's house so Mr. Lujan

14             guesses that's how the weapons got

15             there."

16   That's the defendant's own statement, and

17   remember, there's about nine people that are

18   prosecuted, I counted, in this case, according to

19   the 1203.01 report.  Going on, on page two, it

20   talks about one of the co-defendant's statements

21   in the probation report.  I'm sorry, the

22   circumstance of the offense as summarized by the

23   probation report,

24             "Physical altercation occurred because

25             Ms. Rose is jealous of another young

26             woman, blah, blah, blah.  Later in the

27             day, Ms. Rose told her roommate,

98

1          21-year-old Leslie Peng, that some

2          guys are coming over to protect them.

3          And then approximately 20 persons

4          arrived, mainly male, Hispanic gang

5          types. One man had a handgun, others

6          carried baseball bats and other items

7          that could be used as a weapon."

8  And then one of the gang investigators from the

9  defendant's gang area said that the use of bats is

10  something particular to this gang. That that's

11  how they do muggings and so forth. So, for the

12  defendant to act like he was just there for a

13  party is ridiculous. And also the notion that he

14  wasn't a member of the gang is absurd. He was not

15  only Boogie -- I mean, I don't care if the jacket

16  was his or not. But not only did he have a

17  (inaudible) Boogie, but he in his own words was so

18  well respected as this veterano drug dealer, that

19  other people started adopting the name and wanting

20  to be like him, like Boogie Two or whatever he

21  said. And somehow he wasn't a gang member. I

22  mean, that's just idiotic to anybody who knows

23  anything, and an insult to anybody who knows

24  anything about gang membership. And then, also on

25  page five of the probation report, Mr. Pimentel

26  (phonetic), one of the co-defendants, explained to

27  police that on the day of the instance offense, he

99

1    and the defendant were at the house -- at a house

2    in Dominguez when a friend by the name of

3    Tito-something and several friends came by

4    indicating that they were going to needed in the

5    city of Newport Beach regarding some type of

6    trouble with Skinheads.  Pimentel went on to say

7    that subsequently, the defendant telephoned

8    Richard Nigawa, who told the defendant that there

9    was going to be a fight, because Heather Rose was

10   beaten up by a group of Skinheads.  Mr. Pimentel

11   overheard Mr. Nigawa tell Mr. Lujan, hey man,

12   we're going to get the guys that jumped Heather.

13   Why does the defendant pretend that that's not why

14   he was there all these years.  He'd be so much

15   more credible if he said, yeah, I was part of

16   this, you know, big gang fight, and I lied about

17   it.  I made it up, the self-defense claim, I

18   fabricated it.  Rather than what he's doing now.

19   And there's no doubt that he tried to fabricate a

20   self-defense claim.  His summary of the current --

21   of the offense from the current Board report

22   incorporates the '04 report.  And he wasn't vague

23   somehow that there was a knife.  He tried to make

24   it seem like he was going to be a stabbing victim.

25   He says to the department of corrections

26   counselor,

27              "When I looked up, I did not recognize

1        him.  He reached and swung his arm

2        back.  The car lights made the knife

3        in his hand shine, and my first

4        reaction was to jump back.  He

5        attempted to stab me and snagged my

6        t-shirt and ripped it.  After he

7        swung, he took off running into the

8        street, and before I knew it, I was

9        right in back of him swinging the bat,

10       hitting on his side, knocking him

11       down.  He ended up on his back, sat up

12       and just looked at me, then, with the

13       same knife, tried to stab me in the

14       leg."

15  So, he was being clear that he -- the victim used

16  the knife twice to try and stab him.  That's what

17  he tried to make up.  And now he tries to back off

18  from it, and said, oh well, you know, when he was

19  lying on his back, he sat up, I don't know what he

20  had, or whatever.  I mean, he's all over the

21  place, and he just needs to come to grips with

22  that.  And he's so far from getting a parole date

23  as far as the People are concerned until he could

24  do that.  Again, there is nine defendants total.

25  There's three guns, and there's a bat that's found

26  at the scene.  The bat's never recovered, but the

27  three guns were according to the 1203.01 report.

101

1   All of this nonsense has been supportive, you

2   know, by this fabricated self defense claim, and

3   the probation officer who did the probation and

4   sentencing report, sums it up best on page 16,

5   when she said there's just absolutely no evidence

6   to corroborate the defendant's version of self

7   defense.  We would ask for a denial of parole for

8   this inmate.  Thank you.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel,

10   final statement?

11        **ATTORNEY RUTLEDGE:**  Thank you.  I would just

12   address that the probation officer must have

13   missed the part in the trial where it came out

14   that there was a knife found in the bushes.  When

15   they wrote that report, when they said zero

16   evidence that the person was carrying a knife.

17   And as far as whatever was said at the time of

18   this commitment offense, and this is a Second

19   Degree Murder.  This is a plea bargain made

20   between the People of -- did you remember --

21        **DEPUTY COMMISSIONER MELVIN:**  I'm sure not

22   mixing you up again.  It was a plea bargain?

23        **INMATE LUJAN:**  Yes, ma'am.

24        **ATTORNEY RUTLEDGE:**  Between my client and

25   the People of Orange County.  At the time he

26   entered into the plea bargain, it was agreed that

27   he had to serve time for this murder that he did

102

1  not pull the trigger but he attacked this man, put
2  him in a position where he was vulnerable to be
3  hurt further.  And he made an agreement with the
4  People of Orange County that he would plead guilty
5  to Second Degree Murder, and he would be committed
6  to a term of 15 years to life.  And the idea of
7  that, of the to life, is that if he can conform
8  and rehabilitate to the laws set forth in Title 15
9  in the Penal Code, that he would be given an
10  opportunity at some point, if found suitable, to
11  enter society again.  And he has met those
12  factors, he has kept his part of the deal.  If the
13  People show up here and harp on the crime, they
14  could have prosecuted to First Degree if they
15  wanted -- if they were so sure that this false
16  defense -- you know, if he was -- that he went
17  over there and had baseball bats.  If they had
18  such a solid case, I don't know why he is sitting
19  here today after a Second Degree plea bargain.
20  But, I would put a lot of question into these
21  allegations about my client's story being
22  fabricated or blah, blah, blah.  I don't know --
23  you know, he pled to Second Degree.  He has --
24  when he came to prison, he took his part of the
25  bargain seriously.  And looking at the factors in
26  suitability, I think the -- most impressive about
27  Mr. Lujan aside from his ability to talk to the

103

1    Board about his crime.  And he actually shows
2    shame.  I mean, you can see in his -- I pick up
3    from his comments to the Board his shame in the
4    lifestyle that he was living at the time.  But he
5    has four CDC staff people, and as everyone
6    probably knows, CDC staff used to be determinate
7    of whether or not somebody got paroled.  And these
8    are people who have been supervising him for
9    years.  One officer, I think he said -- is it
10   eight years, or how long?  For eight years has
11   been spending his work beats with my client, and
12   one of them who says he doesn't usually like to
13   write chronos, wrote one for him.  And to me, that
14   says -- speaks volumes beyond this file, beyond
15   all his self help programs, because the proof is
16   in the pudding.  Whatever classes he's taken,
17   whatever programs he's participated in, have
18   earned the respect of the staff at the CDC.  The
19   people that deal with him every day, and also his
20   family.  They're all willing to reach out, down to
21   his nieces and nephews.  I think -- and despite
22   him not even -- he didn't even tell all of his
23   accolades, and didn't -- I think he's more
24   reluctant to volunteer any extra information, but
25   there's a lot more in his C-File than what we've
26   covered today as far as the things he has done to
27   rehabilitate himself.  Just looking at the factors

104

1   that support suitability.  He has no juvenile
2   record.  He has stable social history.
3            **INMATE LUJAN:**  (Inaudible).
4            **ATTORNEY RUTLEDGE:**  But they didn't sustain
5   the petition, right?  So, it was a diversion.  He
6   did have contact with police, but it went down as
7   a diversion.  Stable social history, that's clear.
8   His signs of remorse.  He talked to the Board
9   today about -- I'm not sure words can actually
10  explain the act in itself, but he did talk to the
11  Board about his feelings about Mr. Fahey's death.
12  His lack of criminal history, his offense that he
13  was -- there were allegations against him at the
14  time involving drug dealing which he has shared
15  with the Board.  Other than that, he did not have
16  any violent crime.  He has not had any violence
17  inside of prison.  His age reduces the probability
18  of recidivism.  His -- he has made realistic plans
19  for release and has developed marketable skills.
20  He's got two votes and I think his institutional
21  behavior, though I know that there's more in the
22  C-File that tells us all the awesome things he's
23  been doing since he's been here.  He can't go back
24  and change the facts of the crime.  I think
25  every -- most people in here, that would be there
26  first thing to do.  But he can't do that, and it's
27  a shame that he's got to live with.  But all that

105

1    he's given is an opportunity to rehabilitate

2    himself.  And, you know, a lot of people sit in

3    prison for years and don't do a whole lot, but he

4    has done almost everything available to him.  And

5    he's maintained family ties.  So, there's no doubt

6    that when he walks out the door, he has a plan for

7    life, he has a support system.  Every need that he

8    could possibly hope for a need is there.  He'll

9    have the parole department to help him.  He has

10   his family.  He has several offers of home.  He

11   has his ex-wife -- or, they are still legally

12   married -- who is there to support him.  He's got

13   plenty of skills.  He has a sister in Alcoholics

14   Anonymous that has pledged to sponsor him in the

15   program, and the word came in her letter from last

16   year, if there are any questions about that.  All

17   those things set forward, I would ask the Board to

18   seriously consider giving this man a date today.

19   And that's it.

20        PRESIDING COMMISSIONER ENG:  Okay, thank

21   you.  Okay.  Mr. Lujan, this is your chance, if

22   you would like to, to make a final statement

23   regarding your parole suitability to this Panel.

24        INMATE LUJAN:  Yeah, I can -- I needed to

25   write it down so I could --

26        PRESIDING COMMISSIONER ENG:  That's okay.

27        INMATE LUJAN:  -- express it, because I got

106

1    a hard thing with expressing myself and especially

2    when I'm nervous.

3              **PRESIDING COMMISSIONER ENG:**  Okay.

4              **INMATE LUJAN:**  First, I'd like to begin by

5    thanking the Board members and everyone else

6    present for their time today.  On September 30th,

7    1989, I committed a crime that devastated Mr. John

8    Fahey's family, friends, and loved ones.  What I

9    did was so wrong.  I should have known better.  I

10   accept full responsibility for my actions and the

11   death of Mr. John Fahey.  I deeply regret my

12   choices, actions and self disregard.  There are no

13   words to express my deepest sorrows for what I

14   did.  There are no apologies or any comforting

15   words that I can ever say to Mr. John Fahey's

16   family, friends, and loved ones.  The sorrow I

17   feel in my heart is just overwhelming.  I'm not

18   making excuses when I say that I'm no longer that

19   same young, impressionable, impulsive, immature

20   boy that I once was.  I was a follower.  I had low

21   self esteem, and a need to be heavily influenced

22   by friends and money.  I did not fully understand

23   the gravity (inaudible) and seriousness of what

24   was going on in the way a mature and rational,

25   reasoned person would understand.  Again, I offer

26   this as no excuse for my actions.  But with the

27   support of my loving family, I've learned to

107

1    become the man that I am today.  I'm older, a lot
2    wiser, and patient with the various therapies and
3    classes I've participated in over the past sixteen
4    years has helped me deal with stressful situations
5    in rational and mature ways without violence.  I
6    realize that I could never change what I did, the
7    crime I committed, yet I could change me, the
8    person who ultimately is responsible.  Today I
9    have self discipline and respect on making the
10   right and necessary decisions and choices that are
11   beneficial for me.  My intentions and directions
12   are focused on being positive and productive.  I
13   have achieved personal goals set for myself, as
14   well as lending a shoulder and ear to family and
15   friends.  I have grown into a mature and
16   responsible person who is willing to make the
17   necessary changes within myself in order to be a
18   better person.  I have successfully participated
19   in a variety or self help programs aimed at
20   understanding oneself and how to resolve
21   confrontational or conflict situations in a
22   nonviolent matter.  Through these courses and
23   individual therapies, it enables me to identify
24   with who I am as a person and how to take control
25   and manage my life.  Having gained this insight
26   has changed my life contributing towards my
27   reentry back into society and keeping a positive

108

1    outlook on life's expectations and setbacks.

2    During my previous hearing, the Panel made

3    specific recommendations.  One, remain

4    disciplinary free, which I have since 1997.

5    Participate in self help, AA, Anger Management,

6    and AVP and other available workshops I have

7    completed.  I'd also like to add that for the past

8    six and a half years I've been housed here at CTS

9    East Dorm Facility which houses 370 PIA inmates,

10    this demonstrates my ability to function and

11    interact with a multitude of different races,

12    cultures, beliefs, personalities and

13    characteristics, in all walks of life as well as

14    correctional staff and supervisors.  Each year

15    approximately 90 days before -- prior to my parole

16    hearing, a correctional counselor sits with me for

17    a few hours to review my programming since the

18    last hear.  And an evaluation report is prepared.

19    However, this report is based on a two-hour

20    interview.  When you consider the counselor's

21    heavy caseload, limited information is making that

22    they do as well as they do.  However, it seems to

23    me that if the Panel were to hear from

24    correctional staff and supervisors as regular

25    communication with me throughout my daily

26    activities at work, in the housing unit, and on

27    the yard, it would provide a more thorough and

109

1    complete evaluation of who I am today.  For this

2    purpose three correctional officers and two

3    supervisors have written informational chronos for

4    the Panel to review.  On January 25th, 2007,

5    Commissioner Ms. Tracy St. Julian (phonetic) told

6    me, I absolutely have no doubt that you're going

7    to get a date.  That date is in your future.  It's

8    just the area of the crime that she needs to feel

9    comfortable, that I have to find all of the

10   aspects and all the activities of that night so

11   that it's behind me.  It won't happen again.  I'm

12   hoping the Panel sees I've really taken it to

13   heart today.  On being found suitable today, my

14   goal is to have a parole understanding and

15   employment schedule on parole conditions.  These

16   will be very important to my success on parole.  I

17   look forward to discussing these conditions and

18   arrangement to my life to suit my parole agent's

19   concerns.  I'm determined to do well in complete

20   parole.  Thank you all for your patience and time

21   and understanding, and consideration in this

22   matter.

23        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank

24   you for your comments.  We'll now recess for

25   deliberations.  The time is 4:39.

26                    **R E C E S S**

27                    --o0o--

110

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER MELVIN:**  We're back on

4    record.

5    **PRESIDING COMMISSIONER ENG:**  Okay.  The time

6    is 4:59.  Everyone who was present in the room

7    prior to our recess for deliberations has since

8    returned.  In the matter of Leroy Lujan,

9    L-U-J-A-N, CDC Number E-76840, the Panel has

10   reviewed all the information received from the

11   Public and relied on the following circumstances

12   in concluding that the prisoner is not yet

13   suitable for parole and would pose an unreasonable

14   risk of danger to society or a threat to public

15   safety if released from prison.  The Panel finds

16   that the commitment offense was carried out in a

17   very, very cruel and calloused manner in that the

18   victim was clearly outnumbered.  And we find that

19   the inmate made the victim more vulnerable by

20   chasing after him and knocking him down to the

21   ground with a baseball bat.  The offense was

22   carried out in a manner which demonstrates the

23   exceptionally calloused disregard for human

24   suffering.  Again, this victim was -- first had an

25   altercation with the other -- or the inmate's

26   crime partners and ended up coming face to face

27   **LEROY LUJAN    E-76840    DECISION    PAGE 1    2/15/07**

111

```
 1    with the inmate and was chased after and hit with
 2    a bat and knocked down.  And then was thereby shot
 3    in the chest.  And again -- and then left there.
 4    Everybody just left him there in the street to
 5    bleed out and to die.  The motive for the crime,
 6    this is a tricky one.  We had a long discussion
 7    about this.  It appears to this Panel that the
 8    motive for the start of the altercation with the
 9    crime partners, that we believe started up on the
10    stairs, could have been retaliation to what the
11    members of the gang perceived to be a problem that
12    happened with one of the residents of the
13    apartment earlier in the day.  It could have been
14    that Mr. Fahey -- it was just a matter of mistaken
15    identity.  He happened to be in the wrong place at
16    the wrong time when this inmate's crime partners
17    decided to pretty much pounce on him.  However,
18    what really is troubling to the Panel is that the
19    motive for Mr. Lujan in doing what he did with
20    this victim, we find that -- we can not figure
21    out.  We find this to be inexplicable.  We've
22    tried to discuss it.  You know, Mr. Lujan clearly
23    had a chance -- many chances to turn around and
24    leave instead of going after -- chasing after this
25    victim and knocking him to the ground, which ended
26    up causing the death of this victim by gunshot.
27    LEROY LUJAN    E-76840    DECISION  PAGE 2  2/15/07
```

112

1    These conclusions are drawn from the statement of

2    facts wherein, "On that evening back on September

3    30th of 1989, the occupants of Heather Rose's

4    apartment heard someone coming down the stairs.

5    The men grabbed for various weapons, and Mr. Fahey

6    was confronted by several of the suspects after he

7    came down the stairs.  Physical altercation ensued

8    involving the victim and several suspects.

