1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LEROY PAUL LUJAN,

       Petitioner,

   v.

BEN CURRY, Warden,

       Respondent.

_____/

No. C 08-0474 CW (PR)
    C 09-0462 CW (PR)

ORDER GRANTING
PETITIONS FOR WRIT OF
HABEAS CORPUS

These habeas corpus petitions were filed by a state prisoner pursuant to 28 U.S.C. § 2254 challenging decisions in 2006 and 2007 by the California Board of Parole Hearings finding Petitioner unsuitable for parole.  Petitioner argues that the Board's denials of parole in 2006 and 2007 deprived him of his right to due process because they were not supported by at least some evidence that he would be a danger to the community if released.  In each case, Respondent was ordered to show cause why the petition should not be granted.  Respondent filed answers denying the claims in the petitions, along with supporting memoranda and exhibits, and Petitioner filed traverses in response.

Having considered all of the papers filed by the parties, the Court GRANTS the petitions in case numbers C 09-0462 CW and C 08-

1    0474 CW.

2                              BACKGROUND

3         The following summary of the facts of Petitioner's commitment

4    offense is derived from the probation report, which was read into

5    the record at both the January 25, 2006 and February 15, 2007

6    parole consideration hearings. (Petitions, Exs. C Probation

7    Report.)

8         Records of the Newport Beach Police Department reveal
          that on September 30th, 1989, at approximately 10:15
9         p.m., police responded to a West Balboa Boulevard
          address to investigate a report that gunshots had been
10        fired.  Their subsequent investigation revealed that
          the [Petitioner] was one of several young men involved
11        in a shooting death of 21-year-old John David Fahey.

12        After talking with various witnesses and the suspects,
          police determined that earlier in the day on September
13        30, 1989, 21-year-old Heather Rose, a resident at 1324
          West Balboa, Apartment A, became involved in a physical
14        altercation with 19-year-old Jennifer McMartin, who was
          one of several roommates of Mr. Fahey residing at 1324
15        West Balboa, Apartment C.  The physical altercation
          occurred because Ms. Rose was jealous of another young
16        woman she felt was becoming involved with 20-year-old
          Brent Claxton, a young man she had been dating.  Ms.
17        Rose reportedly received injuries which necessitated
          medical treatment.  Later in the day, Ms. Rose told her
18        roommate, 21-year-old Leslie Peng, that "some guys are
          coming over to protect them."  In the early evening,
19        approximately 20 persons arrived, mainly male Hispanic
          "gang types."  One man had a handgun, and other items
20        that could be used as weapons.

21        When the occupants of Heather Rose's apartment heard
          someone coming down the stairs, the men grabbed for
22        various weapons and Mr. Fahey was confronted by several
          of the suspects, after he came down the stairs.  A
23        physical altercation ensued, involving the victim and
          several suspects.  Subsequently, Mr. Fahey attempted to
24        flee, however, he was pursued by approximately five
          suspects, including the [Petitioner.]  [Petitioner] was
25        observed to strike Mr. Fahey with a baseball bat,
          causing the victim to fall to the ground.  The physical
26        assault continued, until Stanley Anaya allegedly
          approached and shot the victim in the chest with a .25
27        caliber handgun.

28        The victim was transported to a nearby hospital where

                                  2

1  he was pronounced dead at 10:45 p.m. as a result of a
2  gunshot wound.

(Petitions, Exs. C at 3-4.)

3      In 1990, Petitioner plead guilty to second degree murder.
4
5  (C 09-0462 CW Petition at 2.)  Thereafter, the court sentenced him
   to a total of fifteen years to life.  (Transcript of 2006 Hearing
6
   (2006 Tr.) at 1.)  His minimum eligible parole date was October 23,
7
   1999.  (Id.)
8
9      The Board found Petitioner unsuitable for parole for a third
10 time at his parole hearing in 2006, and Petitioner filed
11 unsuccessful habeas petitions in the California courts challenging
12 the Board's decision.  In 2007, the Board held Petitioner's fourth
13 parole hearing and, again, found him unsuitable for parole.
14 Petitioner challenged this decision in the California courts, but
15 these petitions also failed.  Thereafter, Petitioner filed a
16 federal petition for writ of habeas corpus in case number C 08-0474
17 CW (PR), in which he challenges the Board's denial of parole in
18 2007.  Subsequently, Petitioner filed a federal petition for writ
19 of habeas corpus in case number C 09-0462 CW (PR), in which he
20 challenges the Board's denial of parole in 2006.[1]  Both petitions
21 will be addressed below.

                            DISCUSSION
22
   I.  Standard of Review
23
24     A district court may not grant a petition challenging a state
25 conviction or sentence on the basis of a claim that was reviewed on

26 _____

27     [1]  Petitioner initially filed a federal habeas petition
   challenging his 2006 parole hearing on January 19, 2007 in C 07-
28 0387 CW (PR).  On March 25, 2008, the Court dismissed the petition
   without prejudice as unexhausted.