9    Subsequently, Mr. Fahey attempted to flea;

10   however, he was pursued by approximately five

11   suspects including the defendant.  Mr. Lujan was

12   observed to strike Mr. Fahey with a baseball bat,

13   causing the victim to fall to the ground.  The

14   physical assault continued until Stanley Anaya

15   allegedly approached and shot the victim in the

16   chest with a .25 caliber handgun.  The victim was

17   transported to a nearby hospital where he was

18   pronounced dead at 10:45 in the evening as a

19   result of a gunshot wound."  Oh, I filled it out

20   incorrectly this time.  In terms of a prior

21   record, we find that this inmate does have -- he

22   does have a history of unstable and tumultuous

23   relationships with others in that he admitted that

24   he was dealing in drugs, and he was associating

25   with many gang members, and that he was supplying

26   drugs to many of the gang members.  That he has

27   **LEROY LUJAN     E-76840     DECISION   PAGE 3    2/15/07**

113

1  failed previous grants of probation, and that he's

2  failed to profit from society's attempts to

3  correct his criminality. And again, the attempts

4  include adult probation. Again, your unstable

5  social history of selling drugs to the gangs and

6  his prior criminality, which includes a prior

7  arrest for Sale of a Controlled Substance and for

8  Receiving Stolen Property. And as we discussed,

9  this is all tied to tradings on the stolen goods

10  for stolen drugs. And then Lujan being arrested

11  for that. His institutional behavior, we just

12  find that the inmate's misconduct while

13  incarcerated includes three 128a counseling

14  chronos, the last one being in March of 1995 for

15  Gambling. And two 115 disciplinaries, the last

16  one being February 11 of 1997, Attempt to Smuggle

17  Photos From a Location. We find that the

18  psychological report that is dated December 16th,

19  2005, and authored by Dr. L. Petracek,

20  P-E-T-R-A -- I believe it's C-E-K, yes. This

21  Panel finds its inconclusive in that the doctor

22  states that under the review of the life crime --

23  and this is very, very important for you to pay

24  attention to, because this -- I personally have

25  gone back and looked at specific things in prior

26  decisions as well as the prior psychological

27  **LEROY LUJAN    E-76840    DECISION    PAGE 4    2/15/07**

114

1    reports.  And this states, as related in previous

2    reports, he is still vague about his motive in the

3    crime.  "It happened so fast."  Regarding the

4    relevance of mental condition to life crime, the

5    inmate stated, "I felt I was macho."  But he

6    states that I am a better person than I was

7    before.  Then they go on, Dr. Petracek goes on

8    under assessment of dangerousness and states that,

9    "Within a controlled setting, the inmate Lujan

10   poses some risk as of 1993 and 1996 based on

11   reading his Central File."  But then they go on to

12   state -- she goes on to state that release in the

13   community, his violence potential does appear to

14   be below average.  We find this to be a little

15   questionable.  But under the comments and

16   recommendations, again in the third one, states,

17   Mr. Lujan is still vague about why he committed

18   the crime.  And she states this evaluator feels he

19   needs to do some more sole searching about his

20   motive before being considered for a parole

21   release date.  And if you -- and I know it's all

22   coming at you so fast right now, but when you do

23   get a copy of this transcript, please go back and

24   look how we were asking you questions about that

25   very same issue trying to get you to take a look

26   and understand about what caused you to go

27   **LEROY LUJAN    E-76840    DECISION    PAGE 5    2/15/07**

115

1   forward, to make the decision that you did.  We do

2   note that Mr. Lujan has excellent parole plans and

3   a very, very good support network.  However, we

4   also note that the representative from the

5   District Attorney's office from Orange County did

6   state their opposition to parole at this time.

7   The Panel makes the following finding.  That the

8   inmate does need to continue to participate in

9   documented self help in order to face, discuss,

10  and cope with -- to cope with stress and anger in

11  a nondestructive manner.  Until progress is made,

12  the prisoner continues to be unpredictable and a

13  threat to others.  There's many, many different

14  types of self help, and I know the previous panels

15  have told you that, too.  It doesn't mean that you

16  have to go to AA or NA or any type of group

17  activities.  Take a look at -- you might be

18  reading an article one day that all of a sudden a

19  light will go off -- a light bulb will go off in

20  your head, and you'll say, oh my God.  Okay.  Take

21  the time to sit down and write down a brief

22  statement about what it really means to you and

23  how you are using what you just learned in your

24  everyday life.  And how that could help you to

25  ensure that given a similar situation where you

26  might become angry that you wouldn't make the

27  **LEROY LUJAN    E-76840    DECISION    PAGE 6    2/15/07**

116

1    wrong choice again.  But, again, we feel that you

2    should be commended for your positive work chronos

3    and all the -- you know, especially working with

4    PIA and your participation in Alternatives to

5    Violence Program and obtaining, at least what we

6    saw, was at least two vocationals.  However, these

7    positive aspects of his behavior do not outweigh

8    the factors of unsuitability.  Sir, we are giving

9    you a one-year denial.  You've got twelve months,

10   and I hope that you can find some way to dig deep

11   down and get a better understanding, be able to

12   discuss about what caused you to make the

13   decisions that you did and react the way that you

14   did.  This Panel recommends that the inmate remain

15   disciplinary free, you've done that, at least, I

16   believe, for the last ten years.  And that, if

17   available, that you continue to upgrade

18   vocationally and educationally.  And again, if

19   available, that you participate in any and all

20   types of self help that you can.  That concludes

21   the reading of my decision.  Commissioner --

22           **DEPUTY COMMISSIONER MELVIN:**  Commissioner,

23   I'd actually like to add a couple of things, a

24   couple thoughts.

25           **PRESIDING COMMISSIONER ENG:**  I was going to

26   ask you.

27   **LEROY LUJAN     E-76840     DECISION     PAGE 7     2/15/07**

117

1          **DEPUTY COMMISSIONER MELVIN:**  I'm sorry.

2          **PRESIDING COMMISSIONER ENG:**  That's okay.

3     That -- I was going to ask my fellow commissioner

4     if she has anything to add.

5          **DEPUTY COMMISSIONER MELVIN:**  We've really

6     thought long and hard about this case.  And I,

7     personally, don't think that you are the man at 36

8     that you were at 20.  I really don't.  I do think

9     that you have made strides, Mr. Lujan.  I do agree

10    with the Chair in saying that, for me, I really,

11    really needed to know from you why this happened,

12    other than I was macho.  I needed to hear from you

13    the truth.  And I'm not saying that you didn't

14    give the truth, but I struggled with how you could

15    not be a part of the gang when you agreed to

16    participate in this behavior with these other nine

17    young men -- or other nine people.  So, I suggest

18    that you really, really dig deep and think about

19    what you did and your state of mind at that time.

20    Also, I know you are feeling pretty bad right now,

21    but, you know, I just want you to remember that we

22    do acknowledge that you did -- you have programmed

23    well, and you have to remember that a life was

24    lost here.  And Mr. and Mrs. Fahey, you know, feel

25    20, 30, 100 times worse than you're feeling right

26    now.  And then the last thing I'd like to mention

27    **LEROY LUJAN**    **E-76840**    **DECISION**    **PAGE 8**    2/15/07

118

1    is, and I'd like to know the Chair's thoughts on

2    this.  Because in my opinion a lot of this was

3    based upon the psychologist's assessment that

4    there was no delving into the motive behind the

5    crime, an additional psych report being done.

6         **PRESIDING COMMISSIONER ENG**:  I think that

7    would be appropriate, and I'll go ahead and write

8    that up.  I think it would be highly appropriate

9    because -- and your clock starts ticking the

10   minute you walk out of here in doing whatever it's

11   going to take for you to come to grips and have a

12   better understanding of yourself.  And that's a

13   painful process.  It's not going to be an easy

14   process for you, but -- and you're right.  You

15   know, my fellow commissioner is correct.  This is

16   going to be one of the most difficult things you

17   are going to be facing, is to overcome that.

18   Because you have done so well.  You are a bright

19   man, you have a great future.  But this one aspect

20   is really holding you back.  And until you really

21   come to grips with it, it's going to be difficult

22   for you to move forward.  So, I hope that helps.

23   You're very talented.  I -- you know, to see the

24   graphics that you have done.  Don't stop doing

25   that, but you really -- we really recommend that

26   you concentrate on really digging deep into why

27   **LEROY LUJAN    E-76840    DECISION    PAGE 9    2/15/07**

119

1    you did what you did, and how that has changed.

2    Okay.  So, I will -- we will write that up and do

3    another request.  That concludes this hearing.

4    The time is 5:12.

5                    **A D J O U R N M E N T**

6                        --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEARS**

24    **THIS DECISION WILL BE FINAL ON:** **JUN 1 5 2007**  _____

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **LEROY LUJAN    E-76840    DECISION    PAGE 10    2/15/07**

120

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JaNae Warnock, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which cover a total of pages numbered 1 - 119, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of LEROY LUJAN, CDC No. E-76840, on FEBRUARY 15, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated APRIL 9, 2007, at Sacramento County, California.


_____
JaNae Warnock Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**

EXHIBIT "B"

BOARD OF PRISON TERMS                                              STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

☐ PAROLE GRANTED – (YES)
☐ CDC: Do not release prisoner before
    Governor's Review

☑ PAROLE DENIED – (NO) *One year*

*Jan 2007*

| Records Use Only | | |
|---|---|---|
| Parole Release Date | | |
| YR | MO | DAY |
| Attach Prison Calculation Sheet | | |

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
☐ HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

☐ No more 115's or 128A's     ☑ Stay discipline free
☐ Work to reduce custody level   ☐ Learn a trade*     ☑ Earn positive chronos
☑ Get self-help*           ☐ Get therapy*     ☐ Get a GED*

☐ Recommend transfer to _____
☐ Other _____
  *These programs are recommended if they are offered at your prison and you are eligible / able to participate.

Penal Code 3042 Notices      ☒ Sent    **Date:** 12/20/05

Commitment Offense(s)

| 187 2ND | MURDER 2ND |
|---|---|
| Code(s) | Crime(s) |

| C76180 | 01 |
|---|---|
| Case(s) | Count(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 1/21/90 | - | 10/23/99 |

☐ Initial Hearing     ☒ Subsequent (Hearing No,) 4     Date of Last Hearing 06/29/04

CDC Representative

Attorney for Prisoner   **MARCIA HURST**     Address

D.A. Representative   *Dennis Conway*    County   **ORANGE**

This form and the Board's decision at the end of the hearing on only <u>proposed</u> and **NOT FINAL.** <u>It will not become final until it is reviewed.</u>

Chair _____    Date

Panel Member _____    Date

Panel Member    Date

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| LUJAN, LEROY | E76840 | **CTF-SOLEDAD** | JAN"06 | 1/25/06 |

77

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER SMITH:**   Okay.   We're

4    back on record, and everyone previously

5    identified is back in the hearing room.

6          **PRESIDING COMMISSIONER ST.JULIEN:**   Okay.

7    Mr. Lujan we are going to deny parole today.

8    We're going to deny parole for one year.   And

9    I'll read the decision and give you some

10   suggestions.   We've received all the information

11   received from the public and relied on the

12   following circumstances in conclude that the

13   inmate is not yet suitable for parole and would

14   pose an unreasonable risk to society or a threat

15   to public safety if released from prison.   In

16   regards to the commitment offense.   The offense

17   was carried out in a dispassionate manner, and

18   that was the beating and subsequent shooting of

19   the victim who was John Fahey, age 21 years at

20   the time.   And he was hit twice by the inmate

21   with a baseball bat, and then shot once in the

22   chest by the crime partner.   And this happened

23   on September 30, 1989, in New Port Beach,

24   California.   And the victim did die from those

25   injuries.   And the motive from the crime was

26   very trivial in relation to the offense, in that

27   LEROY LUJAN   E-76840   DECISION PAGE 1      1/25/06

78

1    the fact Mr. Fahey was just an innocent passer

2    by, he was leaving the dwelling of a friend, and

3    apparently there had been some disruption before

4    at a near by residence where there was a group

5    of friends a lot of gang members who wanted to

6    take some time of revenge in relation to an

7    earlier incident that had happened when a couple

8    of the friend and the women who had lived in

9    that apartment.  And apparently about 10 or so

10   people came over and had armed themselves with

11   baseball bats, apparently there were guns as

12   well.  And Mr. Fahey just happened to be walking

13   by.  The group thought that he was someone else,

14   and proceeded to hit him with the baseball bats

15   and then ended up shooting him, which led to his

16   death.  And those conclusions are drawn from the

17   statement of the facts as they appear in the

18   January 2004 board report, and the probation

19   report.  In terms of a previous history, the

20   inmate has only one arrest and had that was for

21   drugs and sales.  And he has an unstable social

22   history which includes the selling of illegal

23   narcotics.  The psychological report dated

24   December 15, 2005 by Dr. Petracek is rather

25   contradictory.  In some places she says that the

26   inmate has made strives and has gained insight

79

1   and other places she doesn't. So we did read

2   this report, and really didn't make a difference

3   to us one way or the other in terms of the

4   decision because we it wasn't very consistent or

5   actually (indiscernible). In terms of parole

6   plans the inmate does is have realistic parole

7   plans. He has several offers of residence with

8   various family members, his mother, his sister,

9   some other friend. He also have acceptable

10  employment plans, several job offers, and he

11  does have marketable skills, and I would say

12  that your parole plans are very strong. Usually

13  that's the part of the puzzle that's missing,

14  however, your plans are very strong. We did not

15  in response to 3042 notices indicating

16  opposition to finding a parole suitability have

17  been expressed by the district attorney of

18  Orange County, and the New Port Police

19  Department. We would like to make the following

20  findings that the inmate continue to need self-

21  help in order to face, discuss, understand, and

22  cope with stress in a nondestructive manner.

23  (indiscernible) continues to be unpredictable

24  and a threat to others. We would like to

25  commend you for being disciplinary free since

26  1997. And that is very significant

27  LEROY JUIAN   E-76840   DECISION PAGE 3   1/25/06

80

1    accomplishment, and we can definitely appreciate

2    you (indiscernible).  You also have numerous

3    laudatory chronos for your participation in

4    Alcoholics Anonymous as well as being vice

5    chair.  Also numerous laudatory chronos for

6    completing the third phase of the inmate

7    employability program, and anger management.

8    You also have taken courses of sexually

9    transmitted diseases, HIV, and hepatitis, and

10   you were assigned in the P.I.A. as I furniture

11   finisher with above average work reports.  And

12   also we received your vocational welding

13   certificates, and also a certificate of

14   proficiency in P.I.A. sewing machine as a P.I.A.

15   sewing machine operator. Okay.  However, these

16   positive aspects does not outweigh the factors

17   of your suitability.  And, you know, for my name

18   is, I really just have one area I think you

19   should concentrate on, I said your parole plans

20   are very good, you've arranged an A.A. sponsor,

21   I see that in the past that have written a

22   letter of remorse to the victim, and you're

23   looking down, I know you're very discouraged,

24   but and it's hard -- it's easy for me to say

25   don't be discouraged.  I'm sure you got to be

26   discouraged so be disappointed and be

27   LEROY JUDD   E-76840   DECISION PAGE 4      1/25/06

81

1   discouraged but do not stop. Don't let this

2   sway you in any way, you've got to keep up the

3   good behavior, you've got to keep up the

4   programming. I absolutely have no doubt that

5   you're going to get a date. A date is in your

6   future. It's the area of the crime that just,

7   you know, we just need to fell completely

8   comfortable that you have confronted all the

9   aspects and all the activities of that night, so

10   that it's completely behind you, and that it is

11   not apt to happen again. So if you can regroup

12   and go back over these transcripts, please pay

13   special attention to particularly what

14   Commissioner Smith said about the opportunities

15   that night were you had an opportunity to stop,

16   and even perhaps if you have a trusted friend

17   here who can read back the transcript and say,

18   you know, this is where it kind of falls apart.

19   This is what you need to really think about, and

20   be able to address. Okay. Because there are

21   (indiscernible) -- and last year when they

22   talked to you about the insight component, and

23   that all ties in together, okay. So you've got

24   to be able to come in here so that the Panel

25   feels completely comfortable about your

26   rendition of the commitment crime because, you

27   LEROY LUJAN    E-76840    DECISION PAGE 5    1/25/06

82

1  know, this is only the first step, it has to go

2  to the Governor, and if you think your going to

3  be disappointed, you're going to be extremely

4  disappointed when you get a Governor's reversal

5  letter after getting a date.  And if we don't do

6  our job here to make sure that all the pieces

7  fit together, with can guarantee you a reversal.

8  But if you do our best to make sure you are

9  ready to go, and we give you date, then

10  hopefully that would be the end of it, and you

11  can go on with your life.  Okay.  Commissioner

12  Smith.

13          DEPUTY COMMISSIONER SMITH:  I have

14  nothing.

15          PRESIDING COMMISSIONER ST.JULIEN:  I wish

16  you good luck sir, and the time is 2:40 p.m.

17  \\

18  \\

19  \\

20  \\

21  \\

22  \\

23  PAROLE DENIED ONE YEAR            MAY 2 5 2006

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  LEROY LUJAN   E-76840   DECISION PAGE 6    1/25/06

83

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, PRISCILLA BAKER, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 82, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF LEROY LUJAN, CDC NO. E-76840, on JANUARY 25, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated February 14, 2006, at Sacramento, California.

PRISCILLA BAKER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

BOARD OF PRISON TERM                                      STATE OF CALIFORNIA
LIFE PRISONER:  PAROLE CONSIDERATION PROPOSED DECISION:
                              DENY PAROLE

---

[✓] PAROLE DENIED FOR:          (1)    2    3    4    5        YEARS

Place the prisoner on the _____Jan 2007_____ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled.  The Board will send you a copy of the decision.  It
will indicate the reasons you did not get paroled.  If this decision is not final, the Board will set up
another hearing.  You can read the laws about your hearing.  You can find the laws at California Code of
Regulations, Title 15, section 2041.

### RECOMMENDATIONS

**The Board Recommends:**

[  ] No more 115's or 128A's                    [  ] Learn a trade*
[  ] Work to reduce custody level               [  ] Get therapy*
[✓] Get self-help*                              [  ] Earn positive chronos
[✓] Stay discipline free                        [  ] Get a GED*

[  ] Recommend transfer to _____
[  ] Other

_____

*  These programs are recommended if they are offered at your prison and you are eligible/able to
participate.