                                3

United States District Court
For the Northern District of California

the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams (Terry) v. Taylor, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams (Terry), 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, that is, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable"

United States District Court
For the Northern District of California

1    to support granting the writ.  See id. at 409.

2         "Factual determinations by state courts are presumed correct

3    absent clear and convincing evidence to the contrary."  Miller-El,

4    537 U.S. at 340.   Under 28 U.S.C. § 2254(d)(2), a state court

5    decision "based on a factual determination will not be overturned

6    on factual grounds unless objectively unreasonable in light of the

7    evidence presented in the state-court proceeding."  Miller-El, 537

8    U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th

9    Cir. 2000).

10        When there is no reasoned opinion from the highest state court

11   to consider the petitioner's claims, the court looks to the last

12   reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06

13   (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079, n.2 (9th Cir.

14   2000).  However, the standard of review under AEDPA is somewhat

15   different where the state court gives no reasoned explanation of

16   its decision on a petitioner's federal claim and there is no

17   reasoned lower court decision on the claim.  In such a case, a

18   review of the record is the only means of deciding whether the

19   state court's decision was objectively reasonable.  See Plascencia

20   v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006); Himes v.

21   Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288

22   F.3d 1081, 1088 (9th Cir. 2002).  When confronted with such a

23   decision, a federal court should conduct "an independent review of

24   the record" to determine whether the state court's decision was an

25   objectively unreasonable application of clearly established federal

26   law.  Plascencia, 467 F.3d at 1198; accord Lambert v. Blodgett, 393

27   F.3d 943, 970 n.16 (9th Cir. 2004).  The federal court need not

28   otherwise defer to the state court decision under AEDPA:  "A state

United States District Court
For the Northern District of California

5

United States District Court
For the Northern District of California

court's decision on the merits concerning a question of law is, and should be, afforded respect.  If there is no such decision on the merits, however, there is nothing to which to defer." <u>Greene</u>, 288 F.3d at 1089.

II. Case number C 09-0462 CW

     A.   January 25, 2006 Board Hearing

Petitioner had been incarcerated for approximately sixteen years at the time of his 2006 parole suitability hearing. Petitioner elected to discuss the commitment offense. (2006 Tr. at 7.)  Petitioner stated that he arrived at the party even though he did not really know anyone there because a friend told him that there was going to be a party and Petitioner thought he could sell drugs to some people.  (<u>Id.</u> at 13.)  When Petitioner heard an altercation starting, he tried to get away by going out the back door because he didn't know what was happening and wanted to get back to his truck.  (<u>Id.</u> at 11-12, 14.)  On his way out, he saw a baseball bat and decided to grab it because he did not know what was happening inside.  (<u>Id.</u> at 12, 54.)  He was not otherwise armed.  (<u>Id.</u> at 52.)  Petitioner denies that he ran out with four other people, insisting that he fled out the back door by himself. (<u>Id.</u> at 53.)  When he got around to the side of the house, Petitioner encountered the victim but did not know who the victim was or if he had been at the party.  (<u>Id.</u> at 15-16.)  Petitioner states that he was still alone at this time.  (<u>Id.</u> at 54.)  The victim swung at Petitioner and then ran.  (<u>Id.</u> at 16.)  Petitioner believed that the victim was holding a knife or something in his hand.  (<u>Id.</u> at 10-11.)  Even though the victim was running away, Petitioner ran after him and hit him with the baseball bat.  (<u>Id.</u>

United States District Court
For the Northern District of California

at 16.)  The victim fell and took a swing at Petitioner's leg, so Petitioner hit him again with the bat.  (<u>Id.</u> at 17.)  At that point, Stanley Anaya ran up and shot and killed the victim.  (<u>Id.</u> at 17, 55.)

Petitioner said that he was responsible for the victim's death, and explained that "it happened so fast, it was like [a] reaction."  (<u>Id.</u> at 17.)  Petitioner went on to say that when he was a child, his father always taught him that, "if anybody tries to hurt you, you get them before they get you, and it was kind of the way I grew up.  It was like if you are angry, try to hit him it was instilled to me that I got back.  And not that I'm making that as an excuse, it's just the way I grew up, was that you don't get [sic] unless someone hits or beats you up in other words.  And that's just the way as a kid I was brought up to think that way."  (<u>Id.</u> at 20.)  Petitioner denied being in any gang, but admitted that he hung around a lot of gang members because he often sold crack cocaine to them.  (<u>Id.</u> at 19.)

After Petitioner's prior parole hearing in 2003, he had completed an Impact Program which taught him how to be a better person, not just to react to things but to think before reacting.  (<u>Id.</u> at 21.)  Petitioner noted the contrast between that way of thinking and how he was taught.  (<u>Id.</u> at 21-22.)  As a child, "[i]t was always to where I would just did it [sic], and whatever happens, happens.  Now that I've been in here all these years, I've taken quite a bit of classes, self-help.  I go to AA, NA.  It's just made me a total different person, how I perceive life, and how I reacted in this situation."  (<u>Id.</u> at 22.)  Petitioner has learned how to draw since being incarcerated and he uses that ability to

"take [himself] away."  (Id. at 25-26.)