### HEARING PANEL

Name _____Tracy Julie_____                      Date ___1/25/06___

Name _____Dw E C_____                           Date _____

~~Name~~ _____                        Date _____

NAME _Lujan,_          CDC# _E 76840_ PRISON _CTF_      DATE _1-25-06_
     _Leroy_

BPT 1005(b)                                      Distribution: White-C Fik
(REV 04/04)                                              Canary-BPT
                                                        Pink-Prisoner

BOARD OF PRISON                                                                STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| **LUJAN, LEROY** | **E76840** |

| DATE OF HEARING | LOCATION |
|---|---|
| **JANUARY 25, 2006** | **CORRECTIONAL TRAINING FACILITY - SOLEDAD** |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 11/21/90 | - | ORANGE |

| OFFENSE | CASE NUMBER |
|---|---|
| MURDER 2ND | C76180 |

| COUNT NUMBER(S) | PENAL CODE SECTIONS(S) VIOLATED |
|---|---|
| 01 | 187 2ND |

| TERMS | MEPD |
|---|---|
| 15 YRS - LIFE | 10/23/99 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☒ | CONSP TO COMMIT ASSLT | 245(A) (1) | ORANGE | C76180 | 02 |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| T. St. Julien | D. Smith | |

OTHERS PRESENT

☒ PRISONER (IF ABSENT, WHY)  _____

☒ ATTORNEY    MARCIA HURST

☒ DEPUTY D. A.   Steve Conway       COUNTY OF   ORANGE

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☒ THE STATEMENT OF FACT IS

☐ QUOTED FROM THE BOARD REPORT, DATED   Jan 2004    , PAGE(S)   1

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

☐ QUOTED FROM THE COURT OPINION, PAGE(S)

BOARD OF PRISON TERMS
LIFE PRISONER HEARING DECISION FACE SHEET

STATE OF CALIFORNIA

---

[ ] PAROLE GRANTED - (YES)
    CDC:  Do not release prisoner before
        Governor's review

[X] PAROLE DENIED - (NO)  *1 yr*
    *Needs new psych report*

| Records Use Only | | | |
|---|---|---|---|
| Parole Release Date | | | |
| | YR | MO | DAY |
| Attach Prison Calculation Sheet | | | |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)
[ ] HEARING POSTPONED/REASON:_____

---

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**
[ ] No more 115's or 128A's    [X] Stay discipline free
[ ] Work to reduce custody level  [ ] Learn a trade*      [ ] Earn positive chronos
[X] Get self-help* *substance*  [ ] Get therapy*      [ ] Get a GED*
    *abuse-when available*
[ ] Recommend transfer to_____
[ ] Other_____
    *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

---

**Penal Code 3042 Notices**    [ ] Sent  Date:_____

Commitment Offense(s)_____

            Code(s)                  Crime(s)

            Case #(s)               Count #(s)

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| [ ] Initial Hearing | [ ] Subsequent (Hearing No.)_____ | Date of Last Hearing_____ |

CDC Representative_____
Attorney for Prisoner_____  Address
D.A. Representative_____  County

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair *Susan Fisher*        Date  6/
Panel Member_____  Date  /29/
Panel Member_____  Date    /04

NAME_____  CDC #_____  CTF-SOLEDAD  CALENDAR  DATE

59

## D E C I S I O N

1

2

3     **DEPUTY COMMISSIONER LOPEZ:**  We're back on

4     record.

5         **PRESIDING COMMISSIONER FISHER:**  All right.

6     Thank you.  I want to note for the record that

7     everyone who was previously in the room and

8     identified themselves have returned to the room.

9     Mr. Lujan, the Panel reviewed all the information

10    received from the public and relied on the

11    following circumstances in concluding that you're

12    not yet suitable for parole and would pose an

13    unreasonable risk of danger to society or a threat

14    to public safety if released from prison.  This is

15    a one-year denial.  And I'm going to read the

16    decision and then I'm going to give you some real

17    specific suggestions. Okay. Obviously, the first

18    thing we looked was the offense, and this was a

19    particularly brutal crime.  This young man, Mr.

20    Fahey, was basically set upon by 10 people,

21    apparently, who had come there with the intent of

22    getting into an altercation with someone as a

23    result of, apparently, Heather Rose having issues

24    with one of the roommates of Mr. Fahey.  Mr. Fahey

25    happened out of his apartment, and several people

26    armed with bats, tire irons, and other kinds of

27    **LEROY LUJAN   E-76840    DECISION PAGE 1    6/29/04**

60

1    weapons, started to beat him. He broke away and
2    was caught again and beaten some more, broke away
3    again and apparently was then shot with a handgun.
4    He was beaten so badly that the imprint from the
5    baseball bat striking into his chest was clearly
6    visible and his ribs were broken. According to the
7    autopsy report, the internal injuries from the
8    trauma caused substantial bleeding into his chest
9    cavity. This couldn't have been an easy way to
10   die. He must have been absolutely terrified and
11   for all practical purposes we can assume that he
12   probably didn't have any idea why he was the victim
13   of this attack. I think it's important to note
14   that according to the Newport Beach Police
15   Department, Mr. Fahey, had he been allowed to live,
16   would have turned 36 in March of this year. This
17   was without question a cruel and callous murder and
18   was carried out in a very calculated manner as the
19   perpetrators of the crime came prepared to accost
20   and beat someone with the weapons that they brought
21   with them. Certainly it was carried out in a
22   manner that demonstrates an exceptional disregard
23   for human suffering. Mr. Lujan has an unstable
24   social history and prior criminality that includes
25   associating with gang members, certainly, and drug
26   dealing. He has some prior law enforcement
27   LEROY LUJAN  E-76840    DECISION PAGE 2    6/29/04

61

1  contacts.  They aren't violent; however, it's
2  important to note that he was on probation at the
3  time of this offense.  He has not sufficiently
4  participated in beneficial self-help, specifically
5  related to substance abuse.  He did participate in
6  AA for a period of time but recently I think, was
7  it 2000 that he was involved in AA.  Yeah.
8      DEPUTY COMMISSIONER LOPEZ:  2000.
9      PRESIDING COMMISSIONER FISHER:  Okay.  He
10  was involved up until 2000, apparently, and then
11  started again in 2004 so there hasn't been a
12  continuous participation in substance abuse self-
13  help.  He has had only three 128 counseling
14  Chrono's since his commitment offense.  The last
15  one was back in 1995, and he's only had two 115's
16  since his commitment offense and the last one was
17  back in 1997.  The Psychiatric report, dated
18  11/23/01, authored by Dr., I believe it's Alevy,
19  it's A-L-E-V-Y, is not totally supportive of
20  release and is in fact contradictory.  It states
21  that within a controlled setting he poses some
22  risk, and it says that he's had a few Chrono's
23  suggesting difficulty with social boundaries and
24  behavior.  And then it goes on to say if released
25  to the community, his violence potential is
26  estimated to be average.  But then it goes on to
27  LEROY LUJAN  E-76840    DECISION PAGE 3    6/29/04

62

1    say that inmate Lujan needs to explore further and
2    understand the requirements of appropriate social
3    behavior and the general requirements of underlying
4    good citizenship, and it also says that regarding
5    the causative factors of this offense that he
6    stated that he doesn't know and that he was young
7    at the time.  He does have good Parole Plans and he
8    obviously has good family support.  The hearing
9    Panel notes that in response to 3042 Notices, the
10   Newport Beach Police Department, specifically, the
11   officer who was the investigating officer in this
12   case, wrote to oppose a finding of suitability at
13   this time and that the District Attorney of Orange
14   County has had Mr. Anderson here as its
15   representative to speak in opposition of a finding
16   of suitability at this time.  We do want to commend
17   you, Mr. Lujan, for the work that you've been doing
18   here.  You've completed both vocational welding and
19   screen process printing back in 1996, and you got
20   your GED back in 1992, and you did participate in
21   AA up until 2000 and we want to commend you for
22   getting back into that.  However, these positive
23   aspects of his behavior do not currently outweigh
24   the factors of unsuitability.  The Panel recommends
25   that the prisoner remain disciplinary free, when
26   and if available, continue to upgrade vocationally,
27   LEROY LUJAN   E-76840    DECISION PAGE 4    6/29/04

63

1    and when and if available, participate in an

2    ongoing manner in substance abuse self—help.  Also

3    we're going to order a new Psych report to address

4    the contradictions that are in this current Psych

5    report and to be more clear on some of the issues

6    that were of concern to us, so I would recommend

7    that you participate in completion of that

8    evaluation.  And that completes the reading of the

9    decision.  Do you have any comments?

10            DEPUTY COMMISSIONER LOPEZ:  I wish you luck,

11    sir.

12            PRESIDING COMMISSIONER FISHER:  Okay.  Mr.

13    Lujan, I'm going to recommend to you that, you

14    know, apparently are you actually back in AA at

15    this point or are you just on the waiting list?

16            INMATE LUJAN:  I'm back in.

17            PRESIDING COMMISSIONER FISHER:  All right.

18    I'm going to recommend to you that you stay in that

19    until your next Board hearing consistently and that

20    if you have the opportunity any kind of self—help

21    that would help you with issues of insight.  I

22    think that it would be helpful for you to get

23    involved in something like that also, and if

24    there's not anything available to you maybe read

25    some books and bring some information back to the

26    Board about what you're looking into as to the

27    LEROY LUJAN   E-76840    DECISION PAGE 5    6/29/04

64

1   causative factors because you told the current, in
2   the current Psych report you told the Psych that
3   you just didn't know what might be the causative
4   factors of your behavior at the time of the
5   offense.  That completes the hearing.  It's
6   approximately 3:35.

7       ATTORNEY TARDIFF:  There's a pink sheet.  I
8   think it's underneath.

9       PRESIDING COMMISSIONER FISHER:  Did I not
10  give it to you.  I may have put it in here.  I
11  think I packed it along with the carbon paper.  I'm
12  not used to having to put them together.  Here you
13  go.

14      ATTORNEY TARDIFF:  Thank you.  That's your
15  copy.

16      ASSISTANT DISTRICT ATTORNEY ANDERSON:
17  (Indiscernible) art?

18      PRESIDING COMMISSIONER FISHER:  Yeah, and
19  it's really excellent, by the way.  Okay.  We're
20  all done.

21                  --o0o--

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON: OCT 27 2004 _____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  LEROY LUJAN  E-76840   DECISION PAGE 6    6/29/04

65

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CINDY WALKER, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of LEROY LUJAN, CDC No. E-76840, on JUNE 29, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 14, 2004, at Sacramento County, California.

_Cindy Walker_
Cindy Walker
Transcriber
CAPITOL ELECTRONIC REPORTING

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
SETTING A LIFE PRISONER TERM – PAROLE DENIED

## 11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

☒ 3.  the panel's belief that the prisoner's current mental health is an
      important issue. In the new full evaluation, the panel requests that the
      clinician specifically address the following:

   ☒ a.  the prisoner's violence potential in the free community;

   ☐ b.  the significance of alcohol/drugs as it relates to the commitment
         offense and an estimate of the prisoner's ability to refrain from
         use/abuse of same when released;

   ☐ c.  the prisoner's psycho-sexual problems;

   ☒ d.  the extent to which the prisoner has explored the commitment
         offense and come to terms with the underlying causes;

   ☐ e.  the need for further therapy programs while incarcerated.

   ☒ f.  other: _prior rept states that the inmate
         needs to explore & understand the requirements
         of appropriate social behavior & the general
         requirements underlying good citizenship._

☐ 4.  the panel's belief that the prisoner has deteriorated psychologically and
      there appears to be a need for treatment. The panel bases this conclusion
      upon

      _____

      _____

      _____

      _____

☐ B.  (Other requests to CDC staff): _____    _S. Fisher BPT_

      _____     _6/29/04_

_Lujan    CDC# E-76840_

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION  (BPT §2041)

I.  [X]  PAROLE DENIED

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|---|---|---|

B.  Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . +_____ Months

C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . +_____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

E.  Postconviction Credit From _____ To _____ – _____ Months
                                         (Date)              (Date)

F.  Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

| | | Date 6/ |
| *Fisher* | | Date 29/ |
| | *N/A* | Date 04 |
| *Lujan* | E 76840 | |
| | CDC NUMBER | INSTITUTION | HEARING DATE |

005 (Rev. 8/1/81)

BOARD OF PRISON

STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☐ SUBSEQUENT HEARING

| PRISONER'S NAME  *Lujan* | CDC NUMBER  *E76840* |
|---|---|
| DATE OF HEARING  *6/29/04* | LOCATION  CORRECTIONAL TRAINING FACILITY - SOLEDAD |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| OFFENSE | | CASE NUMBER |
| COUNT NUMBER(S) | | PENAL CODE SECTIONS(S) VIOLATED |
| TERMS | MEPD | |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER  *Fisher* | PANEL MEMBER  *D Lopez* | PANEL MEMBER |
|---|---|---|

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY) _____

☐ ATTORNEY _____

☐ DEPUTY D. A. _____   COUNTY OF _____

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☐ THE STATEMENT OF FACT IS

    ☐ QUOTED FROM THE BOARD REPORT, DATED _____ ,PAGE(S) _____

    ☒ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S)  *3 & 4*

    ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

PT  1000 (Rev 8/90)

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT
### (RECORDS OFFICER USE ONLY)

|                                 | YR   | MO | DAY |
|---------------------------------|------|----|-----|
| Adjusted Period of Confinement.. |      |    |     |
| Date Life Term Begins ....      | 1990 | 11 | 21  |
| At Large Time......             | +    |    |     |
| PAROLE DATE                     | =    |    |     |

## MISCELLANEOUS

*Parole denied one (1) year.*

Panel recommendations and requests:
_____ Become    ✓ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
✓ Upgrade _____ vocationally _____ educationally
✓ Participate in _____ self-help (and) _____ therapy.
_____ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES        ☒ SENT    (Date) 11-27-2002

## COMMITMENT OFFENSE

|                         |                      |
|-------------------------|----------------------|
| P187                    | MURDER 2ND           |
| (Code Section)          | (Title)              |
| C76180                  | 01                   |
| (Case Number)           | (Count Number)       |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|----------------------|-----------------------|------------------|
| 11-21-1990           | 11-21-90              | 10-23-1999       |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|-----------------|---------------------------------------------|
| ☐ INITIAL    ☒ SUBSEQUENT (Hearing No.) #2 | 01-30-02 |

Department Representative
D.S. LEVORSE, C&PR

| Counsel for Prisoner | Address |
|----------------------|---------|
| BILL SCHMIDT         |         |

| District Attorney Representative | County |
|----------------------------------|--------|
|                                  | ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:
Presiding (Name) _____    Date _____
Concurring (Name) _____    Date  1-22-03
Concurring (Name) _____    Date _____

| NAME                 | CDC NUMBER | INSTITUTION | CALENDAR     | HEARING DATE |
|----------------------|------------|-------------|--------------|--------------|
| LUJAN, LEROY PAUL III | C76180    | CTF         | JANUARY 2003 | 1-22-03      |

BPT 1001 (Rev. 1/91)

70

1          CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3          **DEPUTY COMMISSIONER HARMON:**  You're on

4    record.

5          **PRESIDING COMMISSIONER WELCH:**  Okay, sir.

6    We do have a decision.  The Panel reviewed all the

7    information received from the public and relied on

8    the following conclusions in concluding --

9    circumstances in concluding that the prisoner is

10   not yet suitable for parole and would pose an

11   unreasonable risk of danger to society or a threat

12   to public safety if released from prison.

13   (inaudible) cruel and callous manner.  The offense

14   was carried out in a dispassionate manner.  The

15   offense was carried out in a manner that

16   demonstrates an exceptionally callous disregard for

17   (inaudible) in relationship to the offense.  The

18   conclusion was drawn from the Statement of Facts

19   wherein on September 30, 1989, the Newport Beach

20   police responded to a report of gunshots.  And when

21   they arrived, they found the victim who had been

22   beaten, a (inaudible) baseball bat by the prisoner

23   and also shot (inaudible) and he was subsequently

24   transported to the hospital where he died.  In

25   reviewing the prisoner's prior criminality, the

26   prisoner failed -- did not have a lengthy criminal

27   LEROY LUJAN    E-76840    DECISION PAGE 1    01/22/03

71

1    history.  The only arrest was an arrest (inaudible)

2    cell.  (inaudible)  The prisoner have programmed

3    since his incarceration (inaudible) manner.  Recent

4    psychiatric report shows that the prisoner has

5    making (inaudible) progress.  (inaudible) appears

6    to be reduced.  The prisoner does have some parole

7    plans.  (inaudible) Orange County.  The Panel makes

8    the following findings:  We recommend that you

9    continue to engage in self-help programs, continue

10   to participate in (inaudible) programs.  And we are

11   going to ensure that (inaudible) continue to face,

12   discuss, understand and cope with stress in a

13   (inaudible).  The prisoner has (inaudible) progress

14   and involved in several vocational programs.

15        **ATTORNEY SCHMIDT:**  Excuse me, Commissioner,

16   I have an objection.  Should I hold the objection

17   to the end?

18        **PRESIDING COMMISSIONER WELCH:**  Yes, hold it

19   to the end.  The prisoner has been involved in

20   several vocational programs.  He's been involved in

21   voc programs (inaudible) and some of these

22   programs.  He's been involved in (inaudible).

23   Nevertheless, these positive aspects of his

24   behavior does not (inaudible).  Parole is going to

25   be denied for one year.  The Panel recommends that

26   you continue to remain disciplinary-free and to

27   **LEROY LUJAN    E-76840    DECISION PAGE 2**    01/22/03

72

1    continue to (inaudible), vocational programs, and

2    also that you continue to participate in programs

3    (inaudible).  With that, that concludes the reading

4    of the decision.  Commissioner, you have anything

5    else?

6           **DEPUTY COMMISSIONER HARMON:**  Nothing

7    further, other than you're on the right track, sir.

8    Good luck to you.

9           **PRESIDING COMMISSIONER WELCH:**  (inaudible),

10   you have --

11          **ATTORNEY SCHMIDT:**  Yeah.  I have an

12   objection.  The Panel specifically stated that the

13   reason, or one of the reasons, for denying a parole

14   date today was that my client needed rehabilitation

15   in the form of self-help and therapy.  Penal Code

16   Section 1170 specifically states under Section

17   (A)(1) that:

18              "The Legislature finds and declares

19              that the purpose of imprisonment for

20              crime is punishment.  This purpose is

21              best served by the terms

22              proportionate to the seriousness --

23              by terms proportionate to the

24              seriousness of the offense with

25              provision for uniformity in the

26              sentences of offenders committing the

27   LEROY LUJAN    E-76840    DECISION PAGE 3    01/22/03

73

1          same offenses under similar

2          circumstances."