Petitioner had been arrested as a juvenile in February, 1989, for transporting and selling narcotics and for receiving stolen property.  (Id. at 26.)  Petitioner was in night school at the time of the commitment offense and was 18 or 19 years old.  (Id. at 28.) Petitioner has since received his GED.  (Id. at 51.)

As a parole plan, Petitioner wanted to live with his sister, Michelle.  (Id. at 30.)  Petitioner has four siblings, all of whom live in Southern California.  (Id. at 30-31.)  Petitioner had job offers as well.  (Id. at 31.)  Petitioner was married to his childhood sweetheart but realized that she had put her life on hold while waiting for him.  (Id. at 32, 35.)  The Board read several support letters from Petitioner's family.  (Id. at 36-42.)

While institutionalized, Petitioner had received three 128As since March, 1995 for gambling, and two 115s, the last one in February, 1997, for attempting to smuggle photographs.  (Id. at 43.)  Further, since Petitioner's last parole hearing in 2003, he had received eight laudatory chronos for his continuous participation in AA, and secured a sponsor from AA for when he is released into the community.  (Id. at 43.)  Petitioner had received four additional laudatory chronos for completion of the inmate employability program and of a three hour anger management course. (Id. at 44.)  Petitioner had also taken health courses and was currently a furniture finisher.  (Id. at 44-45.)  Moreover, Petitioner had consistently received above average work reports and acquired a certificate of proficiency as a sewing machine operator. (Id. at 45.)  Finally, Petitioner participated in Buddhist meditation studies which taught him how to relax and control

himself.  (<u>Id.</u> at 46-47.)

Reviewing Petitioner's psychological evaluation from December, 2005, the Board noted that Petitioner's diagnosis scores appeared normal.  The doctor reported that Petitioner was "still vague about the motive for the crime" and needed some more "soul-searching" before being considered for release.  (<u>Id.</u> at 48-49, 50.)  The report concluded that Petitioner's violence potential was estimated to be below average compared to the average citizen.  (<u>Id.</u> at 49.)

The Board denied parole.  (<u>Id.</u> at 77.)  It concluded that the commitment offense was carried out in a dispassionate manner and the motive was very trivial in relation to the offense.  (<u>Id.</u> at 77-78.)  The Board commented that Petitioner's criminal history involved only one arrest for the sale of drugs, but that selling drugs contributed to his unstable social history.  (<u>Id.</u> at 78.)  The Board viewed the 2005 psychological report as inconsistent and, therefore, did not rely on it.  (<u>Id.</u> at 79.)  The Board commended Petitioner on his realistic and strong parole plans and for remaining disciplinary-free since 1997.  (<u>Id.</u>)  The Board recommended that Petitioner continue to participate in self-help programs in order to "face, discuss, understand, and cope with stress in a nondestructive manner."  (<u>Id.</u>)

> It's the area of the crime that just, you know, we just need to feel completely comfortable that you have confronted all the aspects and all the activities of that night, so that it's completely behind you, and that it is not apt to happen again.  So if you can regroup and go back over these transcripts, please pay special attention to particularly what Commissioner Smith said about the opportunities that night where you had an opportunity to stop, and even perhaps if you have a trusted friend here who can read back the transcript and say, you know, this is where it kind of falls apart.  This is what you need to really think about, and be able to address. . . .  So you've got to

```
                be able to come in here so that the Panel feels
                completely comfortable about your rendition of the
                commitment crime because, you know, this is only the
                first step.
```

(Id. at 81-82.)

B.    State Court Decisions

In 2006, Petitioner filed a petition for a writ of habeas corpus in Orange County Superior Court. (Resp. Ex. 1.) That petition was denied because Petitioner failed to provide the court with a complete copy of his 2006 parole hearing transcript. (Resp. Ex. 2.) Petitioner filed the same claim in the California Court of Appeal, which denied the petition. (Resp. Exs. 3, 4.) Petitioner filed a petition for review in the California Supreme Court, which rejected the petition as untimely. (Resp. Ans. at ¶ 4.) Finally, Petitioner filed an original habeas petition in California Supreme Court, which was summarily denied. (Resp. Ex. 6.)

C.    Analysis

This petition can be summarized as a single claim that Petitioner was denied due process because the Board's decision was not supported by some evidence that he is currently dangerous. In conjunction with answering on the merits, Respondent asserts that Petitioner's claims are procedurally defaulted.

1.    Procedural Default

Respondent asserts that because Petitioner failed to attach adequate records to his superior court petition and the superior court denied the petition based on that failure as an independent and adequate state ground, this Court is barred from reviewing Petitioner's claims.