3     That's it.   Thank you.

4          **PRESIDING COMMISSIONER WELCH:**   Okay.   Thank

5     you, Counselor.   Noted.   This hearing is concluded

6     at approximately thirteen forty-five.   Good luck to

7     you.

8                         --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED ONE YEAR**

26    **FINAL DATE OF DECISION** _____   APR 2 2 2003

27    **LEROY LUJAN     E-76840    DECISION PAGE 4    01/22/03**

74

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATTY DAVIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 73, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of LEROY LUJAN, CDC No. E-76840 on JANUARY 22, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 10, 2003, at Sacramento County, California.

Patty Davis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

Community Release Board

State of California

# LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION (CRB § 2041)

I.  [X] PAROLE DENIED  *One (1) Year.*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|---|---|---|

B.  Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

E.  Postconviction Credit From _____ To _____ − _____ Months
(Date)                      (Date)

F.  Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to CRB § 2041, and, if approved, a copy of the approved decision will be sent to you within 30 days, and at that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in CRB § 2451. Such conduct may result in rescission or postponement of your parole.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the decision and the reasons for disapproval. The proposed decision will have no effect and you will be scheduled for another hearing if necessary.

PANEL HEARING CASE

| Name | | Date |
|---|---|---|
| Name | | Date |
| Name | | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| JJAN, LEROY | E-76840 | CTF-SOLEDAD | 1-22-03 |

BOARD OF PRISON

STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING

| PRISONER'S NAME<br>LUJAN, LEROY PAUL | CDC NUMBER<br>C76180 |
| --- | --- |
| DATE OF HEARING<br>WEDNESDAY, JANUARY 22, 2003 @ 11:00 AM | LOCATION<br>CORRECTIONAL TRAINING FACILITY - SOLEDAD |

## LEGAL STATUS

| DATE RECEIVED<br>11-21-1990 | DATE LIFE TERM STARTS (IF DIFFERENT)<br>11-21-90 | COUNTY<br>ORANGE |
| --- | --- | --- |
| OFFENSE<br>MURDER 2ND | | CASE NUMBER<br>C76180 |
| COUNT NUMBER(S)<br>01 | | PENAL CODE SECTIONS(S) VIOLATED<br>P187 |
| TERMS<br>15 YRS TO LIFE | | MEPD<br>10-23-1999 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
| --- | --- | --- | --- | --- | --- |
| ☐ | CONSP. TO COMMIT ASSAULT | 182/245(A)(1) | ORANGE | C76180 | 02 |
| ☐ | ASSAULT W/DEADLY WPN | 245(A)(1) | ORANGE | C76180 | 03 |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER<br>*Welch* | PANEL MEMBER<br>*Harmon* | PANEL MEMBER |
| --- | --- | --- |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY)

☐ ATTORNEY          BILL SCHMIDT _____

☐ DEPUTY D. A. _____ COUNTY OF   ORANGE

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☒ THE STATEMENT OF FACT IS          *10 - 98*

    ☐ QUOTED FROM THE BOARD REPORT, DATED ~~1-22-03~~ ,PAGE(S)   1

    ☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

    ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

**BOARD OF PRISON TERMS**
LIFE PRISONER DECISION FACE SHEET                                    **STATE OF CALIFORNIA**

## PERIOD OF CONFINEMENT
### (RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement.. | | | |
| Date Life Term Begins .... | + 90 | 11 | 21 |
| At Large Time...... | + | | |
| PAROLE DATE | = | | |

## MISCELLANEOUS

*PAROLE DENIED ONE YEAR*

Panel recommendations and requests:
_____ Become _____ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
_____ Upgrade _____ vocationally _____ educationally
_____ Participate _____ self-help _____ therapy.
in                (and)
_____ Transfer _____ Cat. X _____ Cat. T.
to

---

**PENAL CODE SECTION 3042 NOTICES     X SENT     (Date) 12-14-01**

---

**COMMITMENT OFFENSE**

| P187 2ND | MURDER 2ND |
|---|---|
| (Code Section) | (Title) |
| C76180 | 01 |
| (Case Number) | (Count Number) |

| Date Received by CDC 11-21-90 | Date Life Term Begins | Controlling MEPD 10-23-99 |
|---|---|---|
| Type of Hearing ☐ INITIAL   X SUBSEQUENT (Hearing No.) 1 | | If Subsequent Hearing, Date of Last Hearing 12-2-98 |

Department Representative
R.S. LEVORSE, C&PR

| Counsel for Prisoner PATRICIA FOX | Address |
|---|---|
| District Attorney Representative TOM CROFOOT | County ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a **proposed** decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | | Date 01/ |
|---|---|---|
| Concurring (Name) | N/A Per SB 778 | Date 30/ |
| Concurring (Name) | | Date /02 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| JJAN, LEROY | E-76840 | CTF | DECEMBER 2001 | 1-30-02 |

BPT 1001 (Rev. 1/91)

BOARD OF PRISON

STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          **X** SUBSEQUENT HEARING

| PRISONER'S NAME LUJAN, LEROY | CDC NUMBER E-76840 |
|---|---|
| DATE OF HEARING WEDNESDAY, JANUARY 30, 2002 AT 2:45 P.M. | LOCATION CORRECTIONAL TRAINING FACILITY - SOLEDAD |

## LEGAL STATUS

| DATE RECEIVED 11-21-90 | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY ORANGE |
|---|---|---|
| OFFENSE MURDER 2ND | | CASE NUMBER C76180 |
| COUNT NUMBER(S) 01 | | PENAL CODE SECTIONS(S) VIOLATED P187 2ND |
| TERMS 15 TO LIFE | | MEPD 10-23-99 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☒ | CONSP. TO COMMIT ASSLT | P245(A)(1) | ORANGE | C76180 | 02 |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER A ANGELE | PANEL MEMBER N/A PER SB 778 | PANEL MEMBER R RODRIGUEZ |
|---|---|---|

OTHERS PRESENT

☒ PRISONER (IF ABSENT, WHY) _____

☒ ATTORNEY    PATRICIA FOX

☒ DEPUTY D. A.    TONI CRAWFOUT    COUNTY OF    ORANGE

☐ OTHERS: _____

## STATEMENT OF FACTS

☒ ~~THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD~~

ON _____, ~~PAGES~~ _____ ~~THROUGH~~ _____

☒ ~~THE STATEMENT OF FACT IS~~

              OCT 1998

☒ ~~QUOTED~~ FROM THE BOARD REPORT, DATED ~~☒☒☒☒ ☒☒☒☒~~ ,PAGE(S)    1

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

46

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

1

2

3     DEPUTY COMMISSIONER RODRIGUEZ:  We're back

4     on record.  All parties are present.

5          PRESIDING COMMISSIONER ANGELE:  This is in

6     the matter of Leroy Lujan.  Mr. Lujan, the Panel

7     has reviewed all information received from the

8     public and relied on the following circumstances

9     in concluding that you're not suitable for parole

10    and would pose an unreasonable risk of danger to

11    society and a threat to public safety if released

12    from prison.  The offense was carried out in a

13    violent manner.  The offense was carried out in

14    manner which demonstrated a disregard for a human

15    life and human suffering.  These conclusions are

16    drawn from the Statement of Facts wherein the

17    inmate was at a party where a scuffle broke out,

18    armed himself with a baseball bat, and as a

19    result, hit the victim with a baseball bat at

20    least twice. The victim was then shot by another

21    individual which caused his death.  The inmate has

22    a minor record which merely includes an arrest for

23    selling narcotics, for being in possession of

24    narcotics for sale, and also for receiving stolen

25    property, which he states was a result of

26    exchanging stolen property for a controlled

27    **LEROY LUJAN   E-76840   DECISION PAGE 1   1/30/02**

47

1    substance.  The inmate has received no 128(a)

2    counseling chronos since his last hearing nor has

3    he received any 115s since his last hearing.  The

4    psychological evaluation dated 11-23-01 by Daniel

5    Alvey, A-L-V-E-Y, appears to support release.  The

6    inmate does have realistic parole plans.  The

7    Hearing Panel notes in response to 3042 Notices

8    indicate opposition to a finding of parole

9    suitability, specifically the District Attorney of

10   Orange County.  The Panel makes the following

11   findings:  That the inmate needs additional time

12   in order to fully understand and deal with the

13   causation factors that led to the commitment of

14   the life crime.  Until progress is made, the

15   prisoner continues to be unpredictable and a

16   threat to others.  Nevertheless, the prisoner

17   should be commended for completing vocational

18   welding, vocational silk printing, and vocational

19   screen process printing. Also for he participation

20   in AA and NA, and also for working the 12-step

21   program.  However, these positive aspects of his

22   behavior do not outweigh the factors of

23   unsuitability.  Mr. Lujan, the denial will be for

24   a period of one-year, and during that year we

25   expect you to remain disciplinary free.  We want

26   you to continue what you're doing in regards to

27   **LEROY LUJAN  E-76840   DECISION PAGE 2   1/30/02**

48

1    your education and vocation, and your self-help

2    and therapy programming.  I also want to indicate,

3    however, that the counselor's report dated 10-98

4    by a L. Hunter indicates a moderate degree of

5    threat to the public as does the current one.  And

6    the reason why I brought that up is because of the

7    problem of not having the current Board report or

8    counselor's report in a timely fashion, just to

9    indicate that it was moderate in 1998 and it was

10   moderate in 2001, so the same results in both

11   particular reports.  You're doing pretty decent,

12   and I'll say that much to you, and you very

13   honestly are somebody who I can see getting a

14   date, the problem is, is very honestly is, you go

15   back and read the story about what happened, and

16   only you knows what really happened there.  Maybe

17   some other people were there.  It seems to be just

18   too many differences, and even when it's picked up

19   by the psychiatrist who says that there are some

20   discrepancies about what really happened.  And

21   again, I don't know, but it doesn't

22   (indiscernible) well for you because it appears

23   that different people are writing different parts

24   of the story.  And it appears that the

25   correctional counselors have a different version

26   of their own, as does the psychologist, so I don't

27   **LEROY LUJAN   E-76840   DECISION PAGE 3   1/30/02**

49

1    know how that really happened, but it does happen

2    and that's something you have to deal with.  You

3    seem very talented, and quite frankly, I hate to

4    see this kind of talent go to waste.  I wish you

5    good luck. That does conclude the reading the

6    decision.  Comments, Commissioner Rodriguez.

7         **DEPUTY COMMISSIONER RODRIGUEZ:**  Mr. Lujan,

8    if we'd brought that jacket here today, would it

9    fit you?

10        **INMATE LUJAN:**  No.

11        **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  Good

12   luck.

13        **PRESIDING COMMISSIONER ANGELE:**  That does

14   conclude the hearing.  The time is approximately

15   7:05 p.m.  Good luck to you, sir.

16        **INMATE LUJAN:**  Thank you.

17                      --oOo--

18

19

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**

26   **EFFECTIVE DATE OF THIS DECISION**          MAR 1 1 2002

27   **LEROY LUJAN   E-76840   DECISION PAGE 4   1/30/02**

50

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY THOMAS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 49, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of LEROY LUJAN, CDC No. E-76840, on JANUARY 30, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 15, 2002 at Sacramento County, California.

_Wendy Thomas_ _____
Wendy Thomas
Transcriber
**CAPITOL ELECTRONIC REPORTING**

BOARD OF PRISON TERMS                                        STATE OF CALIFORNIA

## LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION  (BPT §2041)

I.  [X]  **PAROLE DENIED**   ONE YEAR

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

---

II.  [ ]  **PAROLE GRANTED**

A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|---|---|---|

B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E.  Postconviction Credit From _____ To _____ − _____ Months
    (Date)            (Date)

F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-ponement of your parole date.

---

II.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

---

**PANEL HEARING CASE**

| Name | | Date |
|---|---|---|
| ame | _(signature)_ | 01/ |
| ame | N/A PER SB77Y | 30/ |
| ame | _(signature)_ | /02 |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| LUJAN, LEROY | E-76840 | CTF-SOLEDAD | 1-30-02 |

T 1005 (Rev. 8/1/81)

Distribution: White—C. File
Canary—BPT

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ............................................ |  |  |  |
| Date Life Term Begins ............................................ | + 90 | 11 | 21 |
| At Large Time ............................................ | + |  |  |
| PAROLE DATE ............................................ | = |  |  |

## MISCELLANEOUS

*Denial 3 years
set next hearing date
for Dec. 2001.*

Panel recommendations and requests:
_____ Become ✓ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
✓ Upgrade ✓ vocationally ✓ educationally.
✓ Participate in ✓ self-help (and) ✓ therapy.
_____ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES ☑ SENT  (Date) 10/15/98

COMMITMENT OFFENSE

| PC 187 | Murder 2nd |
|---|---|
| (Code Section) | (Title) |
| C76180 | 01 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 11/21/90 | SAME | 11/23/99 |

| Type of Hearing ☑ INITIAL ☐ SUBSEQUENT (Hearing No.) _____ | If Subsequent Hearing, Date of Last Hearing |
|---|---|

Department Representative

| Counsel for Prisoner   JEFF CHAMPLIN | Address |
|---|---|
| District Attorney Representative   DAVE BRENT | County   ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | D. Shelton | Date |
|---|---|---|
| Concurring (Name) | Thomas Well | Date |
| Concurring (Name) |  | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| LUJAN, LEROY | E-76840 | CTF SOLEDAD | 10/98 | 12/02/98 |

BPT 1001 (REV. 1/91)

PERMANENT ADDENDA

36

1           CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3           DEPUTY COMMISSIONER WEBB:  We're back on

4      record.

5           PRESIDING COMMISSIONER SHELTON:  We're back on

6      record and everybody has returned that was here prior

7      to recess for deliberation.  Mr. Lujan, the Panel

8      reviewed all the information received from the public

9      and relied on the following circumstances in

10     concluding that you are not suitable for parole and

11     would pose an unreasonable risk of danger to society

12     and a threat to public safety if released from prison.

13     The offense was carried out in a manner which exhibits

14     a callous disregard for the life and suffering of

15     another.  And these conclusions are drawn from the

16     Statement of Facts wherein the prisoner was at a party

17     and his purpose for being there was dealing drugs.

18     Some witnesses state he knew of the altercation and

19     that they were looking for the victim, he denies that.

20     However he did come about the victim and hit him with

21     a baseball bat rendering him defenseless until another

22     person came over and shot him, causing the victim's

23     death.  He has an escalating pattern of criminal

24     conduct, he has a persistent pattern of tumultuous

25     relationships and criminal behavior which commenced at

26     an early age.  He's failed previous grants of

27     LEROY LUJAN        E-76840    DECISION PAGE 1    12/02/98

C-FILE

37

1    probation, unstable social history and prior criminal

2    which includes using and selling narcotics, burglary,

3    receiving stolen property.  He has programmed in a

4    limited manner while incarcerated.  He has failed to

5    demonstrate evidence of positive change.  His

6    misconduct while incarcerated includes two 115s, the

7    last one February 11th, '97, and he had three 128(a)s

8    and the last one being in 1995.  The prisoner needs

9    therapy in order to face, discuss, and understand and

10   cope with stress in a non-destructive manner.  Until

11   progress is made, the prisoner continues to be

12   unpredictable and a threat to others.  The prisoner's

13   gains are recent and he must demonstrate an ability to

14   maintain gains over an extended period of time.

15   Nevertheless, the prisoner should be commended for

16   obtaining his GED, I believe you have a vocational

17   certificate for screening, a lot of hours put in that.

18   You have welding, you've taken.  There's three

19   different versions of that you've taken.  You've been

20   attending AA and NA, you've attended Victims

21   Awareness, Impact of Crime Victims and How to Survive

22   a Loss.  So you're showing some good things in your

23   rehabilitation.  The Panel further finds it is not

24   reasonable to expect that parole would be granted at a

25   hearing during the next three years and the specific

26   reasons for this finding are as follows:  Your parole

27   LEROY LUJAN        E-76840    DECISION PAGE 2    12/02/98

38

1   is denied for three years before you have another

2   hearing.  And the prisoner committed the offense in an

3   especially cruel manner, whereas he did disable the

4   victim with a baseball bat until the victim was shot

5   and rendered dead.  A longer period of time is

6   required to evaluate  his suitability in view of the

7   prisoner's long history of criminality and misconduct,

8   again including using and selling of drugs and the

9   burglary charges and the stolen property charges.  We

10  recommend that you become and remain disciplinary

11  free, that you continue to upgrade vocationally and

12  educationally and participate in your self-help

13  programs.  This is a serious crime.  This is your

14  initial hearing, I don't think you had an expectation

15  of getting out this time.  But I do think that your

16  road to recovery is remarkable.  You're a fine young

17  man, so we wish you the best of luck and that ends the

18  hearing for today.