However, a denial based on People v. Duvall, 9 Cal. 4th 464,

United States District Court
For the Northern District of California

474 (1995), cited by the superior court in its denial (Resp. Ans. Ex. 2 at 2), is not irremediable and can be cured in a renewed petition. Cf. Gaston v. Palmer, 417 F.3d 1030, 1039 (9th Cir. 2005) (analyzing whether a state petition was "properly filed" and concluding that citations to Duvall and In re Swain, 34 Cal. 2d 300, 303-304 (1949) are more akin to a demurrer rather than a final ruling on the merits); Kim v. Villalobos, 799 F.2d 1317, 1319-1320 (9th Cir. 1986) (discussing "fair presentation" and explaining that a citation to In re Swain is a curable deficiency rather than an automatic preclusion of review).

Thus, because California law allowed Petitioner to file a new state petition remedying these deficiencies, by definition, Petitioner's claim is not procedurally barred. Cf. Johnson v. Lewis, 929 F.2d 460, 463 (9th Cir. 1991) ("If a federal constitutional claim can no longer be raised because of a failure to follow the prescribed procedure for presenting such an issue, however, the claim is procedurally barred"); Carey v. Sisto, 2009 WL 385777 (E.D. Cal.). Furthermore, Petitioner did file a new and original state petition in the California Supreme Court, which was summarily denied without citation. Thus, contrary to Respondent's assertion, Petitioner gave the state courts an opportunity to dispose of his claims on the merits.

Accordingly, Respondent's argument for procedural default is not well-taken and the Court will address Petitioner's claim on the merits.

        2.  Due Process

The Due Process Clause does not, by itself, entitle a prisoner to release on parole in the absence of some evidence of his or her

"current dangerousness." <u>Hayward v. Marshall</u>, 603 F.3d 546, 555, 561 (9th Cir. 2010) (en banc).  Under California law, however, "some evidence" of current dangerousness is required in order to deny parole.  <u>Id.</u> at 562 (citing <u>In re Lawrence</u>, 44 Cal. 4th 1181, 1205-06 (2008) and <u>In re Shaputis</u>, 44 Cal. 4th 1241 (2008)).  This requirement gives California prisoners a liberty interest, protected by the federal constitutional guarantee of due process, in release on parole in the absence of "some evidence" of current dangerousness.  <u>Cooke v. Solis</u>, 606 F.3d 1206, 1213-1214 (9th Cir. 2010).

When a federal habeas court in this circuit is faced with a claim by a California prisoner that his right to due process was violated because the denial of parole was not supported by "some evidence," the court analyzes whether the state court decision reflects "an 'unreasonable application'[] of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" <u>Hayward</u>, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); <u>see</u> <u>Cooke</u>, 606 F.3d at 1213.  California's "some evidence" requirement was summarized in <u>Hayward</u> as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness.  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

United States District Court
For the Northern District of California

1   <u>Hawyard</u>, 603 F.3d at 562 (quoting <u>Lawrence</u>, 44 Cal. 4th. at 1191,
2   1210-14); <u>see</u> <u>Cooke</u>, 606 F.3d at 1213-1214 (describing California's
3   "some evidence" requirement).

4       Because there is no reasoned state court opinion, this Court
5   conducts "an independent review of the record" to determine whether
6   the state court's decision was an objectively unreasonable
7   application of clearly established federal law.   <u>Plascencia</u>, 467
8   F.3d at 1198.

9       Here, a primary, though not exclusive, basis for the Board's
10  determination of parole unsuitability was the nature of the
11  commitment offense.  (2006 Tr. at 78.)  In <u>Lawrence</u>, the California
12  Supreme Court held that in cases

13          in which evidence of the inmate's rehabilitation and
            suitability for parole under the governing statutes and
14          regulations is overwhelming, the only evidence related to
            unsuitability is the gravity of the commitment offense,
15          and that offense is both temporally remote and mitigated
            by circumstances indicating the conduct is unlikely to
16          recur, the immutable circumstance that the commitment
            offense involved aggravated conduct does not provide
17          "some evidence" <u>inevitably</u> supporting the ultimate
            decision that the inmate remains a threat to public
18          safety.

19  <u>Lawrence</u>, 44 Cal. 4th at 1191 (emphasis in original); <u>see also</u>
20  <u>Cooke</u>, 606 F.3d at 1214 (finding California's "some evidence" rule
21  requires "more than the crime or its circumstances alone to justify
22  the Board's or Governor's finding of current dangerousness").  The
23  question then is whether any other factors for parole unsuitability
24  indicate that the cruel and callous nature of a petitioner's
25  commitment offense is still "probative" of the risk he poses to
26  public safety.  <u>Cooke</u>, 606 F.3d at 1214.

27      One of the bases upon which the Board deemed Petitioner
28  unsuitable for parole was that he had an unstable social history.

13

**United States District Court**
For the Northern District of California

(2006 Tr. at 78.)  However, the Board failed to identify any evidence supporting this conclusion except that he sold narcotics. (<u>Id.</u>)  In fact, while Petitioner has used drugs and alcohol in the past, (2001 Psychological Evaluation at 2), he currently does not use drugs, alcohol, or cigarettes, (2006 Tr. at 74).  Moreover, the record demonstrates that Petitioner's post-incarceration record includes continuous involvement in AA and NA.  Thus, that Petitioner had engaged in selling drugs prior to being incarcerated does not lead to a finding of current dangerousness.