19                    --o0o--

20

21

22

23

24

25  **PAROLE DENIED THREE YEARS**

26  **EFFECTIVE DATE OF THIS DECISION**    DEC 29 1998   _____

27  **LEROY LUJAN**       **E-76840    DECISION PAGE 3       12/02/98**

BOARD OF PRISON                                                    STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☒ INITIAL HEARING          ☐ SUBSEQUENT HEARING

| | |
|---|---|
| PRISONER'S NAME **LUJAN, LEROY** | CDC NUMBER **E-76840** |
| DATE OF HEARING **12/02/98** | LOCATION **CTF SOLEDAD** |

## LEGAL STATUS

| | | |
|---|---|---|
| DATE RECEIVED **11/21/90** | DATE LIFE TERM STARTS (IF DIFFERENT) **SAME** | COUNTY **ORANGE** |
| OFFENSE **MURDER 2ND** | | CASE NUMBER **C76180** |
| COUNT NUMBER(S) **01** | PENAL CODE SECTIONS(S) VIOLATED **187** | |
| TERMS **15-LIFE** | MEPD **11/23/99** | |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☒ | CSP/Asslt | 182/245(a)(1) | Orange | C76180 | 02 |
| ☒ | ADW | 245(a)(1) | Orange | C76180 | 03 |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| D. Shelton | T. Webb | T. Giaquinto |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY)

☑ ATTORNEY  *Jeff Champlin*

☑ DEPUTY D. A.  *Dave Brent*  COUNTY OF *Orange*

☑ OTHERS:  *Victims – Matt + Shelly Mabry*

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☐ THE STATEMENT OF FACT IS

    ☐ QUOTED FROM THE BOARD REPORT, DATED _____ ,PAGE(S) _____

    ☒ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) **3 - 4 - 5**

    ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT    1000 (Rev 8/90)

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

## LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION  (BPT §2041)

---

I.  [X]  PAROLE DENIED   *3 YEARS*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

---

II.  [ ]  PAROLE GRANTED

A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|---|---|---|

B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|

D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E.  Postconviction Credit From _____ To _____ -- _____ Months
                                         (Date)                    (Date)

F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

---

I.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | | |
|---|---|---|

| ame | _D. Shelton_ | Date |
| ame | _Thomas Welch_ | Date |
| ame | _Giaquinto_ | Date |

| AME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| LUJAN, LEROY | E-76840 | CTF | 12/2/98 |

Distribution: White—C. File
Canary—BPT

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

# LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|
| P187 MURDER 2ND | | C-76180 | Ct. 01 |

| DATE RECEIVED CDC | MIN. ELIG. PAROLE DATE | EARLIEST MIN. ELIG. PAROLE DATE |
|---|---|---|
| 11-21-90 | 10-24-99 | |

| INITIAL HRG. SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 08-98 | 04-16-94 to 09-13-96 | 07-12-94 |

## INFORMATION CONSIDERED

| CDC 115 CHRONOS | | LAUDATORY CHRONOS | |
|---|---|---|---|
| | | DATE | CIRCUMSTANCES |
| ☐ DISCIPLINARY FREE | | | |
| ☒ MAJOR DISCIPLINARY (SERIOUS) | ONE (1) 10-27-95 | | |
| ☐ MINOR DISCIPLINARY (ADMIN.) | | | |

Claims to have been reduced
to Administrative write-up.

| CDC 128 CHRONOS (NEGATIVE) | | CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC. | |
|---|---|---|---|
| DATE | CIRCUMSTANCES | DATE | CIRCUMSTANCES |
| | | | |

See Progress Report of 8-21-96

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED: _____

PSYCHIATRIC:

REFER TO CATEGORY _____

COMPLETE PRIOR TO _____ MEPD- 1999- Initial _____

PLACE ON APPROPRIATE:
☒ LIFE PRISONER DOCUMENTATION CALENDAR
☐ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR

OTHER _____

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| LUJAN, LEROY | E-76840 | SCC | 11/96 | 09-13-96 |

BPT 1009 (REV. 4/86)                    PAGE 1 OF 2 PAGES                    PERMANENT ADDENDA

AFTER REVIEWING WITH THE PRISONER THE FACTORS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE: VOCATIONAL TRAINING  Completed Silk Screening as directed - date of Certificate 4-4-96. Expressed interest for further vocational Training. Recommended Graphic ARTS.

RE: ACADEMICS  Since Completion of GED in 1992 - Up graded Education in Business Law - Recommend pursue other educational Courses to enhance potential.

RE: WORK RECORD  MAC Chairman and Secretary — a full time job Prisoner gets $37.00 per month.

RE: GROUP ACTIVITIES  Continues to participate and in N.A. A.A. and Victim Awareness class

RE: PSYCHIATRIC TREATMENT  No indication of need for Psychiatric evaluation unless adjustment deteriorate

RE: PRISON BEHAVIOR  Prison has made satisfactory progress demonstrated by Completion of Vocational Silk Screening and Completion of College Course in Business Law — He been a

RE: OTHER  leader in MAC. and Continues in self help groups. Incarceration prisoner has gotten only one write-up that was reduced to Administrative

BPT REPRESENTATIVE SIGNATURE  [signature] DC

DATE  9-13-96

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|-----------|-------------|----------|--------------|
| LUJAN, LEROY | E-76840 | SCC | 11/96 | 09-13-96 |

BPT 1009 (REV. 4/86)

PAGE 2 of 2 PAGES

PERMANENT ADDENDA

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

## LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE

### SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | CASE NUMBER | COUNT NUMBER |
|---|---|---|
| 187 PC MURDER 2ND | C76180 | 01 |

| DATE RECEIVED CDC | MIN. ELIG. PAROLE DATE | EARLIEST MIN. ELIG. PAROLE DATE |
|---|---|---|
| 11-21-90 | 9-22-1999 | 9-22-1999 |

| INITIAL HRG. SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 8-98 | 11-21-90 TO PRESENT | |

### INFORMATION CONSIDERED

| CDC 115 CHRONOS | LAUDATORY CHRONOS | |
|---|---|---|
| | DATE | CIRCUMSTANCES |
| ☑ DISCIPLINARY FREE | | |
| ☐ MAJOR DISCIPLINARY (SERIOUS) | | |
| ☐ MINOR DISCIPLINARY (ADMIN.) | | |

| CDC 128 CHRONOS (NEGATIVE) | | CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC. | |
|---|---|---|---|
| DATE | CIRCUMSTANCES | DATE | CIRCUMSTANCES |
| | | | |
| | | | |
| | *See Progress Report dated 7-12-94* | | |

### INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED: _____

PSYCHIATRIC: _____

REFER TO CATEGORY _____

COMPLETE PRIOR TO _____ *Initial* _____

PLACE ON APPROPRIATE:        *MEPD — 9-22-99*
☑ LIFE PRISONER DOCUMENTATION CALENDAR
☐ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR

OTHER _____

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| LUJAN, LEROY | E-76840 | SCC | 10/93 | July 12, 1994 |

AFTER REVIEWING WITH THE PRISONER THE FACTORS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE: VOCATIONAL TRAINING  Voc. Stk Screening ~ enrolled 12-14-93 In the process of completion.

RE: ACADEMICS  Completed GED at PBSP - Verified 5-22-92 Spl. (12.9) tests 12-6-93

RE: WORK RECORD  Yard Crew maintenance in '93 at Corcoran sat satisfactory

RE: GROUP ACTIVITIES  Participated in NA. 2-1-94 - 6-30-94 - encouraged to continue in Self Help Groups - ie. NA, AA and other self help group.

RE: PSYCHIATRIC TREATMENT  Psychiatric evaluation by W. O'Evans (?) dated 10-08-93 - noted no psychiatric disorder needing psychiatric intervention.

RE: PRISON BEHAVIOR  Rec. RGC CIM. 11-21-90 w/ 15-Life Term. -Prisoners' adjustment has been satisfactory and records indicate prisoner has the proper and constructive outlook. Expressed

RE: OTHER  interest for a transfer to prison where he can enhance his education and attain a AA or BA. degree. Encouraged remain Disciplinary free and continue to up-grade educationally / and or Vocationally and participate in self help program.

BPT REPRESENTATIVE SIGNATURE  *Conrad War DC*

DATE  7-12-94

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|-----------|-------------|----------|--------------|
| LUJAN, LEROY | E-76840 | SCC | 10/93 | July 12, 1994 |

BPT 1009 (REV. 4/86)          PAGE 2 of 2 PAGES                    PERMANENT ADDENDA

EXHIBIT "C"

*Institution*

**ORANGE COUNTY**
**PROBATION DEPARTMENT**

CENTRAL SUPERIOR COURT, Dept./Div. __30__ Time __9 a.m.__

Defendant's Full Name: LUJAN, Leroy Paul          P & S Date: 11/8/90

AKA:

Address: 21952 Carlerik Ave.                      C- 76180      A- 190083
Long Beach, CA

Present Whereabouts: OCJ                           DPO: Katherine A. Sano/ds

Telephone: 213/835-3507                            Attorney: Michael Horan

Present Offense Please see body of report.  **COURT STATUS**

                                  Date of Offense   9/30/89          Arresting Agency  HBPD
                                                                     Date of Arrest  10/6/89
Inf./Cmplnt. Filed  11/9/89    Guilty by   Plea                      Date  10/10/90
Days in Custody Since 10/6/89  Codefendants

**DESCRIPTION**

Age  20  DOB  6/19/70  POB  Long Beach, CA        Ethnic Background  Hisp  Sex  Male
Height  5-6  Weight  135  Hair  Brown  Eyes  Brown    Complexion  Medium
Identifying Marks  L12 on chest; scar on stomach   Social Security No.  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
Date of Arrival in California       Birth           Date of Arrival in Orange County  Non-resident
FBI  431708LA0  CII  A09190374  OCSO  712 811      Operator's License  A3378291
                                                   Expiration Date  Suspended

**PRIOR PROBATION GRANTS**              **PRIOR PAROLE GRANTS**

| Year | County | Term | Year | State | Term |
|------|--------|------|------|-------|------|
|      |        |      |      |       |      |

**EMPLOYMENT HISTORY**

Last/Work/Employer  Lujan's Welding          Address _____ City _____
Date Began _____ Date Terminated  1988   Reason  Find another job
Type of Work  Welder's helper,   Work Phone _____ Salary _____
Previous Employment:  on and off

| From | To | Employer | Type | Salary | Reason Terminated |
|------|-----|----------|------|--------|-------------------|
|      |     |          |      |        |                   |
|      |     |          |      |        |                   |
|      |     |          |      |        |                   |

**MARITAL HISTORY**

| Present Spouse | Home Address | DOB | Date & Place of Marriage | Status |
|----------------|--------------|-----|--------------------------|--------|
| None |  |  |  |  |

Occupation _____                          Employment Address _____

| Children | Address | DOB | Sex | Other Parent |
|----------|---------|-----|-----|--------------|
| None |  |  |  |  |

# FILED

### NOV 15 1990

GARY L. GRANVILLE. County Clerk

By _____ DEPUTY

| Previous Marriages | Address | Date Married | Terminated |
|--------------------|---------|--------------|------------|
| None |  |  |  |

**PRE-SENTENCE REPORT**

**CONFIDENTIAL**
Per Sec. 11142 P.C. The Furnishing of this
Report, or Information Contained within,
to an Unauthorized Person is

## FAMILY DATA

Father __Leroy Lujan__  Died _____  Age _49_  DOB _Unk_  POB _Unk_
Address ____S.A.D.____  Telephone _____  Ethnic Background _____
Occupation _____  Religion _____
Marriage Date _____  Status _____

Mother __Elizabeth Lujan__  Died _____  Age _52_  DOB _Unk_  POB _Unk_
Address __S.A.D.__  Telephone _____  Ethnic Background _____
Occupation _____  Religion _____

Other Marriages: Father

| Name | Dates | Status of Marriage | Date of Termination |
|---|---|---|---|
| None | | | |

Other Marriages: Mother

| Name | Dates | Status of Marriage | Date of Termination |
|---|---|---|---|
| None | | | |

| Brothers & Sisters | Age | Address | | | | Occupation |
|---|---|---|---|---|---|---|
| | | No. | Street | City | State | |
| Virginia Nesbit | 32 | | | | CA | |
| Sandra Venezuela | 25 | | S.A.D. | | | |
| Michelle Lujan | 21 | | " | | | |
| John Lujan | 17 | | " | | | |

| Former Residences | Dates | |
|---|---|---|
| | From | To |

## EDUCATIONAL BACKGROUND

Highest grade completed __10th__  Where __Carson H.S.__  Degrees held _____

## MILITARY RECORD

Branch __None__  Dates of Service _____  Service No. _____
Highest rate or rank _____  Type of Discharge _____  Job Classification _____
Duty Assignments _____  Honors & Benefits _____

## PERSONAL INFORMATION

Health __Good__  Health Problems __None__  Organizations—Religion _____

Hobbies and Interests

__Drawing__

Habits
Tobacco: __None__
Liquor: __See body of report.__
Drugs: __"__  __"__

Vehicle License No. _____  Firearms owned / possessed: __None__
Type __None__
Color _____
Year _____

COURT STATUS

On November 9, 1989 in the Superior Court of Orange County an
Information was filed alleging violation of 187(a) of the Penal Code
(Murder), Section 182.245(a)(1) of the Penal Code (Conspiracy to Commit
Assault With a Deadly Weapon), and Section 245(a)(1) of the Penal Code
(Assault With a Deadly Weapon). On October 10, 1990 the defendant
entered a plea of guilty to Murder in the Second Degree, as well as the
remaining counts in the Information. The matter was continued to
November 8, 1990 for a probation and sentencing hearing.

CIRCUMSTANCES OF THE OFFENSE

Records of the Newport Beach Police Department (DR 89-13200)
reveal that on September 30, 1989 at approximately 10:15 p.m., police
responded to a West Balboa Boulevard address to investigate a report
that gunshots had been fired. Their subsequent investigation revealed
that the defendant was one of several young men involved in the
shooting death of 21-year-old Jonn David Fahey.

After talking with various witnesses and suspects, police
determined that earlier in the day, on September 30, 1989, 21-year-old
Heather Rose, a resident at 1324 W. Balboa, Apartment "A", became
involved in a physical altercation with 19-year-old Jennifer McMartin,
who was one of several roommates of Mr. Fahey, residing at 1324 W.
Balboa, Apartment "C". The physical altercation occurred because Ms.
Rose was jealous of another young woman she thought was becoming
involved with 20-year-old Brent Claxton, the young man she had been
dating. Ms. Rose reportedly received injuries which necessitated
medical treatment. Later in the day, Ms. Rose told her roommate, 21-
year-old Leslie Peng, that "some guys are coming over to protect them.'

LUJAN, Leroy Pa[    ]                                    Page 4

1  In the early evening, approximately 20 persons arrived, mainly male

2  Hispanic "gang types." One man had a handgun and others carried

3  baseball bats and other items that could be used as weapons.

4      When the occupants of Heather Rose's apartment heard someone

5  coming down the stairs, the men grabbed for various weapons and Mr.

6  Fahey was confronted by several of the suspects, after he came down the

7  stairs. A physical altercation ensued, involving the victim and

8  several suspects. Subsequently, Mr. Fahey attempted to flee, however,

9  he was pursued by approximately five suspects, including the defendant.

10 Mr. Lujan was observed to strike Mr. Fahey with a baseball bat, causing

11 the victim to fall to the ground. The physical assault continued,

12 until Stanley Anaya allegedly approached and shot the victim in the

13 chest with a .25 caliber handgun.

14     The victim was transported to a nearby hospital where he was

15 pronounced dead at 10:45 p.m., as the result of a gunshot wound.

16     Four codefendants were arrested as they fled the scene and,

17 subsequently, on October 6, 1989 the defendant and codefendant Robert

18 Pimentel were arrested. Police determined that they needed to take

19 photos of graffiti in the Washington Boulevard area of Dominguez so

20 both Mr. Lujan and Mr. Pimentel volunteered to assist police in

21 locating graffiti in the area. It was noted that "DV13" and "WbL" and

22 "Boogie" had been spray painted on walls and a trash bin. Police

23 learned that "Boogie" is the defendant's moniker. (On October 3, 1989

24 Ms. Peng provided police with a jacket that had been left at her

25 residence on the night of the murder. On the back of the jacket were

26 the words "Washington Blvd." and on the front was the name "Boogie.")

27     Mr. Pimentel explained to police that on the date the instant

28

1  offense occurred, he and the defendant were at a house in Dominguez,

2  when a friend by the name of Tito Huizar and several friends came by,

3  indicating that they were going to be needed in the City of Newport

4  Beach regarding some type of trouble with skinheads.  Mr. Pimentel went

5  on to say that subsequently the defendant telephoned Richard Nogawa,

6  who told the defendant that there was going to be a fight, because

7  Heather Rose was beaten up by a group of skinheads.  Mr. Pimentel

8  overheard Mr. Nogawa tell Mr. Lujan, "Hey man, we're gonna get the guys

9  that jumped Heather."

10          Initially, when Mr. Lujan was interviewed he denied any

11  involvement with the victim.  However, with continued questioning, he

12  admitted that he did go outside Heather Rose's apartment, and happened

13  to come face-to-face with Mr. Fahey.  He saw something shiny in the

14  victim's hand that he thought looked like a knife or something, and the

15  victim looked at the bat Mr. Lujan had in his possession.  Then the

16  victim swung whatever he had and took off running.  The defendant

17  followed him and hit him on the side with the baseball bat, causing Mr.

18  Fahey to fall to the ground.  The defendant recalled that the victim

19  swung at him again with whatever the object was, so Mr. Lujan hit him

20  one more time prior to his hearing a gunshot.  Mr. Lujan explained that

21  he did not want to hurt anybody.

22  VICTIM'S STATEMENT

23          Telephone contact was made with the victim's mother, Carleta

24  Fahey.  During the course of the conversation, she was advised of

25  information regarding Mr. Lujan's sentencing hearing.

26          She explained that though she and her husband worked for the

27  Department of Corrections for 30 years, it has been very difficult to

28

1  deal with the murder of their son.  She pointed out that Mr. Lujan was

2  involved in the gathering of people who were eventually involved in the

3  death of her son, who was unknown to them, and an innocent victim.

4  According to Mrs. Fahey, the defendant had no thought for the victim or

5  his family, and should be given no leniency.  She pointed out her

6  concern that the defendant could continue his involvement in gang

7  activities as a predator and wanted to be sure the Department of

8  Corrections was advised of this possibility.

9  ADJUSTMENT IN ORANGE COUNTY JAIL

10      In a review of the defendant's file at Orange County Jail,

11  one minor disciplinary action was noted.  On December 11, 1989 the

12  defendant was involved in horseplay (wrestling on the ground).  He

13  received a loss of dayroom privileges from December 12 through

14  December 15, 1989.

15  COLLATERAL INFORMATION

16      Records of the California Bureau of Criminal Identification

17  and Information reveal that on February 15, 1989 the defendant was

18  arrested by the Los Angeles County Sheriff's Office for sale of a

19  controlled substance, burglary and receiving known stolen property.  In

20  telephone conversation with the Criminal Clerk's Office at Compton

21  Municipal Court, it was learned that this felony matter continues to be

22  pending.  Mr. Lujan is charged with violating Sections 11352 and

23  11351.5 of the Health and Safety Code (Court Case #A652765).