In discussing his social history, Petitioner stated that he has four siblings and a mother still living.  (<u>Id.</u> at 30-31, 33.) He also reportedly has a seventeen or eighteen year old son whom he has never met.  (<u>Id.</u> at 33-34.)  In Petitioner's 2001 psychological report, the evaluator noted that Petitioner's "family relationships were poor in the past, but he says that they are good now.  One sister ran away from home because of drugs.  His siblings have had a variety of positions as secretaries and in managerial positions." (2001 Psychological Evaluation at 2.)  In fact, Petitioner's support letters came from family members.

Petitioner dropped out of high school mainly due to conflicts with his peers because he would get into fights.  (2006 Tr. at 28-29.)  At the hearing, Petitioner suggested that he engaged in fights because he was looking for attention, and he does not look for that kind of attention any longer.  (<u>Id.</u> at 29.)

Nothing in the record reveals an unstable social history that can be rationally connected to a finding that Petitioner is currently dangerous.  As the California Supreme Court explained, "due consideration of the specified factors [for parole

suitability] requires more than rote recitation of the relevant
factors with no reasoning establishing a rational nexus between
those factors and the necessary basis for the ultimate decision --
the determination of current dangerousness." <u>Lawrence</u>, 44 Cal. 4th
at 1210 (internal quotation marks omitted).  Although the Board may
base a parole denial on "immutable facts" like an unstable social
history, "some evidence will support such reliance <u>only</u> if those
facts support the ultimate conclusion that an inmate <u>continues</u> to
pose an unreasonable risk to public safety." <u>Id.</u> at 1221 (emphasis
in original).  No rational nexus links the immutable facts of
Petitioner's pre-offense "unstable social history" with his current
dangerousness.  Given the record as a whole, Petitioner's social
history does not provide "some evidence" of danger to others.

The second factor the Board appeared to rely upon in denying
parole was that Petitioner needed to "cope with stress in a
nondestructive manner" and to engage in "self-help." (2006 Tr. at
79.)  However, again, the Board did not identify any evidence
supporting this conclusion.  Petitioner excelled in his
participation in self-help programs.  He received numerous
laudatory chronos in AA, anger management, and the inmate
employability program; had been disciplinary free for almost ten
years; and was vice-chair of AA.  (<u>Id.</u> at 79-80.)  Accordingly,
this factor does not reasonably support a finding of current
dangerousness.  <u>See</u> <u>Cooke</u>, 606 F.3d at 1215.

The last factor the Board relied on, and seemingly the most
significant, was Petitioner's lack of insight into the crime.
(2006 Tr. at 81-82.)  Specifically, the Board indicated that it
needed to feel completely comfortable that Petitioner had

United States District Court
For the Northern District of California

"confronted all the aspects and all the activities of that night," and had thought about the opportunities he had to stop or disengage.  (<u>Id.</u> at 81.)  A prisoner's remorse or demonstrated understanding of the nature and magnitude of the commitment offense is one factor tending to indicate the prisoner is suitable for release.  15 Cal.Code Regs., tit. 15, § 2402(d)(3).  "Lack of insight," however, is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness. <u>In re Calderon</u>, 184 Cal. App. 4th 670, 690 (2010).  Further, the California Penal Code provides that the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."  Cal. Penal Code § 5011(b).

Contrary to the Board's conclusion, the record contains evidence of Petitioner's remorse and insight into the offense. Petitioner acknowledged that he did not feel threatened after the victim started to run from him and that he ran after the victim because he was always taught as a child to "get them before they get you." (2006 Tr. at 20, 55.)  Petitioner explained that, through self-help classes and programs, he has learned to think before he reacts and knows how different his perception of life has become.  (<u>Id.</u> at 21-22.)  Petitioner took responsibility for the victim's death (<u>id.</u> at 75) and understood that he hit the victim and engaged in fights pre-incarceration because he wanted to look "tough." (<u>Id.</u> at 75-76.)  Petitioner said, "Before it was just, I was just a kid trying to look tough.  I don't want to be tough no more.  I don't want to be out in a crowd.  I want to be just like the real men and enjoy the rest of my life and my families." (<u>Id.</u>

United States District Court
For the Northern District of California

at 76.)  Petitioner's psychological evaluation in 2001 reported that he "feels remorse for the family and doesn't know how to repay the family."  (Petition, Ex. D 2001 Psychological Evaluation at 4.) Although the Board believed Petitioner must have had more reasons for failing to disengage that he was not disclosing, the Board cannot deny Petitioner parole for disagreeing with its version of events.  See Cal. Penal Code § 5011(b).