24      It was determined that there is currently an outstanding

25  warrant for the defendant's arrest regarding this matter.  The Carson

26  Station of the Los Angeles She      s Office was advised that Mr. Lujan

27  is in Orange County Jail.

28

1          In telephone conversation with Deputy Feiga of the Carson
2   Sheriff's Office, he indicated that they had received information from
3   neighbors that narcotics were being sold from the defendant's home.
4   This led to an undercover officer purchasing twenty dollars' worth of
5   rock cocaine from Mr. Lujan.  When the defendant's home was searched,
6   they located a lot of sound equipment that was taken from Mr. Lujan's
7   place of employment,  Also, they found jewelry, but were unable to
8   locate all the victims.

9          According to Deputy Feiga, although they just made one "buy,"
10  their information would indicate that this was not just a one-time
11  sale.

12  DEFENDANT'S STATEMENT

13          With regard to the instant offense, Mr. Lujan explained that
14  he and approximately ten of his friends went to a party at Heather
15  Rose's house.  He mentioned that he originally met Ms. Rose at another
16  party he attended.  He went on to say that everyone was in the
17  apartment, and then things started happening outside.  He overheard
18  that there were people outside the apartment with crowbars and other
19  weapons and, he could see some people scuffling outside.  The group
20  outside included some of the people he knew.  Mr. Lujan decided he
21  would leave the location and, to protect himself against possible
22  problems, he picked up a baseball bat that happened to be in the
23  apartment.  As Mr. Lujan left the apartment, the back way, he almost
24  bumped into Mr. Fahey, who was alone at the time.  It was at that point
25  that the victim pulled a knife and swung it at Mr. Lujan.  The
26  defendant then swung his bat and struck the victim, causing Mr. Fahey
27  to fall to the ground on a pathway next to the apartment.  Then, Mr.

28

Fahey swung at the defendant again, although this time Mr. Lujan did not think Mr. Fahey had a knife. However, because he was already afraid and angry, he struck the victim again on the legs. It was at this point that Mr. Lujan heard a gunshot, which shocked him.

The defendant added that after Mr. Fahey swung the knife at him, the defendant probably ran after the victim, and it was at that point that the victim fell close to a truck on the street. According to Mr. Lujan, the only thing he could think of was to defend himself.

Although the defendant explained that the reason he was at Ms. Rose's apartment was to attend a party, he did hear that Ms. Rose had been physically assaulted by skinheads and that she called Richard Nogawa and told him about it. He understands that Mr. Nogawa transported bats to Heather's house so Mr. Lujan guesses that is how the weapons got there.

The defendant denied any gang membership, although the people he was with that evening belonged to the Dominguez and other gangs. He went on to say that he went to school with Tito Huizar, and knew other friends from the neighborhood. The group attended parties together.

According to Mr. Lujan, he was not concerned about having a gun present at a party, as his friends are involved in the sale of drugs and they always carry guns with them, so he is used to it. He added that nothing like this had ever happened before, as the result of the possession of guns. Mr. Lujan even mentioned that there was one occasion when he was a minor, that he possessed a firearm and happened to be stopped by a Sheriff. Although he did not recall being placed on juvenile probation, he did have to attend counseling. (Records of the Carson Station of the Los Angeles Sheriff's Office, reveal that on

1    January 11, 1986 the defendant was arrested for violation of Section

2    12021.5 and 12025(b) of the Penal Code.  In telephone conversation with

3    the Los Angeles County Probation Department, their records reveal that

4    on April 28, 1986 the Petition was dismissed.)

5            With regard to the defendant's consumption of alcohol, he

6    explained that he would occasionally consume beer on the weekends.  As

7    far as his usage of controlled substances, Mr. Lujan explained that he

8    smoked marijuana, with his heaviest usage being almost daily, at the

9    age of 16.  Also, he used "crack."  He first used this substance at the

10   age of 16, and stopped when he was 18.  Mr. Lujan went on to say that

11   for a period of time he was involved in the sale of "crack" and, at the

12   time he was arrested for sales, the property in his possession came

13   from people he worked with who stole it from their employer.  He ended

14   up with it, because they gave it to him in exchange for drugs.

15           Mr. Lujan wishes that the whole incident had never happened.

16   He feels badly about it, he did not wish that anybody would die.  The

17   defendant added that he prays that the victim rests in peace.  He knows

18   that what he did was wrong, and that his striking the victim with a

19   baseball bat may have contributed to his death, however, Mr. Lujan does

20   not feel responsible for Mr. Fahey's death, because he did not shoot

21   him.

22           The defendant realizes that formal probation is not a

23   consideration in this matter.  He indicated that he has no enemies in

24   prison, no physical limitations, and he has never had any emotional

25   problems.  While incarcerated, he hopes to take college courses and

26   learn some type of trade so he can work when released from custody.

27           His future plans include making the best out of life.  He

28

hopes to marry someday and have a family.

STATEMENT OF REFERENCES AND INTERESTED PARTIES

Telephone contact was made with the defendant's mother, Elizabeth Lujan. She explained that her family lived in the same area for 22 years, and her son went to school with some of the people involved as codefendants in this case. She feels that although her son is basically a pretty good person, he got involved with the wrong people. He discontinued his education because he was not interested in school. Eventually, this led to his quitting. According to Mrs. Lujan, in the last few years, the defendant seemed to be more of a follower and, when he as 17 years of age and almost 18, he started associating with Tito Huizar on a more regular basis. Although, her son was the same at home and never caused any problems there, after a closer association with Mr. Huizar, her son did not work on a regular basis. Sometimes he worked with his father and, he had a pattern of leaving home in the morning, saying he was going to look for work, and then he would return later in the day. According to the defendant's mother, for a while her son was dating a girl she thought was good for him, however, he discontinued that relationship and started associating with the wrong people. She is not aware of any problem her son had with the abuse of drugs and, with regard to the instant offense, she does not feel he would have gone with his friends that evening if he knew there was a gun involved.

Telephone contact was also made with the defendant's sister, Sandra Venezuela. She stated that she cannot believe her brother was involved in a crime such as this, because she does not feel he would deliberately hurt anyone. She feels that probably part of what

1    happened is that he became involved with the wrong people.  With regard

2    to Tito Huizar, Ms. Venezuela explained that her brother felt sorry for

3    him and felt that he was Tito's only friend.  There was a period of

4    time when the defendant would go out dancing with his sister, an

5    activity that they both enjoyed.  Then, however, he started going back

6    to Mr. Huizar's home and the defendant sort of changed.  Ms. Venezuela

7    feels that her brother was influenced by his companions, even though

8    their family is not a gang family and she, personally, hates gangs.

9    Ms. Venezuela indicated that her brother is not a violent person.

10   Rather, he is a caring individual, who was in shock when he realized

11   that the victim had been shot.  She knows he did not go to Ms. Rose's

12   home intending to harm anyone, and she does not feel he was motivated

13   to prove himself to others.  She expressed her ongoing concern for her

14   brother and hoped that he would not receive a stiff sentence.  She

15   expressed her concern with regard to her brother spending time in State

16   Prison.

17            At the defendant's request, Ron Marchello, Assistant Center

18   Director at Dominguez Park, was contacted by telephone.  According to

19   Mr. Marchello, approximately three-to-four years ago the defendant

20   worked at the park as a part-time employee for the City of Carson Parks

21   and Recreation.  He was classified as a sport official, working with

22   young teens.  Mr. Marchello recalled that Mr. Lujan was a good worker.

23            In telephone conversation with Sergeant Van Horn with the

24   Newport Beach Police Department, he explained his feeling that Mr.

25   Lujan was one of the "main players" in the instant offense, with regard

26   to the physical assault.  He elaborated by saying that he feels there

27   were four principal persons involved in this crime and the defendant

28

1   was one of them.  He went on to say that he feels Mr. Lujan was as

2   involved as anyone, because of his physical assault on the victim, with

3   a baseball bat.  He said that unfortunately, the victim seemed to be at

4   the wrong place at the wrong time, which led to his death.

5          According to Sergeant Van Horn, he was one of the officers

6   present at the time of the defendant's arrest.  He recalled that during

7   the process of transporting Mr. Lujan to the Newport Beach Police

8   Department, the defendant proudly showed officers gang graffiti.  It

9   was Sgt. Van Horn's feeling that the defendant was a proud member of

10  the Washington Boulevard Dominguez 13 Gang.

11         Telephone contact was made with Detective Push, of the Carson

12  Sheriff's Office, as he is directly involved with gang activity.

13  According to Det. Push, the gang Mr. Lujan is thought to be affiliated

14  with has been responsible for driveby shootings as well as muggings

15  with baseball bats and sticks.  He was not personally acquainted with

16  the defendant and because the computers were not working, due to an

17  impending move, further checks could not be made with regard to

18  identifying the defendant as a member of the already mentioned gang.

19         In telephone conversation with the defendant's attorney,

20  Michael Horan, he described his client as being a likeable, decent

21  young man.  He mentioned that one of the prosecution witnesses

22  explained that the defendant did not seem to fit in with his

23  codefendants, because he was a nicer, kinder person.  Mr. Horan was

24  hopeful that the California Youth Authority might be an option for his

25  client.

26         In telephone conversation with the prosecuting attorney, he

27  expressed his thought that there was every indication that if Mr. Fahey

28

1   had not been shot, Mr. Lujan would have continued his assault with the

2   baseball bat.  He elaborated by saying that the defendant ran out into

3   oncoming traffic, pursuing the victim, which would seemingly point out

4   Mr. Lujan's serious intent to pursue his attack on Mr. Fahey.  The

5   prosecutor pointed out that the victim did nothing to bother the

6   defendant in this matter, and he felt there were no mitigating factors

7   with regard to the attack on the victim.  According to the Deputy

8   District Attorney, during cross examination, the defendant admitted

9   seeing something shiny in the victim's hand at the time they confronted

10  each other, however, he did not state it was a knife.  The prosecutor

11  went on to say that there was no evidence that there was anything in

12  the victim's hand at the time of the final attack on him.  He added

13  that the victim was observed having a folded knife on his waistband

14  and, a folded knife was located in the bushes after the instant offense

15  occurred.  With regard to a disposition in this matter, the prosecuting

16  attorney described the crime as being extremely vicious and he felt

17  that Mr. Lujan should be sentenced to the maximum term prescribed by

18  law.

19  PRIOR RECORD

20          Records of the California Bureau of Criminal Identification

21  and Information reveal that on August 2, 1989 the defendant was

22  arrested by the Redondo Beach Police Department on a charge of theft by

23  use of access card.  According to the defendant, this incident involved

24  two credit cards that his brother found in a wallet located in a gutter

25  near their home.

26          Records of the Torrance Municipal Court reveal that on

27  September 25, 1989 the defendant was placed on two years' informal

28

probation after he was convicted of violating Section 484(a) of the
Penal Code (Court Case #89-MØ7949).

The California Department of Motor Vehicles shows that the
defendant's driver's license was suspended effective April 16, 1988
because of a citation. A reissue fee is now required. Two violations
were noted to have occurred in 1987 and 1988. Also, the already
mentioned theft case appears showing the September 25, 1989 conviction
for violating Section 484(a) of the Penal Code. No failures to appear
or accidents are listed.

SOCIAL HISTORY

According to the defendant, he has a satisfactory
relationship with his family. With regard to his education, he
mentioned that he dropped out of high school because of conflicts he
experienced with his peers, which were directly related to
relationships he had with girls. At the time the instant offense
occurred, he was attending night school at Jordan High School. At the
present time he is working toward obtaining his GED.

With regard to his employment, the defendant stated that on-
and-off, he has worked with his father, doing welding. His most recent
employment was as a machine operator for a company he cannot remember
the name of. He was employed there for two-to-three weeks, however, he
quit because of low pay. In the past, he has been employed in shipping
and receiving. This employment ended because stolen property from the
employer was located in Mr. Lujan's house at the time he was arrested
with regard to the previously mentioned narcotic charges. Although he
did not mention it, in his file with the Orange County Jail, it was
listed that at the time of his arrest, he was employed by Unique

1  Install, installing car alarms.

2         Mr. Lujan has never been married although, he mentioned that

3  for approximately one year he lived with his girlfriend.  They had

4  plans to marry, however, these plans never materialized and they broke

5  up.  At the time the instant offense occurred. Mr. Lujan was residing

6  with his parents.

7         Good health is enjoyed by the defendant.  He does have a scar

8  on his lower stomach area which he sustained at the age of ten, when a

9  bowl full of soup fell on him.  He has never suffered from any other

10  serious illness or injury.  In his leisure time, the defendant enjoys

11  drawing.

12  DISCUSSION AND EVALUATION

13                    CIRCUMSTANCES IN MITIGATION

14  The Crime:

15         423(a) -      None.

16  The Defendant:

17         423(b) - 3    The defendant acknowledged wrongdoing prior to

18                       the conclusion of the trial.

19                    CIRCUMSTANCES IN AGGRAVATION

20  The Crime:

21         421(a) - 1    The crime involved great violence, disclosing a

22                       high degree if viciousness.

23         421(a) - 2    The defendant used a weapon at the time of the

24                       commission of the crime.

25         421(a) - 3    It is felt Mr. Fahey was particularly

26                       vulnerable.

27         421(a) - 8    The circumstances of the crime show planning,

28

LUJAN, Leroy Paul

thus indicating some degree of premeditation.

The Defendant:

421(b) - 4    Although the defendant does not have a
significant record of prior crimes, he had one
felony case pending at the time the instant
offense occurred, as well as being on informal
probation through the Torrance Municipal Court.

CRITERIA AFFECTING DECISION TO GRANT OR DENY PROBATION

414(a) -    Pursuant to Section 1203(e)(2) of the Penal
Code, it would appear that the defendant is
ineligible for probation, except in unusual
cases. In examining the criteria affecting
probation in unusual cases, it is felt none of
these apply, especially in light of the gravity
of the offense.

DISCUSSION

This is indeed a tragic, senseless crime, that involved the
vicious murder of an innocent young man. Although there appears to be
no documented evidence of past violent behavior on the part of Mr.
Lujan, he was definitely one of the aggressors in this crime. He
attempted to mitigate his involvement by saying the victim threatened
him with a knife, however, there appears to be no evidence to
substantiate his claims.

Mr. Lujan's family views him as a non-violent, caring young
man, who causes no problems within the home. However, once he is away
from that environment, he has chosen to affiliate himself with gang
members who carry firearms and reportedly have been involved in violent

LUJAN, Leroy Paul                                      Page 17

1   activities.  His association with these people, in this instance, led

2   to his involvement in this violent crime.

3          Based on the foregoing, the Court is asked to consider a

4   commitment to the State Department of Corrections, to provide

5   punishment for the defendant's involvement in the instant offense, and

6   to protect the community.  Pursuant to Section 1732.5 of the Welfare

7   and Institutions Code, the defendant cannot be committed to the

8   California Youth Authority, as he has been convicted of a serious

9   felony, as listed in Section 1192.7 of the Penal Code.

10         It would appear that a Restitution Fund fine in the amount of

11  $10,000 would be appropriate.

12  RECOMMENDATION

13         In view of the foregoing, it is respectfully recommended that

14  probation be denied, and that pursuant to Section 13967 of the

15  Government code, the defendant be ordered to pay a Restitution Fund

16  fine in the amount of $10,000.00.

17                                      Respectfully submitted,

18                                      MICHAEL SCHUMACHER
19                                      Chief Probation Officer

20

21                                      Katherine A. Sano
22                                      Deputy Probation Officer
                                        569-2055
23

24  Dated this 8th day of November, 1990.

25  I have read and considered the foregoing
    report of the Chief Probation Officer.
26

27

28  JUDGE OF THE CENTRAL SUPERIOR COURT

insert name of court, branch court, if any, and mailing address

SUPERIOR COURT OF CALIFORNIA, COUNTY OF _____ORANGE_____
700 Civic Center Drive West
P.O. Box 1994
Santa Ana, CA  92702

**PEOPLE OF THE STATE OF CALIFORNIA**

DEFENDANT: LUJAN, Leroy Paul III    [X] Present    [ ] Not Present

**FOR COURT USE ONLY**

F I L E D

NOV 9 - 1990

C...Y - .. ...LLE, County Clerk

by _____
DEPUTY

[X] JUDGMENT OF COMMITMENT TO:    [X] STATE PRISON    [ ] COUNTY JAIL
[ ] ORDER GRANTING PROBATION    [ ] AND MINUTE ORDER

CASE NUMBER:
C-76180

| Date of hearing: 11-09-90 | Dept. No.: 30 | Judge: DONALD A. McCARTIN | Clerk: G. Carpenter | Reporter: Sandra Wingerd |
|---|---|---|---|---|
| Counsel for People: Robert Gannon DDA | | Counsel for defendant: Michael Horan | | Probation Officer: A-190083 |

1  Defendant was convicted of the commission of the following crime on (Date): ___10-10-90___

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | 187(a) PC | Murder | 2nd | Plea |
| 2 | 182/245(a)(1) | PC Conspiracy to Commit Assault | | Plea |
| 3 | 245(a)(1) PC | Assault with a Deadly Weapon | | Plea |

2. Defendant [ ] was arraigned [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced    **as to Ct. 1**

   a. [X] Sentences defendant to State Prison for ~~XXXXXXXXXXXXXXXXXXXX~~ **15 years to life**

   b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count: _____

   c. [ ] Sentences defendant to County Jail for the period of (Specify number of days): _____

   d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of: _____
      [ ] upon conditions set forth in attachment 3d.

4. [X] Defendant, convicted of more than one count, shall

   a. [X] serve the sentence as to each count as follows:

   | Count | Consecutive With | Concurrent with |
   |---|---|---|
   | 2 stayed pursuant to Sec. 654 | | |

   b. [ ] serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a [ ] concurrently.   b. [ ] consecutively.
   c [ ] as set forth below or in attachment 5c.

6. Execution of sentence is

   a [X] stayed on the following count: ___3___ _____ pending appeal, with the stay to become permanent
      when the sentence is completed as to count: ___1___

   b. [ ] suspended and defendant is placed on probation for the period of: _____
      [ ] upon conditions set forth in attachment 6b.