This record contrasts with that in Shaputis, where the California Supreme Court upheld a parole denial based in part on Shaputis' failure to grasp the nature of his commitment offense. Although Shaputis stated that his conduct was "wrong" and that he felt "some remorse" for his crime, he still claimed that his wife's brutal murder was an "accident" and sought to minimize his responsibility.  In addition, recent psychological reports indicated that Shaputis' character remained unchanged and that he was "unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative programming."  Shaputis, 44 Cal. 4th at 1260 (internal quotation marks omitted).

Here, there simply was no reliable evidence showing that Petitioner failed to appreciate the significance of his offense or lacked remorse or insight into his role in the offense.

The Board mentioned that it was not relying on the 2005 psychological evaluation because of its inconsistencies. (2006 Tr. at 78-79.)  Because the report was disregarded, it was not found probative of the Board's determination that Petitioner was dangerous.  See Cooke, 606 F.3d at 1215.

At the time of the parole decision, Petitioner had served approximately sixteen years in state prison, more than six years

United States District Court
For the Northern District of California

past his minimum eligible parole date. "[A]fter these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." Lawrence, 44 Cal. 4th at 1211. As described above, there is strong evidence of Petitioner's rehabilitation and no other evidence of current dangerousness cited by the Board.

Therefore, pursuant to the standard announced in Hayward entitling a petitioner to habeas relief if the state court unreasonably applied California's "some evidence" requirement, the petition for a writ of habeas corpus in this case will be granted. See Hayward, 603 F.3d at 563 (citing 28 U.S.C. § 2254(d)(1)); see also Cooke, 606 F.3d at 1216.

III. Case number C 08-0474 CW

    A.    February 15, 2007 Board Hearing

    Petitioner had been incarcerated for approximately seventeen years at the time of his 2007 parole suitability hearing. Petitioner elected to discuss the commitment offense. The Board again questioned Petitioner about his motivation for running after the victim once the victim began to flee. (Transcript of 2007 Hearing (2007 Tr.) at 18.) Petitioner responded that he wasn't thinking, but merely reacting. (Id.) Petitioner acknowledged that he realizes now that the decision to chase after the victim was wrong. (Id. at 19.)

    With respect to his criminal history, Petitioner elaborated on prior encounters with law enforcement that the Board had not discussed in his 2006 parole hearing. Specifically, when

Petitioner was around sixteen or seventeen years old, he was arrested for carrying a gun which belonged to his father, and received counseling as a result. (Id. at 30-31.) Then, as discussed in his 2006 hearing, he was arrested for the sale of a controlled substance and receiving stolen property in February, 1989. (Id. at 28.) Ultimately, those charges were dropped when Petitioner plead guilty to the commitment offense. (Id. at 28-29.) Also in 1989, Petitioner had been charged with theft for use of an access card when his brother found a wallet near their house and Petitioner used the card. (Id. at 31-32.) Petitioner was convicted of petty theft and placed on two years informal probation. (Resp. Ex. C, Orange County Probation Department at 14; 2007 Tr. at 32-33.)

Since Petitioner's 2006 hearing, he had remained disciplinary-free. (Id. at 43.) He had also received at least five laudatory chronos for his participation in an Alternatives to Violence Project (AVP), where he was "an interactive participant radiating positive energy and exuberance," (id. at 47), and in AA, (id. at 47-48, 49, 50.) The Board read into the record five separate chronos written by prison staff vouching for Petitioner's good character. (Id. at 52-57.) Petitioner also presented many updated support letters. (Id. at 57, 58-74.) There was no updated psychological report.

Again, the Board denied parole. (Id. at 110.) The Board concluded that the commitment offense was "carried out in a very, very cruel and calloused manner in that the victim was clearly outnumbered." (Id.) The Board also concluded that Petitioner had a "history of unstable and tumultuous relationships with others,"

United States District Court
For the Northern District of California

referring to Petitioner's admission that he had sold drugs, associated with gang members, and supplied drugs to gang members. (<u>Id.</u> at 112.)  The Board mentioned Petitioner's prior arrest for sale of a controlled substance and receiving stolen property and stated that Petitioner had "failed previous grants of probation" and "failed to profit from society's attempts to correct his criminality."  (<u>Id.</u> at 113.)  The Board again dismissed the 2005 psychological report as inconclusive because of its contradictions.  (<u>Id.</u> at 113-114.)  The Board again stated that Petitioner needed to "continue to participate in documented self-help in order to face, discuss and cope with . . . stress and anger in a nondestructive manner" and that "[u]ntil progress is made, the prisoner continues to be unpredictable and a threat to others."  (<u>Id.</u> at 115.) Finally, the Board's main concern was about Petitioner's motivation to chase the victim once the victim started to run.  (<u>Id.</u> at 114-115.)  In fact, one Board member stated:

> I really, really needed to know from you why this happened, other than I was macho.  I needed to hear from you the truth.  And I'm not saying that you didn't give you the truth, but I struggled with how you could not be a part of a gang when you agreed to participate in this behavior with these other nine young men -- or other nine people.  So, I suggest that you really, really dig deep and think about what you did and your state of mind at that time.