7 [X] No allegation to enhance punishment was made in count: ___1, 2 or 3___

8 [ ] It was alleged

   a [ ] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged
      in count _____ [ ] and allegation stricken as to count: _____

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

b. ☐ Defendant used a firearm _____ and allegation : o count: _____

c. ☐ Defendant was armed at . e of arrest with a concealed deadly weapon w · meaning of Pen. C. 3024
    ☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): _____

9. ☐ The Court finds the defendant

a. ☐ was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of
    (1) ☐ Pen C. 3024 as to count: _____ ☐ but strikes the finding as to count: _____
    (2) ☐ Pen C. 12022 as to count: _____ ☐ but strikes the finding as to count: _____
    (3) ☐ Pen C. 1203 (Specify weapon): _____
        as to count: _____ ☐ but strikes the finding as to count: _____

b. ☐ was not armed at the time of commission or attempted commission of the crime within the meaning of
    (1) ☐ Pen C. 3024 as to count: _____
    (2) ☐ Pen C. 12022 as to count: _____
    (3) ☐ Pen C. 1203 as to count: _____

c. ☐ did use a firearm as to count: _____ ☐ but strikes the finding as to count: _____
    (1) ☐ The use was one use for the following counts: . _____ The additional penalty shall
        run consecutively to the sentence on the last count to be served.

d. ☐ did not use a firearm as to count: _____

e. ☐ was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes
    the finding.

f. ☐ was not armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in
    attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|

11. The court finds defendant a. ☐ is ☐ is not an habitual criminal under Pen C. 644a.
    b. ☐ is ☐ is not an habitual criminal under Pen C. 644b.

12. The court pronounced sentence on (Date): __November 11, 1990__ and defendant was held in custody, through and including
    the date of pronouncement of sentence for (Total no. of days): __621__ as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| 414 | 207 (good/work time) | |

13. Defendant is remanded to the custody of the Sheriff
    a. ☐ For the period of (Specify no. of days): _____ ☐ upon conditions and recommendations set forth in attachment 13a
    b. ☒ To be delivered ☒ at the earliest convenient time ☐ after 48 hours, excluding Saturdays, Sundays and holidays
        [Pen. C. 1203c] into the custody of the Director of Corrections at
        (1) ☐ California Institution for Women—Frontera          (3) ☒ California Institution for Men—Chino
        (2) ☐ California Men's Facility—Vacaville                (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them

16. ☐ Other (See attachment 16)

Dated: _____ Donald A McCartin

_____ (Type or print name) _____ (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: __11__

**CLERK'S CERTIFICATE**

I hereby certify that the foregoing is a correct copy of the original on file in my office

[Seal]

Clerk of the superior Court

By _Gail Carpenter_ Deputy

1  Filed in open Superior Court of the State of
   California, in and for the County of Orange,
2  on Motion of the District Attorney of said
   County, this 9th day of November, 1989
3
   GARY L. GRANVILLE, COUNTY CLERK
4
   BY:_____SUE PATLIAN_____ Deputy
5


6
              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                   IN AND FOR THE COUNTY OF ORANGE
8

9
   _____
10  THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                          )
11                            Plaintiff,  )    CASE NO. C- 76180
                                          )
12                 vs.                    )
                                          )    INFORMATION
13  RICHARD K. NOGAWA,                    )
    ROBERT PIMENTEL, JR.,                 )
14  LEROY P. LUJAN,                       )
    and DOES 1 through 10, inclusive,     )
15                                        )
                              Defendant(s) )
16  _____

17  THE DISTRICT ATTORNEY OF ORANGE COUNTY hereby accuses the aforenamed
    defendant(s) of violating the law at and within the County of Orange
18  as follows:

19  COUNT 1: On or about September 30, 1989, RICHARD K. NOGAWA, ROBERT
    PIMENTEL, JR., and LEROY P. LUJAN, in violation of Section 187(a)
20  of the Penal Code (MURDER), a FELONY, did willfully and unlawfully
    assist, aid and abet in the killing of John David Fahey, a human
21  being.

22  COUNT 2:  On or about September 30, 1989, RICHARD K. NOGAWA, ROBERT
    PIMENTEL, JR., and LEROY P. LUJAN, in violation of Section
23  182/245(a)(1) of the Penal Code, a Felony, did willfully and
    unlawfully conspire together and with another person and persons
24  whose identity is known and unknown to commit the crime of ASSAULT
    WITH A DEADLY WEAPON, in violation of Section 245(a)(1) of the Penal
25  Code, a Felony; pursuant to and for the purpose of carrying out the
    objects and purposes of the aforesaid conspiracy, the following acts
26  were committed at and in the County of Orange.

27  ///

28  ///

1

OVERT ACT NO. 1

2  On September 30, 1989 Larry Velles Pena drove several persons to the
3  City of Newport Beach and transported a baseball bat and firearm with said persons.

OVERT ACT NO. 1A

4

5  On September 30, 1989, Larry Velles Pena drove Stanley Frank Anaya
   to 1324 "A" West Balboa Boulevard, City of Newport Beach, County of
6  Orange, in an automobile containing a baseball bat and a .25 caliber handgun.

7

OVERT ACT NO. 2

8  On September 30, 1989, Reynaldo Zepeda drove to 1324 "A" West Balboa
   Boulevard, City of Newport Beach, County of Orange, and took with
9  him a .45 caliber handgun.

10

OVERT ACT NO. 3

11  On September 30, 1989, Heather Renee Rose contacted and met with
    defendant RICHARD KIRK NOGAWA at 1324 "A" West Balboa Boulevard,
12  City of Newport Beach, County of Orange, for the purpose of
    arranging a physical assault.

13

OVERT ACT NO. 4

14

15  On September 30, 1989, defendant RICHARD KIRK NOGAWA, transported
    a baseball bat to 1324 "A" West Balboa Boulevard, City of Newport
16  Beach, County of Orange.

17  COUNT 3:  On or about September 30, 1989, RICHARD IR NOGAWA, ROBERT
    PIMENTEL, JR., and LEROY P. LUJAN, in violation of Section 245(a)(1)
18  of the Penal Code (ASSAULT WITH A DEADLY WEAPON), a Felony, did
    willfully and unlawfully commit an assault upon John David Fahey
19  with a deadly weapon, and by means of force likely to produce great
    bodily injury.

20  Contrary to the form, force and effect of the Statute in such cases
    made and provided, and against the peace and dignity of the People
21  of the State of California.

22  DATED:  November 9, 1989

23

CECIL HICKS, DISTRICT ATTORNEY
COUNTY OF ORANGE
24  STATE OF CALIFORNIA

25

26  BY:  _Robert C Hanson Jr_
         DEPUTY DISTRICT ATTORNEY

27  RG/pm   89F01588    THIS INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL
                        ON FILE IN THIS OFFICE

                        NOV 13 1990
28              ATTEST:
                        GARY L. GRANVILLE
                        County Clerk and Clerk of the
                        Superior Court of the State of California
                        in and for the County of Orange

# Statement By Judge And District Attorney

## 1203.01 (PENAL CODE)

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### IN AND FOR THE COUNTY OF ORANGE

**FILED**

NOV 15 1990

GARY L. GRANVILLE, County Clerk

By _____

DEPUTY

The People of the State of California,
                    Plaintiff,

vs.

Co. Clerk No. ___C-76180___

LEROY P. LUJAN _____
                    Defendant.

Prison No. _____

The following is furnished for the assistance of the Department of Corrections.

The crimes for which the defendant was convicted are as follows:

Count 1 - P.C. 187 (Murder, Second Degree)
Count 2 - P.C. 182/245(a)(1) Conspiracy to Commit Assault With a Deadly Weapon)
Count 3 - P.C. 245(a)(1) Assault With a Deadly Weapon)

I hereby incorporate by reference the Information and Proceedings had at sentence ~~and direct~~ ~~the court reporter to transcribe and attach a copy of each to this statement.~~ Additionally, my views with respect to the person convicted and or sentenced and the crime committed are as follows:

_____
                    **Trial Judge**

My views with respect to the person convicted and or sentenced and the crime committed are as follows:

Defendant pursued out into traffic and beat down to the ground a person who had done him no harm.  Defendant's actions prevented the victim from reaching a position of safety and materially aided the assailant who shot the victim to death.  Absent some significant evidence of rehabilitation and a demonstrated commitment to constructive behavior avoiding criminal conduct, there is no reason to believe that defendant will not again resort to such senseless violence.

_____
                    **District Attorney**
                    ROBERT C. GANNON, JR.

C:\WP50\HM\FORMS\1203

A history of crime, whether he pled guilty or was convicted by court or jury, date of crime, amounts of money or losses involved, injuries incurred, names of codefendants, probation granted and revoked, causes of revocation, etc., are as follow:

On September 30, 1989, defendant and his friends drove to Newport Beach from the city of Carson in Los Angeles County. Three of his companion's had handguns and several had baseball bats. The group had been told that a girl some of them knew had been beaten by some skinheads. About 5 minutes after arriving at the girl's apartment, the victim, who lived in the rear apartment was confronted by defendant's friends. The victim was attacked; he escaped only to be attacked again by a number of defendant's friends. Eventually, the victim was chased out into the street where defendant LUJAN beat the victim with a baseball bat knocking him to the ground. He was then shot to death by STANLEY ANAYA who was standing next to defendant LUJAN. Ten (10) persons were arrested and charged in connection with this crime.

Description of type of weapons involved at time of crime and arrest, how acquired by prisoner, how used, whether loaded or unloaded, is as follows:

One (1) .45 Cal Colt handgun           Prisoner used a baseball bat (not recovered)
One (1) .25 Cal Raven handgun
One (1) .25 Cal Beretta handgun

A complete list of partners, their names in full, and disposition of each case as follows:

(See Attached)

Disposition of other charges is (list all crimes in other indictments or complaints or other counts not included in commitments and give disposition of each):

The within instrument is a correct copy of the original on file in this office. ATTEST 11/15/9c Court Clerk and ex-officio Clerk of the Superior Court of the State of California, County of Orange By: _____

                    Deputy Clerk

         (Attach additional sheets if necessary)

# EXHIBIT "D"

## Life-Term Inmate Evaluation for the Board of Prison Terms
## MENTAL HEALTH EVALUATION

### PSYCHOSOCIAL ASSESSMENT

### 1. IDENTIFYING INFORMATION

| | |
|---|---|
| NAME: | Lujan, Leroy |
| CDC# | E-76840 |
| AGE: | 35 years old |
| MARITAL STATUS: | married |
| RACE: | Hispanic |
| RELIGION: | Catholic |
| DATE OF REPORT: | 12/15/05 |

This report is based on review of the inmate's medical file, review of his C-file, prior Board of Prison Terms reports. Prior psychological evaluations, current classification information and probation officer's report were used in preparation for this report. The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview. The following information is accurate to the extent that the records and the inmate's self-report are accurate As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Prison Terms psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date. The inmate was interviewed for approximately 1 hour and 10 minutes and the inmate's file was reviewed for approximately 4 to 6 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Prison terms to assist in determining his eligibility for parole. The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify, under the American's with Disabilities Act, the evaluation was conducted by a licensed clinical psychologist.

Previous Board of Prison Term Evaluations

This is third psychological evaluation for the Board of Prison Terms on this inmate. The inmate was provided the opportunity to review Alevy, Ph.D., 2001 evaluation and endorsed it with minor changes as noted below.

## II. DEVELOPMENTAL HISTORY

No notable changes from Dr. Alevy's 2001 report.

## III. EDUCATION

No notable changes from Dr. Alevy's 2001 report. He completed high school in 1992.

## IV. FAMILY HISTORY

Inmate Lujan's mother is 68 and his father died 3 years ago of stomach cancer, at age 67. He reports no difficulties in the family in terms of mental illness, medical illness or substance abuse. His family relationships were poor in the past, but he says that they are good now.

## V. DEVELOPMENT AND SEXUAL ORIENTATION

The inmate reported no sexual adjustment issues and has no history of sexual acting out recorded in his records. He describes himself as heterosexual and denied engaging in dangerous sexual behaviors. He married his girlfriend, Amparo, before he was incarcerated. There are no children from this marriage. Amparo visits 1X a month. "If she wants kids, I should really let her go."

## VI. MARITAL HISTORY

Inmate Lujan was married his childhood sweetheart, Amparo, on 11/15/90. He feels that he has a good relationship with her, and his family of origin. His also reported that he has a son, Javier, from a former girlfriend, Garland, before he met Amparo. Javier is about 18 now; he has never had a visit from his son.

## VII. MILITARY HISTORY

The inmate does not claim any military service.

## VIII. EMPLOYMENT HISTORY

Since his incarceration, he has worked as a certified welder, and now works in the PIA wood factory. He has had good reviews from this job.

## IX. SUBSTANCE ABUSE HISTORY

Mr. Lujan has a history of both alcohol and marijuana use and abuse. He has attended AA on a regular basis since being incarcerated and has Chronos in his file reflecting his attendance. He attends Yoga on Tuesday nights, and has taken an anger management course.

## PSYCHIATRIC AND MEDICAL HISTORY

Inmate Lujan denies prior illnesses, hospitalizations, serious accidents or injuries. Further, he denies any history of suicidal activity. He admits to his offense as being assault behavior which led to a homicide.

## PLANS IF GRANTED RELEASE

If he is still married to his wife, he states "I will let her go." He will live with his mother in Downey. He has a bank account and plans to work either as a welder or stuccoing houses in Downey. He plans to comply with whatever the conditions of parole are. This seems to be a viable plan with a good prognosis. He has letters of support from his mother in his C file and job offer letters.

## CURRENT MENTAL STATUS/TREATMENT NEEDS:

Mr. Lujan appears to be his stated age of 35. He was appropriately dressed and groomed. He was coherent, cooperative, calm and alert throughout the interview. His speech was clear and readily understandable. His flow of thought and affect were within the normal range. There were no hallucination, nor delusions noted. He was fully oriented. His intellectual functioning was estimated to be within the average range. His attention and concentration were adequate for the purpose of this examination. There was no evidence of a mood or thought disorder. His insight and judgment appeared to be intact. He showed good insight into his commitment offense.

### DSM IV Diagnoses
Axis I Polysubstance Abuse, by history, in institutional remission
Axis II Deferred
Axis III None
Axis IV Psychosocial Stressors: Incarceration
Axis: V Global Assessment of Functioning 80

## XIII. REVIEW OF LIFE CRIME

Overall, Mr. Lujan's report currently does no differ or deviate significantly from that which has previously been reported. As related in previous reports, he is still vague about his motive in the crime. "It happened so fast." Regarding relevance of mental condition to life crime, the inmate stated, "I felt I was macho." He states, "I am a better person than I was before." Mr. Lujan was remorseful about the death of the victim.

## Assessment of Dangerousness:

A. Within a controlled setting, inmate Lujan poses some risk as of 1993 and 1996, based on reading his Central File. His last CDC 115 was in 1997.

*ludicrous*

B. If released into the community, his violence potential is estimated to be below average when compared to the average citizen in the community.

C. Significant risk factors and precursors to violence are his past substance abuse, and a relapse would increase his risk for violence and undo the gains he has made.

## Comments and Recommendations:

1. If paroled, he should be mandated to attend both AA and NA meetings and have frequent periodic drug testing for alcohol and illegal substances.

2. Mr. Lujan continues to remain a stable individual committed to his work, studies, and family. It is my professional opinion that his release into the community and parole should be based upon custody and not psychological factors.

3. Mr. Lujan is still vague about why he committed the crime. This evaluator feels he needs to do some more soul searching about his motive before being considered for a parole release date.

*Key*

Respectfully submitted,

*Laura Petracek, Ph.D.*                     12-16-05
Laura Petracek, Ph.D.                         Date
Contract Psychologist, CA License PSY 20033
CTF Soledad


*B. Zika, Ph.D.*                              12/19/05
B. Zika, Ph.D.                                Date
Senior Supervising Psychologist
Correctional Training Facility, Soledad


Lujan, Leroy          E-76840          CTF                              4

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**JANUARY 2003 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**AUGUST 23, 2002**

Inmate Leroy Lujan, CDC# E-76840, was seen for a psychological evaluation for the Board of Prison Terms by Daniel I. Alevy, Ph.D., Staff Psychologist at the Correctional Training Facility (CTF), on 11/23/01 for the December 2001 Lifer Calendar.

According to the instructions given to Wardens and Health Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis Chartrand, Jr. (BPT) in September 1998, once a mental health evaluation is completed in the new format, revised in August 1998, a new evaluation is not necessary when an inmate appears before the Board of Prison Terms unless the BPT has filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health evaluation was not conducted at this time.

**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:  08/23/02
T:  08/23/02

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
DECEMBER 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 23, 2001

This is a mental health evaluation for the Board of Prison
Terms on inmate Leroy Lujan, CDC# E-76840.  This report is
the product of a personal interview, conducted on 11/23/01,
as well as a review of his Central file and unit health
record.  This interview included the completion of a
Rorschach Ink Blot Test.

## PSYCHOSOCIAL ASSESSMENT

### I.    IDENTIFYING INFORMATION:

Inmate Lujan is a 31-year-old male who was born on
06/19/70.  He states he is married and that his wife
was his girlfriend "on the streets."  They have no
children.  He does not have any family visits at this
time since 1997.  She, however, does want a family.
Inmate Lujan states that he is of the Mexican race.
Concerning religion, he states, "I don't really have
one.  I was Catholic."

### II.   DEVELOPMENTAL HISTORY:

Inmate Lujan denies any prenatal, perinatal or birth
concerns or birth defects.  There are no reported
abnormalities of developmental milestones.  His speech
and language are unremarkable.  His motor development
is normal, but he says, "I'm a little nervous now."  He
reports no habits that are detrimental.  Peer
interaction and socialization skills are normal.

He reports no history of cruelty to animals, enuresis
or acts of arson.  His significant childhood medical
history is given as measles and chicken pox, but not
mumps.  He denies any physical or sexual abuse as
either a perpetrator or victim.