(<u>Id.</u> at 118.)

   B.   State Court Decisions

   In 2007, Petitioner filed a state habeas petition in superior court.  In denying the petition, the state court concluded that there was "some evidence" to support the Board's denial.  (Resp. Ex. 2.)  The court relied on <u>In re Dannenberg</u>, 34 Cal. 4th 1061 (2005), and concluded that the Board did not abuse its discretion

**United States District Court**
For the Northern District of California

1  in denying parole.  (<u>Id.</u>)  The court determined that, because the

2  Board pointed to other factors beyond the minimum elements of the

3  commitment offense, i.e., that Petitioner could not give a

4  satisfactory explanation for his behavior and that he became

5  involved in an attack on an unknown and unarmed person, the Board

6  "was not required to engage in a further analysis."  (<u>Id.</u> at 3.)

7  The court therefore found it unnecessary for the Board, and thus

8  the court, to consider other suitability factors, and denied habeas

9  relief.  (<u>Id.</u> at 2-3.)

10       The California Court of Appeal and California Supreme Court

11  both denied Petitioner's subsequent state habeas petitions.  (Resp.

12  Exs. 4, 6.)

13       C.   Analysis

14       Petitioner's claims, again, can be summarized as a single

15  assertion that the denial of parole for a fourth time, based on

16  immutable factors, did not rest on "some evidence" of current

17  dangerousness and violated his right to due process.

18       The state court found it unnecessary to discuss all the

19  Board's reasons for denying parole, and unheld the denial of parole

20  based solely on the facts and circumstances of the commitment

21  offense.  In <u>Lawrence</u>, which was announced after the superior

22  court's decision here, the California Supreme Court addressed

23  whether the "some evidence" requirement can be met solely by the

24  circumstances of the commitment offense, stating that

25           to the extent our decisions in <u>Rosenkrantz</u> and
         <u>Dannenberg</u> have been read to imply that a particularly
26       egregious commitment offense <u>always</u> will provide the
         requisite modicum of evidence supporting the Board's or
27       the Governor's decision, this assumption is
         inconsistent with the statutory mandate that the Board
28       and the Governor consider all relevant statutory

> factors when evaluating an inmate's suitability for
> parole, and inconsistent with the inmate's due process
> liberty interest in parole that we recognized in
> Rosenkrantz.

Lawrence, 44 Cal. 4th at 1191 (emphasis in original); see also

Cooke, 606 F.3d at 1214 (finding California's "some evidence" rule

requires "more than the crime or its circumstances alone to

justify the Board's or Governor's finding of current

dangerousness"). Thus, the state court's decision approving the

Board's denial of parole based solely on the circumstances of the

commitment offense was an unreasonable application of California's

"some evidence" standard.

Here, however, the Board denied parole based on several

additional factors. First, the Board relied on Petitioner's

unstable social history and, in particular, his history of selling

drugs to gang members. The Court finds no evidence that

Petitioner's prior sales of drugs to gang members is probative of

current dangerousness. See In re Shipman, 185 Cal. App. 4th 446,

459 (2010) ("an inmate's unstable social history, like his

commitment offense, is an 'immutable' fact, and thus insufficient

by itself to prove unsuitability."). Considering the time that

has passed since Petitioner's incarceration, his past relationship

with gang members is unlikely to motivate his actions upon

release.

In fact, the evidence indicates that Petitioner does not have

"unstable or tumultuous relationships with others." Cal. Code

Regs., tit. 15, § 2402(c)(3). Numerous family members and friends

sent letters of support and offers of residency and employment,

evidencing Petitioner's stable relationships with people outside

of prison.  (2007 Tr. at 58-73.)   Thus the Court finds that
Petitioner's social history does not provide some evidence that he
is currently dangerous.

The Board also relied on Petitioner's prior criminal history.
While Petitioner's record is not pristine, there is no indication
that he committed previous violent crimes.   Cf. In re Scott, 133
Cal. App. 4th 573, 601-602 (2005) ("the fact that a prisoner has a
previous record of violence -- i.e., that '[t]he prisoner on
previous occasions inflicted or attempted to inflict serious
injury on a victim, particularly if the prisoner demonstrated
serious assaultive behavior at an early age' -- tends to show him
unsuitable for release; while the fact that he 'lacks any
significant history of violent crime' tends to show him suitable
for release on parole") (internal citations omitted).   Moreover,
Petitioner was nineteen years old at the time of the commitment
offense and seventeen years had passed from the time of the
commitment offense to the hearing.   During that time, Petitioner
had committed no serious rules violations involving violence and
had committed no serious rules violations at all for the previous
twelve years.

The Board's reliance on the immutable factor of Petitioner's
pre-incarceration criminal record is erroneous as the Board failed
to articulate a rational explanation as to why this immutable
factor continues to be probative of Petitioner's current
dangerousness.   Just as "mere recitation of the circumstances of
the commitment offense, absent articulation of a rational nexus
between those facts and current dangerousness, fails to provide
the required 'modicum of evidence,'" mere recitation of

United States District Court

For the Northern District of California

Petitioner's pre-incarceration record fails to provide the required modicum of evidence here. See Lawrence, 44 Cal. 4th at 1227. Accordingly, the Court finds that Petitioner's non-violent youthful criminal history is not probative of current dangerousness.