LUJAN, LEROY
CDC NUMBER: E-76840
BPT MENTAL HEALTH EVALUATION
PAGE TWO

### III. EDUCATIONAL HISTORY:

Inmate Lujan's claimed grade level at school is the ninth grade. His measured grade point level is 12.9, having received his GED while incarcerated. He denies any attendance in special classes. He has had no academic problems. He states his behavioral problems involved going to the principle's office when he was missing classes or being late.

Current educational interests include business and he hopes to go to law college. He has not had any special educational activities here. He has had a job for some five years as a lead man in the production of textiles, where he has 20 to 30 workers under his supervision. He has good social skills.

### IV. FAMILY HISTORY:

Inmate Lujan's mother is 67 and his father is 66. He has three sisters and one brother, ranging in age from 42 to 29. He reports no difficulties in the family in terms of mental illness, medical illness or substance abuse. There is no report of illegal or criminal activities by any other member of the family. There is no significant information on other family members. His family relationships were poor in the past, but he says that they are good now. One sister ran away from home because of drugs. His siblings have had a variety of positions as secretaries and in managerial positions.

### V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Lujan states that puberty occurred at the age of 15. Sexual relations began at that time. His sexual orientation is heterosexual. There are no reported disorders or dysfunctions. His history is that he has had a girlfriend "on the streets," and that they went steady together and became married subsequently. There are no children from this marriage. There is no report of any high-risk behavior on his part.

LUJAN, LEROY
CDC NUMBER:  E-76840
BPT MENTAL HEALTH EVALUATION
PAGE THREE


### VI.  MARITAL HISTORY:

Inmate Lujan was married on 11/15/90.  They went
together for a year and were then married on that date.
Her first name is "Amparo".  There are no children from
this marriage.  He reports that his relationships with
his spouse and children is normal since he was 18.  He
feels that he has good relations and will always have
his family.  His parents do report that he does have a
son from a girlfriend who moved away, and he knows
nothing more than that.

### VII.  MILITARY HISTORY:

Inmate Lujan has no history of military service.

### VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Lujan has worked as a welder's helper with his
father and has also worked as a dock worker.

Work skills are indicated as being a certified welder,
and is able to work both in the welding shop, and
presently works making silk screen copies, which got
him in trouble, and he was therefore fired from that
shop.  He has no governmental programs or union
affiliations.  He has not received any public
assistance money and feels he can manage his money when
the time comes up.  He presently earns 75 cents an hour
at prison activities.

### IX.  SUBSTANCE ABUSE HISTORY:

Inmate Lujan admits to usage of alcohol and drugs, but
he did not abuse drugs.  He has tried marijuana, PCP,
cocaine once, and he states that, "Everything is here
and I don't want to use it."

He has been in treatment programs, Alcoholics
Anonymous, served as chairman, and apparently
(according to his report) "ran good meetings."
He currently denies any problems or needs in this
area.


LUJAN        E-76840        CTF-CENTRAL        12/03/91        gmj

LUJAN, LEROY
CDC NUMBER: E-76840
BPT MENTAL HEALTH EVALUATION
PAGE FOUR

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Lujan denies prior illnesses, hospitalizations, serious accidents or injuries. Further, he denies any history of suicidal activity. He admits to his offense as being a homicide and assaultive behavior. He does not report seizures or other neurological conditions, nor any disabilities or impairments. He is not on any medication.

XI.    **PLANS IF GRANTED RELEASE:**

If he is still married to his wife, he will let her go. His mother and sister are living in Reno, Nevada, and he would go to live with them, in terms of living arrangements and support system. Concerning financial plans, he has a bank account and plans to work either as a welder or stuccoing houses in Reno, where he apparently has worked in the past. He plans to comply with the conditions of parole, stating, "I will not take it lightly." He does not think he will need any outpatient treatment. He feels that his plans are viable. He has no problem areas and the relationship to his mother and sister are supportive and helpful. He feels his prognosis for community living is "a good bet."

### CLINICAL ASSESSMENT

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Lujan appears to be intact psychologically in all respects. He is oriented to time, place and person. There is no evidence of a thought disorder or any psychotic thinking. The only clinical diagnosis that would apply is Antisocial Personality Disorder, which existed in the past and which he is attempting to overcome, he states. There is no evidence of organic or neurological impairment either. His present level of care is that he is in the general population. He is not receiving any therapy nor any medication. His prognosis for general adaptation in life is good.

LUJAN       E-76840       CTF-CENTRAL       12/03/91       gmj

LUJAN, LEROY
CDC NUMBER: E-76840
BPT MENTAL HEALTH EVALUATION
PAGE FIVE


## XIII. REVIEW OF LIFE CRIME:

Inmate Lujan's description of the crime is as follows:
He went to a party and drove from Long Beach to Irvine,
where there were a lot of girls from UC Irvine. There
were about 40 people at the party--Anglo-Latino, as
well as Asian. There were a lot of girls screaming at
one point, which made him run to the back door. He
grabbed a baseball bat, which was his first instinct,
and when confronted by the victim, his first instinct
was to get him. He hit him on the arm and then on his
legs at the second blow.

He states that he has cut ties with everybody from his
earlier years and that he decided to take a plea
bargain. The lawyer, he said, told him that there is
no such thing as self-defense in this setting, and "I
guess I got railroaded to get the other guy that shot
him." He states at the time that he felt scared and
that he didn't know what to feel.

All in all, his description is fairly benign, and he
presents himself as being young, irresponsible and
innocent. There is no hint in his description that
this was a gang-related activity. His attitude toward
the victim was "I wish he didn't have to die." He
feels remorse for the family and doesn't know how to
repay the family. His assessment of causative factors
is that he was, in a sense, fairly innocent. This was
a party. People were drinking and some outside people
caused the problem, and that it was in a sense an
unfortunate happening.

Regarding relevance of mental condition to Life crime,
the inmate states, "I guess I felt I was macho." The
inmate feels that he has a better level of insight now,
stating, "Now I am a better person than what I was
before." Regarding the causative factors, he states he
does not know and that he was very young at the time.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.   Within a controlled setting, inmate Lujan poses
some risk as of 1993 and 1996 based on reading of
his Central file. As of 1997, he has had a few

LUJAN        E-76840        CTF-CENTRAL        12/03/91        gmj

LUJAN, LEROY
CDC NUMBER: E-76840
BPT MENTAL HEALTH EVALUATION
PAGE SIX

chronos suggesting difficulty with social
boundaries and behavior.  Since that time, there
are no CDC-115s in his Central file.

B.   If released to the community, his violence
potential is estimated to be average when compared
to the average citizen in the community.

C.   Risk factors which could be a precursor to violence
for the inmate relate to the use of alcohol and
drugs and membership in antisocial groups, which
would place him at average level of risk.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

In recent years, inmate Lujan has accumulated laudatory
chronos for his attendance at Alcoholics Anonymous
meetings and Impact program, as well as fulfillment of
his training programs.

On the basis of his Rorschach Ink Blot test responses,
inmate Lujan appears to experience some awareness of
the loss of time by his antisocial behavior in his
past.  Otherwise, his Rorschach is essentially within
normal limits.

**RECOMMENDATIONS:**  Inmate Lujan needs to explore further
and understand the requirements of appropriate social
behavior and the general requirements underlying good
citizenship.

DANIEL I. ALEVY, Ph.D.
**Staff Psychologist**
CORRECTIONAL TRAINING FACILITY, SOLEDAD

DIA/gmj

D:   11/23/01
T:   12/03/01

*ADDRESS TYPO*

LUJAN       E-76840       CTF-CENTRAL       12/03/91       gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
LIFER/INITIAL
PAROLE CONSIDERATION HEARING
OCTOBER 1998 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JULY 2, 1998

This is the third psychological evaluation for the Board of
Prison Terms on inmate Leroy Lujan. This report is the
product of a personal interview, as well as a review of his
medical record.

His crime consisted of the 1989 murder of a man at a party.
He did hit the victim with a baseball bat, but another man
ran up and shot him. He expressed his regret for his
involvement in this whole thing.

He denied having a problem with drugs or alcohol prior to
his incarceration, but he does attend Alcoholics Anonymous
now. Educationally, he dropped out of school in the tenth
grade and later got his GED. He also has three units of
college credit. Vocationally, he is trained in welding,
silk screening and drawing. His future plans include going
to live with his wife in Long Beach and work in the welding
field there.

MENTAL STATUS EXAMINATION: Inmate Lujan is a well
developed, well nourished man of
medium build who appeared to be his stated age of 28. He
was appropriately dressed and groomed, and was fully
cooperative during the interview. His speech was clear and
readily understandable. His affect was normal. His flow of
thought was normal with no hallucinations nor delusions
noted. He was fully oriented with normal intellectual
functioning. His attention and concentration were good.
His insight and judgment also appear to be sound.

PSYCHIATRIC DIAGNOSIS (DSM-IV):

AXIS I:    No contributory clinical disorder.
AXIS II:   No contributory personality disorder.
AXIS III:  No contributory physical disorder.

PSYCHIATRIC CONCLUSIONS:    He does not appear to have any
particular psychopathology which
might have related to his offense. He does not now have a
psychiatric condition which would benefit from mental health

LUJAN        E-76840        CTF-NORTH        07/06/98        gj

LUJAN, LEROY
CDC NUMBER: E-76840
PAGE TWO


treatment following his release. He is showing improvement
in his behavior.  If released, I expect him to be able to
maintain the gains that he has made, provided he continues
with the program he has adopted.

SUGGESTED ACTIONS:            If he is to be continued in his
                              present program, he should be
encouraged to add to his vocational skills whenever
possible.  If he is considered for parole, his level of
dangerousness is likely to be less now than for the average
inmate.

RECOMMENDATION TO CLASSIFICATION COMMITTEE:

Until released, he should add to his vocational training
whenever possible so that he will be able to get a good job.


*Bruce Bakeman Ph.D.*
BRUCE M. BAKEMAN, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

BMB/gj

d:  07/02/98
t:  07/06/98

# EXHIBIT "E"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JANUARY 2007 CALENDAR


LUJAN, LEROY                                              E76840


I.    **COMMITMENT FACTORS:**

  A.    **Life Crime:** Murder 2nd Degree, 187 PC, Count 1; Orange County; Case Number C76180. Victim: John Fahey, age 21 years. Sentence: 15 years to Life. MEPD: 10/23/99. Received by CDC: 11/21/90.

    1.    **Summary of Crime:** Remains the same as stated in previous reports.

    2.    **Prisoner's Version:** Remains the same as stated in previous reports.

    3.    **Aggravating/Mitigating Circumstances:**

      a.    **Aggravating Factors:** Remains the same as stated in previous reports.

      b.    **Mitigating Factors:** Remains the same as stated in previous reports.

  B.    **Multiple Crime(s):** N/A.

    1.    **Summary of Crime:** N/A.

    2.    **Prisoner's Version:** N/A.


II.   **PRECONVICTION FACTORS:**

  A.    **Juvenile Record:** Documents from previous reports have been considered and that information remains valid.

  B.    **Adult Convictions and Arrests:** Documents from previous reports have been considered and that information remains valid.

  C.    **Personal Factors:** Documents from previous reports have been considered and that information remains valid.

LIFE PRISONER EVALUATION REPORT                                    2
PAROLE CONSIDERATION HEARING
JANUARY 2007 CALENDAR

## III.   POSTCONVICTION FACTORS:

A.   **Special Programming/Accommodations:** None.

B.   **Custody History:** Lujan remained at Medium A Custody and housed among the general population at CTF. He remains assigned to the PIA as a furniture finisher. Lujan received satisfactory to above average work grades during the period of 7/1/05 through 7/1/06.

C.   **Therapy and Self-Help Activities:** Lujan continues to actively participate in Alcoholics Anonymous, see CDC 128Bs dated 6/6/05 through 10/4/06. He has also completed a course in Anger Management, see CDC 128B dated 12/02/05. He has also completed the 3rd phase of the Inmate Employability Program, see CDC 128B dated 12/2/05.

D.   **Disciplinary History:**

E.   **Other:**

## IV.   FUTURE PLANS:

A.   **Residence:** "My place of residence will be 5766 Bolivia Drive, Buena Park, CA 90620, with my sister Michele Lujan. She can be reached at (714) 522-1874. (Please refer to most recent support letter). Should the need arise, I have also been offered housing with my ex-wife, Amparo Lujan, 1309 E. Greenleaf Blvd., Compton, CA 90221 (310) 637-3634."

B.   **Employment:** "I currently have offers of employment with the following companies: Ozar Brothers Tires, 2903 Uncoln Blvd., Santa Monica, CA 90405. Contact person: Angel Hermosillo/manager (310) 835-3507/(310) 392-1361; Marine Clerks Association, a labor organization that represents 540 workers. I have been offered possible employment with this organization upon my release. (See support letter). Contact person: John Fageaux Jr. (562) 799-3834; Loya International 2839 El Presidio Street, Carson, CA 90810 (Warehouse Distribution Company/Forklift Operator) contact person: Tammie Loya Silva (310) 631-3235; Crown Carton Company Inc. 2550 East 27th Street, Vernon, CA 90058. Contact person: Carlos Romo (323) 582-3053/Manufactures of Corrugated Boxes, Die Cutting Specialties, Package Design, Cushion Materials, Stock Sizes, Job Lots and Overruns.

C.   **Assessment:** Lujan has support letters stating that his family will provide a place of residence and financial support. Additional support letters are forthcoming.

LUJAN, LEROY              E76840              CTF-SOLEDAD          **JAN/2007**

LIFE PRISONER EVALUATIO  `EPORT                                                3
PAROLE CONSIDERATION HL.₄RING
JANUARY 2007 CALENDAR

V.      **USINS STATUS**: Lujan is a United States Citizen.


VI.     **SUMMARY**:

A.      Prior to release the prisoner could benefit from: 1) remaining disciplinary free; 2)
        Earn positive chronos,  and 3) participating in self help programs.

B.      This report is based upon an interview with the prisoner on 10/10/06 and a
        complete review of his Central File.

C.      The prisoner was afforded an opportunity to examine his Central File per the
        Olson Decision on 10/10/06 which he declined.

D.      No accommodation was required per the Armstrong vs. Davis BPH Parole
        Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATIO.. `EPORT
PAROLE CONSIDERATION H.. .RING
JANUARY 2007 CALENDAR

4

_____     12-06-06
S. Mitchell                 Date
Correctional Counselor I


_____     12/11/06
L. Gibbs                    Date
Correctional Counselor II


_____     12/11/06
R. Pope   FC(A)             Date
Facility Captain


_____     12-13-06
D. S. Levorse   C&PR        Date
Classification and Parole Representative

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
   TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
   TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
         ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/05 to 10/06 | | | **PLACEMENT**: Lujan remained at the Correctional Training Facility (CTF) and housed among the general population. <br> **CUSTODY**: Medium A. <br> **VOC. TRAINING**: None. <br> **ACADEMICS**: None during this review period. <br> **WORK RECORD**: Lujan remained assigned to the PIA as a furniture finisher. He received satisfactory to above average work grades for his performance, per CDC 101s dated 1/1/05 to 7/1/06. Supervisory comments: Lujan continues to be responsible for his product flow into the paint room. <br> **GROUP ACTIVITIES**: Lujan continues to actively participate in Alcoholics Anonymous, see CDC 128Bs dated 6/6/05 through 10/4/06. He completed a course on Anger Management, see CDC 128B dated 12/2/05. He completed the 3rd phase of the Inmate Employability Program, see CDC 128B dated 12/2/05. <br> **PSYCH. TREATMENT**: None. <br> **PRISON BEHAVIOR**: Lujan remained disciplinary free during this review period. <br> **OTHER**: Lujan received various letters in favor of his release. He has employment possibilities from his cousin Katrina, who is part owner of a recording studio (letter in C-File not dated). |

CORRECTIONAL COUNSELOR'S SIGNATURE                              DATE
*[signature]*                                                   12-06-06

LUJAN, LEROY          E76840          CTF-SOLEDAD          JAN/2007

BPT 1004 (REV 7/86)                    Page _1_

# EXHIBIT "F"

COURT OF APPEAL 4TH DIST DIV 3
F I L E D

AUG 3 0 2007

Deputy Clerk ___ _____

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| In re LEROY LUJAN<br><br>on Habeas Corpus. | G039128<br><br>(Super. Ct. No. M11394)<br><br>O R D E R |

THE COURT:*

The petition for a writ of habeas corpus is DENIED.


**RYLAARSDAM, J.**

RYLAARSDAM, ACTING P. J.


\* Before Rylaarsdam, Acting P. J., O'Leary, J., and Ikola, J.



EXHIBIT "G"

Court of Appeal, Fourth Appellate District, Div. 3 - No. G039128
**S156287**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re LEROY LUJAN on Habeas Corpus

The petition for review is denied.

**SUPREME COURT**
**FILED**

NOV 1 4 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**
Chief Justice

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA


LEROY PAUL LUJAN
    Petitioner,

       v.

Ben Curry, Warden
    Respondent.

_____/      **PROOF OF SERVICE**


     I hereby certify that on January   , 2008, I served a copy
of the attached PETITION FOR WRIT OF HABEAS CORPUS, by placing a
the required true copies in a postage paid envelope addressed to
the person(s) hereinafter listed, by depositing said envelopes in
the United States Mail at Morro Bay, California, 93443.


UNITED STATES DISTRICT COURT    STATE ATTORNEY GENERAL
FOR THE NORTHERN DISTRICT      P.O. Box 944255
San Francisco Division         Sacramento, CA.
450 Golden Gate Ave.           94244
San Francisco, CA.


     I declare under penalty of perjury that the foregoing is
true and correct.

Dated this /12 day of January, 2008,

                *Dawn Britt*
                Dawn Britt
                P.O. Box 1324
                Morro Bay, CA. 93443



United States Postal Service®

**DELIVERY CONFIRMATION™**

0300 2400 0000 3596 9066

*LEGAL MAIL*

Leroy Paul Lujan, E-76840
Correctional Training Facility
P.O. Box 689 / East Dorm 8-Low
Soledad, CA. 93960-0689

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division
450 Golden Gate Ave.
San Francisco, CA.
94102-3483

**PRIORITY MAIL**
UNITED STATES POSTAL SERVICE ®
www.usps.com
Label 107R, February 2006

**LEGAL MAIL**

USPS
$0.35