Next, although the Board stated that Petitioner needed to participate in more self-help studies in order to cope "with stress in a nondestructive manner," the record demonstrates that Petitioner had received at least five laudatory chronos for his participation and completion in AA and AVP since his previous parole hearing one year prior. There was no reliable evidence supporting the Board's conclusion. See Cooke, 606 F.3d at 1215.

Finally, the record does not support the Board's continued concern about Petitioner's lack of insight into why he committed his offense. As Petitioner stated in his 2006 hearing, he recalled that at the time of the commitment offense, everything happened quickly and he just "reacted" after the victim struck him and ran. (2007 Tr. at 19.) Petitioner explained that he realized he was the cause of the victim's death even though he did not know that someone was going to shoot the victim. (Id. at 22.) Petitioner said he wished he could "correct what went wrong," but understood that the only thing he could do now is recognize that he is no longer that same child and demonstrate that he is a changed person. (Id. at 22-23.)

Petitioner went on to talk about what he had learned, in going to classes and counseling, about himself, confrontation, and choices that he would make now. (Id. at 24.) He learned to walk away from confrontation and to think about what he would do if he

United States District Court
For the Northern District of California

were forced into such a situation. (Id.)  Petitioner explained

that he was housed in a dorm with 370 people all with their own

ways of doing things and he has learned to deal with disagreements

in a non-confrontational way in order to resolve those

disagreements. (Id. at 26.)

> Guys don't want to do things that, you know, the way
> that it should be done.  They want to do it their way.
> And I try to talk to them.  And I've learned after a
> while, talking to somebody even if they're mad, you
> have to come down to being a better result of getting
> things done the right way.  And that's what I've been
> trying to do. Like I said, every day I work, it's just
> like -- I know out there on the street is stressful,
> too, I imagine.  My brother tells me, my sisters tell
> me.  It's not easy there.  And I know that, but being
> in here isn't easy either dealing with nothing but
> convicts and people that don't have rational thinking.
> I try to be as rational in everything.  I'm not the
> smartest person in the world.  I'm not even close to
> being anything like that, but I try to think and take
> into consideration how this person thinks or how he's
> going to react. So I know how I should react.  And
> that's what I do every day at work.

(Id. at 27.)

In light of the record as a whole, the Board's conclusion that

Petitioner had poor insight into his crime and needed to tell the

"truth" as to his motive does not appear to be based on reliable

evidence.  See Pirtle v. California Board of Prison Terms, 611 F.3d

1015, 1025 (9th Cir. 2010) ("[t]he record contains no evidence that

contradicts [the] professional assessment [of the psychologist who

concluded the petitioner] was neither unstable [n]or potentially

dangerous"); Cooke, 606 F.3d at 1216 ("[w]hen habeas courts review

the 'some evidence' requirement in California parole cases, both

the subsidiary findings and the ultimate finding of some evidence"

must have reasonable factual support).

The Court therefore concludes that the state courts'

**United States District Court**
For the Northern District of California

1   determinations that the Board's denial of parole suitability was

2   supported by "some evidence" of current dangerousness was an

3   "'unreasonable application' of the California 'some evidence'

4   requirement, and was 'based on an unreasonable determination of the

5   facts in light of the evidence.'"  <u>Hayward</u>, 603 F.3d at 562-63

6   (citations omitted).  As a result, Petitioner is entitled to

7   federal habeas relief on his due process claim.

8                                CONCLUSION

9        The petitions for a writ of habeas corpus are GRANTED.  Within

10  thirty (30) days of the date of this order, the California Board of

11  Parole Hearings must set a parole date for Petitioner in accordance

12  with Section 3041(a) of the California Penal Code.  <u>See</u> <u>Pirtle</u>,

13  611 F.3d at 1025.  Within ten (10) days thereafter, Respondent must

14  file a notice with the Court indicating whether Petitioner was

15  released on parole.  The Court retains jurisdiction to enforce its

16  Order.

17       The Clerk of the Court shall terminate all pending motions,

18  enter judgment and close the file.

19       IT IS SO ORDERED.

20  Dated: 9/17/2010

21                              CLAUDIA WILKEN
                                United States District Judge

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

LEROY PAUL LUJAN,

     Plaintiff,

     v.

BEN CURRY et al,

     Defendant.
_____/

Case Number: CV08-00474 CW
CV09-00462CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 17, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Leroy Paul Lujan E-76840
Correctional Training Facility
P.O. Box 689 / East Dorm 8-Low
Soledad,  CA 93960-0689

Dated: September 17, 2010

Richard W. Wieking, Clerk
By: Nikki Riley, Deputy Clerk

**United States District Court**
For the Northern District of California

27